DR. ORLY TAITZ, ESQ

29839 SANTA MARGARITA, STE 100

RANCHO SANTA MARGARITA, CA 92688

PH 949-683-5411 FAX 949-766-7687

United States District Court
Southern District of Texas
FILED

AUG 1 5 2014

David J. Bradley, Clerk of Court

## US DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TAITZ, | ) | Case # 14-cv-00119 |
| V | ) | HONORABLE ANDREW S. HANEN PRESIDING |
| JOHNSON, ET AL | ) | |

## A MOTION FOR LEAVE OF COURT TO FILE A SUPPLEMENTAL BRIEF UNDER LOCAL RULE 6(D) WITH EVIDENCE SHOWING DEFENDANTS NOT EVEN GIVING NOTICES TO ILLEGAL ALIEN MINORS TO APPEAR AT DEPORTATION HEARINGS AND ALSO RELEASING 600 ILLIGAL ALIENS WITH A CRIMINAL RECORD

## ARGUMENT

Plaintiff contacted both counsel for the defense, however Counsel Colin Kiser is

out of town and she did not receive a response from the second counsel Daniel Hu,

whether he opposes the motion at hand.

**Local Rule 6(d) states**

D. After the motion, response, and reply are filed, the Court will not entertain any

additional or supplemental filings unless they are accompanied by a motion for

leave to file. The motion for leave to file must explain why the argument, evidence

or legal authority contained in the additional filing was not included in earlier

documents already in the record, and state a specific reason why the Court should

grant the motion for leave in the interest of justice.

On July 14, plaintiff filed an application for stay of trafficking of illegal aliens by

the defendants to California and elsewhere in the country and sought an order to

quarantine/keep in INS custody illegal aliens for two months, which is an

incubation period for a number of infectious diseases found among a number of

illegal aliens crossing U.S. borders. The plaintiff's application also sought a written

medical release, stating that such illegal aliens do not carry infectious diseases,

before they are released from quarantine, as well as criminal records on these

illegals from the countries of origin and a signed release from a judge that such illegal aliens are entitled to reside in the U.S. legally.

On August 1, this court issued an Order to Show Cause for the defense, to answer by August 11, why shouldn't the court rule in favor of the plaintiff. The defense responded on August 8 and the plaintiff filed a reply to the answer by the defense on the same day.

After the reply was filed, the plaintiff read an article titled **Government Has No Receipts for Thousands of Unaccompanied Alien Children**, which was published on the same day. Exhibit 1. The plaintiff did not have this information when she filed an application for stay and she did not have it when she filed her reply.

In the interest of justice, the court should allow filing this brief for the following reason. In their response, defendants claimed that they trafficked illegal alien minors to California and elsewhere in the country pursuant to Flores v Reno 85-cv-4544 USDC SD of CA. However, Flores stipulated agreement states:

**"Nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may** harm or neglect the minor **or fail to present him or her before the INS or the immigration courts when requested to do so."**

So, INS had to have some assurance, some affidavit from the U.S. citizen sponsor that this illegal alien minor will show up for his deportation hearing. National Review article below reveals that there are no receipts of notices to appear for deportation hearings for more than half of these minor illegal aliens released by the DHS.

DHS was supposed to have such receipts, which were supposed to show the names of these released illegal aliens, the names of their U.S sponsors, location, where they are going.   This revelation shows that the defendants only did not have any assurances that these illegal aliens will show up for their deportation hearings, they didn't even tell these illegal aliens to show up, they did not keep any track of who they are releasing and where these individuals are going. The government has been dumping these illegal aliens around the country, many were dumped at the Greyhound bus stations, without any information on them. As stated previously, many of these illegal aliens carry drug resistant Tuberculosis, measles, bacterial meningitis, scabies and lice, many belong to drug cartels and gangs and some are suspected terrorists. As stated previously, a number of Qurans, Muslim prayer rugs and Urdu –English dictionaries were found by Texas ranchers. Urdu, is a language spoken in Afghanistan, which is crawling with America hating Taliban terrorists and we may have another 9/11 in the works.

The above information weighs in favor of granting the application for stay

requested by the plaintiff, as it shows that adherence to *Flores v Reno* is just a

sham and defendants  flagrantly committed fraud on this court by claiming that

they are trafficking these illegals in furtherance of Flores v Reno requirements.

Further, these actions by the defendants make them criminally liable under

8 U.S. Code § 1324 – Bringing in and harboring certain aliens

**(a)** Criminal penalties

**(1)**

**(A)** Any person who—

**(i)** knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

**(ii)** knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

**(iii)** knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

**(iv)** encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

**(v)**

**(I)** engages in any conspiracy to commit any of the preceding acts, or

**(II)** aids or abets the commission of any of the preceding acts,

shall be punished as provided in subparagraph (B).

**(B)** A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—

**(i)** in the case of a violation of subparagraph (A)(i) or (v)(I) or in the case of a violation of subparagraph (A)(ii), (iii), or (iv) in which the offense was done for the purpose of commercial advantage or private financial gain, be fined under title 18, imprisoned not more than 10 years, or both;

**(ii)** in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, imprisoned not more than 5 years, or both;

**(iii)** in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) during and in relation to which the person causes serious bodily injury (as defined in section 1365of title 18) to, or places in jeopardy the life of, any person, be fined under title 18, imprisoned not more than 20 years, or both; and

**(iv)** in the case of a violation of subparagraph (A)(i), (ii), (iii), (iv), or (v) resulting in the death of any person, be punished by death or imprisoned for any term of years or for life, fined under title 18, or both.

**(C)** It is not a violation of clauses [1] (ii) or (iii) of subparagraph (A), or of clause (iv) of subparagraph (A) except where a person encourages or induces an alien to come to or enter the United States, for a religious denomination having a bona fide nonprofit, religious organization in the United States, or the agents or officers of such denomination or organization, to encourage, invite, call, allow, or enable an alien who is present in the United States to perform the vocation of a minister or missionary for the denomination or organization in the United States as a volunteer who is not compensated as an employee, notwithstanding the provision of room, board, travel, medical assistance, and other basic living expenses, provided the minister or missionary has been a member of the denomination for at least one year.

**(2)** Any person who, knowing or in reckless disregard of the fact that an alien has not received prior official authorization to come to, enter, or reside in the United States, brings to or attempts to bring to the United States in any manner whatsoever, such alien, regardless of any official action which may later be taken with respect to such alien shall, for each alien in respect to whom a violation of this paragraph occurs—

**(A)** be fined in accordance with title 18 or imprisoned not more than one year, or both; or

**(B)** in the case of—

**(i)** an offense committed with the intent or with reason to believe that the alien unlawfully brought into the United States will commit an offense against the United States or any State punishable by imprisonment for more than 1 year,

**(ii)** an offense done for the purpose of commercial advantage or private financial gain, or

**(iii)** an offense in which the alien is not upon arrival immediately brought and presented to an appropriate immigration officer at a designated port of entry,

be fined under title 18 and shall be imprisoned, in the case of a first or second violation of subparagraph (B)(iii), not more than 10 years, in the case of a first or second violation of subparagraph (B)(i) or (B)(ii), not less than 3 nor more than 10 years, and for any other violation, not less than 5 nor more than 15 years.

Additionally, plaintiffs violated 18 U.S.C. 2381:

" Whoever, owing allegiance to the United States, levies war against them or **ADHERES TO THEIR ENEMIES, GIVING THEM AID AND COMFORT WITHIN THE UNITED STATES OR ELSEWHERE**, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined under this title but not less than $10,000; and shall be incapable of holding any office under the United States."(emphasis added).

Not only defendants violated 8 USC §1324 by harboring and trafficking illegal aliens, but they also violated 18 USC §2381 by giving aid and comfort to the enemy by releasing Mexican and Central American cartel members, gang members and suspected terrorists from custody without as much as a receipt for a notice to appear for a deportation hearing, without any record of the names of these illegals, names of their U.S. sponsors and the destination where they are going. The defendants' behavior becomes even more egregious and more criminally culpable, when they not only release these illegals, but they spend millions of tax payer dollars to traffic

them all over the nation: to California, to East Coast, and as far as Alaska.

Moreover, evidence provided in this case can and should be forwarded by this code to the federal grand jury under

18 U.S.C. §3332 (a)

(a) It shall be the duty of each such grand jury impaneled within any judicial district to inquire into offenses against the criminal laws of the United States alleged to have been committed within that district. **Such alleged offenses may be brought to the attention of the grand jury BY THE COURT** or by any attorney appearing on behalf of the United States for the presentation of evidence. Any such attorney receiving information concerning such an alleged offense from any other person shall, if requested by such other person, inform the grand jury of such alleged offense, the identity of such other person, and such attorney's action or recommendation. (emphasis added)

In the Matter of In re GRAND JURY APPLICATION. No. 85 Crv. 2235 (VLB) US DC for the SD of NY is the precedent of such direct referral by the judge to the federal grand jury of the evidence of offenses against the criminal laws of the U.S.

## FRAUD IN THE ANSWER BY THE DEFENSE, IN ALLEGATIONS THAT ILLEGAL ALIENS WERE RELEASED IN ORDER TO SAVE COSTS AND CONCENTRATE ON CRIMINALS, AS DEFENDANTS RELEASED OVER 600 ILLEGAL ALIENS WITH THE CRIMINAL RECORD.

An August 12, 2014 article by Sharyl Attkisson, in security news, provides an account of the report by the Attorney General of the Department of Homeland Security, led by the Defendant, Jeh Johnson. This report shows that DHS released from custody over 600 illegal aliens with criminal records. This report was not

available when the original application was filed. It shows that defendants committed fraud on this court by and through their allegations and claims that they released and trafficked illegal aliens around the country in order to save funding and concentrate on illegal aliens, who committed crimes. This report shows that they released 600 illegals with criminal records in the U.S. and untold number of illegals with criminal records in the countries of origin. Further, DHS could deport these illegals. Instead, they released them into the general population, endangering the public with rapists, thieves, burglars and murderers roaming the streets, while spending millions of dollars trafficking illegals all over the nation.

This additional evidence is relevant and should be allowed by the court in the interest of justice, and it weighs in favor of granting an application sought by the plaintiff.

Additionally, this evidence, as well as evidence in Exhibit 1, should be allowed by the court to be filed, as this evidence shows that the court not only should grant the application for stay, but also should, under 18 USC § 3332, forward to the federal grand jury evidence of offences against criminal laws of the U.S. committed by the defendants.

Conclusion

Based on all of the above, this court should grant a leave of court   to file this supplemental brief.

Respectfully,

Dr. Orly Taitz, ESQ

08.12. 20 14

# EXHIBIT 1

## Government Has No Receipts for Thousands of Unaccompanied Alien Children
Government records show a discrepancy in apprehensions and court receipts.

By Ryan Lovelace

The Department of Justice does not have receipts for more than half of the unaccompanied alien children apprehended at the southwest border by Border Patrol since the start of fiscal year 2013, government records show.

U.S. Customs and Border Protection data show more than 85,000 total apprehensions of unaccompanied alien children during fiscal year 2013 and fiscal year 2014 through June. Information from the same time period provided to NATIONAL REVIEW ONLINE by the DOJ's Executive Office for Immigration Review shows 41,592 total receipts marked as juvenile in immigration courts. Kathryn Mattingly, spokesperson for EOIR, tells NRO the receipts refer to new Notices to Appear (NTA) — the document the Department of Homeland Security uses to charge an illegal immigrant with being removable from the United States.

EOIR has recorded 20,814 receipts marked as juvenile in fiscal year 2014 as of June 30, but Border Patrol recorded 57,525 apprehensions of unaccompanied alien children during the same time frame. This means immigration courts have receipts for fewer than four out of every ten unaccompanied alien children apprehended by Border Patrol this fiscal year. Mattingly said EOIR stands behind the numbers of receipts it has recorded, but would not speak about the difference between the number of juvenile receipts and CBP's apprehension data.

Advertisement

Within DHS, Immigration and Customs Enforcement, U.S. Customs and Border Protection, and U.S. Citizenship and Immigration Services have the authority to charge unaccompanied alien children. An ICE spokesperson declined to comment on this story, and a USCIS spokesperson referred questions to DHS, which did not respond to requests for comment. A CBP spokesperson responded to NRO's requests in an e-mail with a link to apprehension data publicly available on CBP's website but did not provide comment about the number of NTAs issued to illegal-immigrant children.

Jessica Vaughan, director of policy studies at the Center for Immigration Studies, tells NRO it is difficult to determine how much of the discrepancy in apprehensions and receipts appears deliberate and how much resulted because federal officials were overwhelmed with work. "But I think it's really willful negligence on the part of DHS leadership to allow this already dysfunctional system to become even more overwhelmed," she says. "It's just like deliberate chaos."

Immigration courts have completed only 9,630 cases marked as juvenile in fiscal year 2014, government data show, despite more than 20,000 juvenile receipts recorded and more than 57,000 UAC apprehensions made in fiscal year 2014 as of June 30, 2014. Mattingly tells NRO it's important to remember that some of the juvenile cases completed this year may have been first brought in previous years. Not all of the cases completed in fiscal year 2014 were brought in fiscal year 2014.

Part of the discrepancy between the numbers of apprehensions and receipts in the month of June 2014 may be attributable to a new policy implemented by ICE that same month. The policy makes ICE attorneys wait to file immigration-court proceedings until after the Department of Health and Human Services notifies ICE that the unaccompanied juvenile has been placed with a sponsor, or 60 days elapse, ICE spokesperson Virginia Kice has previously told NRO. She said the policy is intended to free up immigration courts' dockets by eliminating the need for change of venue hearings. While the new policy could explain some of the discrepancy for June 2014, it does not apply to the discrepancy for the previous months of fiscal year 2014 and for the entirety of fiscal year 2013.

No federal official whom NRO contacted or spoke with provided an explanation as to why the discrepancy exists among apprehensions of unaccompanied alien children and receipts for juveniles.

— *Ryan Lovelace is a William F. Buckley Jr. Fellow at the Nati http://www.nationalreview.com/article/385016/government-has-no-receipts-thousands-unaccompanied-alien-children-ryan-lovelaceonal Review Institute.*

**EXHIBIT 2**

SECURITYNEWS

# Obama Administration Released Over 600 Illegal Immigrants With Criminal Convictions

Sharyl Attkisson   @SharylAttkisson                    63 comments



*During the three weeks leading up to sequestration, ICE released hundreds of immigrants who had criminal convictions. (Photo: Alex Garcia/Chicago Tribune/MCT)*

More than 600 convicted criminals, including felons, were among thousands of illegal immigrants freed under the Obama administration in advance of 2013 budget cuts mandated under sequestration.

That's according to a new report today from the inspector general for the Department of Homeland Security.

***The Obama administration released 2,226 immigrant detainees, 617 of whom had criminal convictions.***

According to the IG's report, at least two-dozen "aliens" were released by Immigration and Customs Enforcement even though they were in a "mandatory detention category." (After an internal review, ICE later redetained them.)

The report provides a scathing portrayal of budget mismanagement and flawed processes at the highest levels inside the nation's immigration enforcement agency.



*During the three weeks leading up to sequestration, from Feb. 9 to March 1, ICE released 2,226 immigrant detainees, including more than 600 with criminal convictions. (Photo: Keith Myers/Kansas City Star/MCT/Newscom)*

**Politically Motivated Decisions?**

The atmosphere leading up to sequestration in early 2013 was politically charged. President Obama claimed the automatic budget cuts would hurt the economy, health care and emergency responders, and that federal prosecutors would have to "let criminals go."

Republicans accused the administration of trying to create the appearance of a crisis by making high-profile cuts they claimed were unnecessary, such as halting White House public tours and mass-releasing illegal immigrants.

During the three weeks leading up to sequestration, from Feb. 9 to March 1, ICE released 2,226 immigrant detainees—617 of whom had criminal convictions. Approximately 1,450 were freed the last weekend before sequestration. The field offices that released the most criminal convicts include Phoenix, Houston, Atlanta and Chicago.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

### Detainee Releases by Field Office



*Source*: OIG Analysis in ENFORCE Database Using Alien Numbers Provided By ICE.

*Chart: Inspector General for the Department of Homeland Security Report, p. 37*
**'Sharp and Immediate Reduction'**
It was Radha Sekar, ICE's chief financial Officer, who decided on the "sharp and immediate reduction in detention bed space," according to the IG. The report did not describe other officials or processes involved in approving and implementing Sekar's decision.

The IG said that in the months prior to sequestration, ICE officials responsible for enforcement and removing aliens repeatedly asked Sekar for information on available funding but did not

receive it. ICE was strapped by a stark increase in illegal immigrant apprehensions and had not developed contingency plans to address its budget shortfall.

***"The publicized releases occurred the weekend before sequestration ... generating speculation that the releases were improperly [politically] motivated."***

About a week before sequestration, Sekhar notified the White House Office of Management and Budget of ICE's funding problem and requested $22 million. But ICE inexplicably moved forward with the mass releases without waiting to hear whether the White House would provide the requested funds that would make the releases unnecessary.

"We were not able to determine why ICE executive leadership did not wait for OMB to make a decision on releasing additional funding," stated the IG report.

Further, ICE's instructions to release illegal immigrants over a weekend meant tax dollars were spent to pay overtime for field officers and, in 23 out of 24 field offices, it meant ICE attorneys did not have the opportunity to review cases before release.



*After the Associated Press reported in March 2013 that the Obama administration had released more than 2,000 immigrants over a three-week period, Homeland Security Chief Janet Napolitano said the story was 'not really accurate.' (Photo: James Tourtellotte/Creative Commons)*

**Misinformation Provided to Congress and the Public**

When the media and Congress began asking questions about the controversial releases in February and March of 2013, the IG says ICE executive leadership rushed answers and, in doing so, gave "inaccurate" information to Congress and the public.

In March 2013, when the Associated Press reported the administration had released more than 2,000 immigrants over a three-week period, Homeland Security Chief Janet Napolitano stated the AP story was "not really accurate" and that it had developed "its own mythology."

"Several hundred [releases] are related to sequester, but it wasn't thousands," Napolitano stated incorrectly on March 4, 2013.

***Housing an average 34,000 illegal immigrant detainees costs the U.S. $122 per bed, a total of $4.15 million a day, for an annual cost of $1.5 billion.***

Nine days later, ICE director John Morton testified to Congress that his agency had, indeed, "released 2,228 aliens" (later revised to 2,226).

"We were trying to live within the budget that Congress had provided us," Morton said, denying any political motivations. "This was not a White House call. I take full responsibility."

That much appears to be true. Today's IG report states, "We obtained no evidence ICE sought or received guidance about the timing or nature of the detainee budgetary releases from [Napolitano] or the Executive Office of the President."

Moreover, according to the report, ICE attorneys reviewed the releases and concluded the agency made reasonable decisions given the short time frame.



*President Obama claimed that federal prosecutors would have to 'let criminals go' because of budget cuts. (Photo: Mandel Ngan/Newscom)*

**Problems Persist**

Despite the debacle, the IG has determined:

- ICE still has no effective strategy to manage its detention budget.
- ICE's ability to track expenditures and available funding has not improved.
- ICE has not improved communication or transparency with key stakeholders.

Homeland Security officials told the IG they still have difficulty obtaining sufficient information from Sekar to conduct adequate oversight, even though ICE falls under Homeland Security's supervision.

"ICE must develop a transparent budget process, delegate detention management functions to field offices, and engage Congress to fund detention bed space fully with multiple year or no year appropriations," concluded the IG.

Sens. Tom Coburn, R-Okla., and John McCain, R-Ariz., requested the IG review.



*Sens. Tom Coburn, R-Okla., and John McCain, R-Ariz., requested the IG review. (Photo: Pete Marovich/ZUMAPRESS.com/Newscom)*

*http://dailysignal.com/2014/08/12/obama-administration-released-600-illegal-immigrants-criminal-convictions/*

I, Lila Dubert, served the defendants with attached pleadings via first class mail on 08.12.2014