DR. ORLY TAITZ, ESQ

29839 SANTA MARGARITA, STE 100

RANCHO SANTA MARGARITA, CA 92688

PH 949-683-5411 FAX 949-766-7687

United States District Court
Southern District of Texas
FILED

OCT 2 4 2014

David J. Bradley, Clerk of Court

## US DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| TAITZ, | ) | Case # 14-cv-00119 |
| V | ) | HONORABLE ANDREW S. HANEN PRESIDING |
| JOHNSON, ET AL | ) | |

### SUPPLEMENTAL APPLICATION FOR STAY DUE TO NEW EVIDENCE

### SUMMARY OF THE APPLICATION

In the past few days the Chairman of the House Committee on the Judiciary, Chairman of House sub-committee for Immigration, members of the Senate committee on the Judiciary, members of the US Congress, who are also doctors and health care providers, submitted demands to defendant Obama to institute under 8 U.S.C. 1182(f) and under Section 212(f) of the Immigration and Nationality act a ban on travel to the US on all individuals from Liberia, Sierra Leon and Guinea until the end of the deadly Ebola epidemic and quarantine of the

U.S. citizens, who visited those countries. In response defendant Obama by and through Secretary of Homeland Security Jeh Jonson, instituted a partial ban, whereby he banned individuals from aforementioned countries from entering the U.S. through all ports of entry aside from five ports of entry. By doing so, defendants de facto acknowledged that they have jurisdiction to ban entrance to the U.S. to individuals from specific regions. Due to this development, plaintiff is seeking an amended STAY, whereby the court is asked for a more narrow STAY/Injunction/Writ of Mandamus to simply extend current partial ban to five remaining ports of entry and convert the partial ban into a full ban. This is requested, as taking temperature of the passengers in those five ports of entry does not prevent individuals, who are infected and in an incubation period, to enter the U.S. and infect US citizens, particularly health care providers, like the plaintiff herein. During the incubation period patients carry the virus, but do not run fever yet, as the concentration of virus in their body is not high enough to cause fever. Due to the fact that every day 150 individuals, possibly exposed to Ebola, arrive in the U.S. and there is still a week prior to October 29th hearing, plaintiff asks the court to issue the STAY as soon as possible, prior to the hearing, as it would stop some 1,050 individuals from Ebola hot zone from arriving to the U.S. by October 29th, many of these individuals can be "Thomas Duncans", meaning Ebola virus carriers. Additional information, which became public only on October 22, 2014, is the fact that defendants defrauded this court, the US Congress and the public by stating that illegal aliens with criminal record are not released from federal custody. New information obtained by the USA Today (Exhibit 7) shows that illegal aliens with serious criminal charges, such as kidnappings, homicide, drug trafficking and sexual assaults were released, which weighs in favor of previously requested quarantine not only to ascertain whether these illegal aliens carry infectious diseases, but also for the purpose of checking their criminal record.

## STATEMENT OF FACTS

Plaintiff in this case, is Dr. Orly Taitz, ESQ, who is a doctor of dental surgery, providing care to immigrants under a number of government programs. She and her assistant were infected with an upper respiratory disease after treating a

number of such immigrants, who appeared in the office with a persistent cough and upper respiratory disease. She had to go through X rays, lab tests, doctors' appointments and was told to use an oxygen positive pressure machine at night for the rest of her life due to reduced oxygen in blood. She, as a number of other similarly situated individuals, health care providers, is at risk of contracting a number of infectious diseases from such immigrants, which includes Enterovirus D-68, drug resistant Tuberculosis and deadly Ebola. Ebola is currently raging in Western Africa, in Liberia, Sierra Leon and Guinea, where there are now nearly 5,000 confirmed deaths from the disease. WHO estimates that the true numbers of dead are three times higher, standing at 15,000, as there is underreporting and there is a stigma against Ebola and often death certificates are mislabeled (Exhibit 4 WHO report on Ebola). "Among the thousands of cases are 443 health care workers, 244 of whom have died. The WHO said it was undertaking extensive investigations to determine why so many had caught the disease." (Exhibit 4). So far there is no explanation how 443 health workers, covered head to toe, contracted Ebola. In the U.S., two nurses, Nina Pham and Amber Vinson, contracted Ebola from an immigrant from Liberia, who did not run fever, when he arrived in the US, and was not red flagged at this arrival. In Spain, a nurse, Teresa Romero, got infected with Ebola as well. All of these nurses wore protective gear. Currently, 13,500 citizens of Liberia, Sierra Leon and Guinea hold US visas. Half of these visas, 6,398 in all, were issued in the last six months, when the epidemic was already raging and other nations were already banning travel. Instead of suspending visa process for aforementioned countries, Mr. Obama streamlined the process, expediting new visas (Exhibit 5), stayed deportation of illegal aliens from Liberia, sent 3,900 US soldiers to the region without any protective gear and is currently planning to bring to the U.S. for treatment individuals infected with Ebola.

Some 30 nations around the world instituted a complete travel ban from the Ebola affected region. WHO finds that the number of infected individuals doubles every 3 weeks and is expected to reach 1.5 million in January of 2015. Current mortality is 70%. Safe treatment of Ebola requires Highest Level 4 risk full isolation units. In the US there are only 22 such beds in only four hospitals. The total population of Liberia is 4 million. More than half of Ebola cases are in Liberia. It means that by January most of Liberians will have some contact with Ebola patients. By January, when expected number of infections reaches 1.5 million, the daily number of 150 arrivals from the area is expected to go up significantly and the number of infected and exposed individuals arriving in the U.S. is expected to grow exponentially. U.S. cannot accept the risk of Ebola epidemic with only 22 full

containment bends in the nation and thousands arriving from Ebola region every month.

On October 16, 2014 Bob Goodlatte, Chair of the House Committee on the Judiciary, and Trey Gowdy, Chair of the House subcommittee on immigration, wrote to defendant Obama (Exhibit 1), seeking under 8 USC 1182 (f) a ban on travel to the US of any foreign nationals, who visited Liberia, Sierra Leon and Guinea in the past 2 months. They argued that Obama previously instituted such ban on individuals who violated human rights. It made sense to institute such ban on individuals who are likely to transfer a deadly disease. They, also, quotes the latest polls showing that two thirds of American citizens or 67% support such ban on travel. On October 17 seven members of the Senate Judiciary committee sent a letter to defendant Obama seeking the same ban on travel from the same West African countries.(Exhibit 2). They wrote: "We couldn't agree more that an Ebola epidemic is a national security issue, and a threat to global security. And, we couldn't agree more with the American people that a travel ban must be put in place to protect our homeland and reduce any spread of the virus.

According to the officials of the State Department, between March 1, 2014 and September 27, 2014, a total of 6,398 visas were issued to nationals of the following countries; 3,135 for Liberians, 1,472 for Sierra Leoneans, and 1,791 for Guineans. Meanwhile, according to international SOS, dozens of countries, including in Africa-have instituted travel and entry restrictions." They sought under 212(f) of the Immigration and Nationality act a ban on travel and moratorium on visas for Liberia, Sierra Leon and Guinea.

This was followed by yet another letter coming from members of Congress, who are medical providers as well: doctors, dentists and nurses, seeking the same ban on travel. (Exhibit3).

Upon these requests, defendant Obama by and through defendant Jeh Johnson, Secretary of Homeland Security, instituted a partial travel ban to all individuals from Liberia, Guinea and Sierra Leon to all ports of entry in the US, aside from 5 airports: Hartsfield-Jackson Atlanta International airport, New Jersey Newark International airport, Dulles International airport in DC, John F. Kennedy International airport in New York and Chicago O'Hara International airport

(Exhibit 6). Travelers have their temperature checked in those airports, however ones, who are in incubation period and do not run fever, are allowed in the U.S., which represents a threat of epidemic.

## ARGUMENT

Plaintiff incorporates by reference all prior paragraphs as well as all prior pleadings in this case, including, but not limited, complaint, first amended complaint, supplemental briefs and an opposition to motion to dismiss, as if fully pled herein.

What is different now from prior pleadings, is the fact that defendants acknowledged their ability to ban travel under 8 USC 1182(f) and under Section 212(f) of the Immigration and Nationality act in both prior ban instituted by Obama in 2011 against individuals convicted in violation of human rights (Presidential Proclamation, Suspension of Entry as Immigrants and Non-immigrants of Persons Who Participate in Serious Human Rights and Humanitarian Law Violations and other Abuses, Aug 4, 2011) and October 21, 2014 ban on citizens from Liberia, Sierra Leon and Guinea from entering at any ports of entry in the US aside from 5 aforementioned airports. Until October 21st defendants refused to institute any ban. On October 21 they instituted a partial ban and plaintiff moves this court to extend this partial ban to a full ban.

Plaintiff is seeking for this court to extend this partial ban to a full ban and stay travel to the remaining five airports with the goal of stopping proliferation of Ebola in the US, which has 70% death rate and Health Care providers, such as the plaintiff, are more affected than others.

As shown in the recent decision by the Fifth Circuit granting a stay in the Voter ID case *Voting for America, inc v Andrade* 488 Fed.Appx. 890, Fifth Circuit looks at four parameters:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;

(2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) where the public interest lies. Plaintiff satisfied all four.

Plaintiff is likely to succeed on the merits, as she provided competent plausible evidence supported by an expert opinion (Exhibit 1 to FAC and Exhibit 1 to Opposition to Motion to Dismiss, Affidavit by Epidemiologist Vera Dolan) that she was harmed by the actions by the defendants and she is in imminent danger and under an ongoing threat of further injury in the form of infection with serious

deadly diseases, which includes Enterovirus, Tuberculosis and Ebola. Plaintiff has shown that she, as a medical provider, as a doctor working with immigrants, will be <u>irreparably harmed</u> by continuous exposure to deadly diseases, if the stay is not granted. Plaintiff will be infected with a deadly disease. PPE (Personal protective equipment) needed to treat Ebola patients is prohibitively expensive and it would bankrupt any small health care provider to try to purchase a full protective gear suit with a separate oxygen supply, which needs to be replaced after every patient. Further, PPE provides an extremely limited dexterity, which makes it impossible to provide to patients necessary dental treatments, which require high dexterity. It shows that the plaintiff does not have a viable alternative to required relief. Defendants did not show any injury whatsoever to any other parties interested in the proceedings. Moreover, individuals exposed to Ebola, actually will have a higher probability to find necessary blood plasma donors in their countries of origin rather than the U.S.

As an example, Liberian immigrant Thomas Duncan died, as there were no Ebola survivors in the U.S., who could donate blood to him. U.S. doctor, Kent Brantley, survived Ebola after he had a blood transfusion from an Ebola survivor in Liberia. Convalescent blood-plasma contains Ebola specific antibodies. Transfusion of blood-plasma gives the infected patient a passive immunity. Antibodies from the donor bind Ebola antigen and neutralize it. In Africa there are as many as 4,500

survivors, who are potential donors. In U.S. there are only a couple Ebola survivors. When Duncan needed convalescent plasma transfusion, Dr. Kent Brantley, who donated to 3 other individuals, revealed that he cannot donate to Duncan, as he is blood type A+ and Duncan is B+. It was announced that the only other Ebola survivor in the U.S. at a time, Nurse Nancy Writeball, was not a match as well. This is an important reason, why individuals exposed to Ebola, have a better chance of getting convalescent plasma in the countries of origin. Other treatments are only experimental and drugs like ZMapp actually represent Ebola infected convalescent mice humanized antibodies, which are inserted in Tobacco plants through a vector and harvested. There is a great shortage of medicine like ZMapp and ultimately convalescent plasma transfusions from a human survivor might be a safer alternative than a ZMapp, which represents monoclonal antibodies from other species, which went through a process of humanization and harvesting in yet another form of species. In the long run such drugs may cause side effects, delayed side effects or second generation side effects.  Lastly, and most importantly, there is a great public interest in granting the stay and protecting the U.S. citizens from deadly epidemics, such as Ebola, Tuberculosis, Enterovirus D68 and others. U.S. has only 22 full isolation beds in only 4 hospitals: CDC unit at Emory University, NIH unit in Bethesda, MD, Nebraska Hospital in Omaha, Nebraska and another unit in Missoula, Montana. With 4,500 individuals coming

to the U.S. from Ebola hot zone every month, some are bound to carry the virus and the number of patients can quickly exceed 22, a total number we can treat safely and competently in isolation units. This exposes the public and particularly the health care providers like the plaintiff herein to the risk of infection with a deadly disease. In Nigeria an American-Liberian dual citizen Patrick Sawyer, flying to U.S. via Lagos, Nigeria, infected 20 people with Ebola and 8 of them died. Among the dead is the doctor, as well as nurses and first respondents, who treated Sawyer. In U.S. one passenger flying from Liberia, Thomas Duncan, infected two nurses. Every day, with 150 people arriving from the hot zone, there is a real threat of infection for medical professionals, particularly ones, who like the plaintiff, routinely treat immigrants. A new study in medical publication, Lancet, predicts that 3 infected individuals per month will fly out of the region and the number will grow as epidemic spreads. "As the outbreak grows, we will be seeing more international exportations of Ebola," said Dr. Kamran Kahn of St. Michael's Hospital in Toronto, the study's senior author." "There are more and more cases of Ebola every week so the risk of exportation is also increasing every week," said Benjamin Cowling of the School of Public Health at the University of Hong Kong, who co-authored a commentary.http://www.sfgate.com/news/article/If-no-checks-more-Ebola-cases-might-leave-Africa-5836727.php  Further, there is an enormous financial cost to an

Ebola epidemic. With only one infected individual, Liberian immigrant, Thomas Duncan, 125 people were quarantined in Texas and a 100 in Ohio, after a nurse, infected by Duncan, travelled to Ohio. Further, the whole cruise ship with 4,633 individuals on board, had to return from Belize to Galveston, Texas, after it was found that a lab technician, who handled Duncan's blood samples, was on board. It is noteworthy, that neither Belize, nor Mexico were willing to allow this ship to dock, knowing that an individual possibly exposed to Ebola, was on board, yet defendants herein continuously allow individuals possibly exposed to Ebola to travel to the U.S. All of the above shows that there is a great public interest in granting the stay, as requested by the plaintiff.

Additional information, which became public only on October 22, 2014, is the fact that defendants defrauded this court, the U.S. Congress and the public by stating that illegal aliens with criminal record are not released from federal custody. New information obtained by the USA Today (Exhibit 7) shows that illegal aliens with serious criminal charges, such as kidnappings, homicide, drug trafficking and sexual assaults were released, which weighs in favor of previously requested quarantine not only to ascertain whether these illegal aliens carry infectious diseases, but also for the purpose of checking their criminal record.

## CONCLUSION

Supplemental application for STAY should be granted

Respectfully,

/s/ Dr. Orly Taitz, ESQ

10.22.2014

I, Lila Dubert, attest that a true and correct copy of the attached pleadings was served on the defendants by first class mail on 10.23.14.

Signed  Lila Dubert