BOB GOODLATTE, Virginia
CHAIRMAN

F. JAMES SENSENBRENNER, JR., Wisconsin
HOWARD COBLE, North Carolina
LAMAR SMITH, Texas
STEVE CHABOT, Ohio
SPENCER BACHUS, Alabama
DARRELL E. ISSA, California
J. RANDY FORBES, Virginia
STEVE KING, Iowa
TRENT FRANKS, Arizona
LOUIE GOHMERT, Texas
JIM JORDAN, Ohio
TED POE, Texas
JASON CHAFFETZ, Utah
TOM MARINO, Pennsylvania
TREY GOWDY, South Carolina
RAUL R. LABRADOR, Idaho
BLAKE FARENTHOLD, Texas
GEORGE HOLDING, North Carolina
DOUG COLLINS, Georgia
RON DeSANTIS, Florida
JASON SMITH, Missouri
VACANCY

ONE HUNDRED THIRTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–3951
http://www.house.gov/judiciary

JOHN CONYERS, JR., Michigan
RANKING MEMBER

JERROLD NADLER, New York
ROBERT C. "BOBBY" SCOTT, Virginia
ZOE LOFGREN, California
SHEILA JACKSON LEE, Texas
STEVE COHEN, Tennessee
HENRY C. "HANK" JOHNSON, JR., Georgia
PEDRO R. PIERLUISI, Puerto Rico
JUDY CHU, California
TED DEUTCH, Florida
LUIS V. GUTIÉRREZ, Illinois
KAREN BASS, California
CEDRIC L. RICHMOND, Louisiana
SUZAN K. DelBENE, Washington
JOE GARCIA, Florida
HAKEEM S. JEFFRIES, New York
DAVID CICILLINE, Rhode Island

October 16, 2014

The Honorable Barack Obama
President of the United States
1600 Pennsylvania Ave., NW
Washington, DC 20500

Mr. President,

We write regarding your solemn duty as the President of the United States to take every step possible to protect the American people from danger. Specifically, we urge you to use authority granted to you by Congress in the Immigration and Nationality Act to prohibit foreign nationals who were recently present in an Ebola-ravaged country, from entering the United States.

8 U.S.C. 1182(f) states "[W]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he deems to be appropriate."

You utilized this provision in August 2011, "to restrict the international travel and to suspend the entry into the United States, as immigrants or nonimmigrants, of certain persons" who participated in serious human rights and humanitarian law violations.[1] Preventing Americans from contracting Ebola, which the World Health Organization (WHO) notes "has a death rate of up to 90%" and has already killed at least 4,484 people in Guinea, Liberia and Sierra Leone, is every bit as important as preventing human rights abusers from entering the United States.[2]

---

[1] Presidential Proclamation, *Suspension of Entry as Immigrants and Nonimmigrants of Persons Who Participate in Serious Human Rights and Humanitarian Law Violations and Other Abuses*, Aug. 4, 2011.
[2] World Health Organization, *"Frequently Asked Questions on Ebola virus disease,"* http://www.who.int/csr/disease/ebola/ebola-faq-en.pdf?ua=1, Updated Aug 7, 2014.



The Honorable Barack Obama
Page Two
October 16, 2014

While Ebola is not transmittable until a victim develops symptoms, the WHO notes that the incubation period can be 42 days or longer and that certain methods of Ebola transmission can continue for as long as seven weeks after a patient's recovery.[3] Therefore we urge that your use of 8 U.S.C. 1182(f) cover any foreign national who was present in a country with widespread and intense transmission of Ebola within the two months prior to desired travel to the U.S. Such a travel restriction can and should be temporary, with the moratorium lifted when the Ebola outbreak in West Africa, and any other countries with a subsequent outbreak, is controlled.

We have listened with interest to the arguments articulated by officials within the Administration in opposition to a ban on travel from affected countries. Unfortunately, such arguments seem to have little, if any, merit. And a growing number of Americans agree. In fact an October 14, 2014, ABC News/Washington Post poll showed that 67% of Americans surveyed said they would support "restricting entry to the United States by people who've been in affected countries."

Use of 8 U.S.C. 1182(f) is not only reasonable at this point, but is prudent and necessary to help prevent additional Ebola cases in the U.S. It will also help begin to turn around Americans' large-scale lack of confidence that the Federal government is doing everything it can to protect them from Ebola.

Thank you for your immediate attention to this critical matter.

Sincerely,

Bob Goodlatte
Chairman
House Committee on the Judiciary

Trey Gowdy
Chairman
Subcommittee on Immigration and
Border Security

---

[3] *Id.*

PATRICK J. LEAHY, VERMONT, CHAIRMAN

DIANNE FEINSTEIN, CALIFORNIA
CHARLES E. SCHUMER, NEW YORK
RICHARD J. DURBIN, ILLINOIS
SHELDON WHITEHOUSE, RHODE ISLAND
AMY KLOBUCHAR, MINNESOTA
AL FRANKEN, MINNESOTA
CHRISTOPHER A. COONS, DELAWARE
RICHARD BLUMENTHAL, CONNECTICUT
MAZIE HIRONO, HAWAII

CHARLES E. GRASSLEY, IOWA
ORRIN G. HATCH, UTAH
JEFF SESSIONS, ALABAMA
LINDSEY O. GRAHAM, SOUTH CAROLINA
JOHN CORNYN, TEXAS
MICHAEL S. LEE, UTAH
TED CRUZ, TEXAS
JEFF FLAKE, ARIZONA

Kristine J. Lucius, *Chief Counsel and Staff Director*
Kolan L. Davis, *Republican Chief Counsel and Staff Director*

# United States Senate

COMMITTEE ON THE JUDICIARY
WASHINGTON, DC 20510-6275

October 17, 2014

President Barack H. Obama
The White House
1600 Pennsylvania Avenue NW
Washington, D.C. 20500

Dear President Obama:

As members of the Senate Judiciary Committee, which has oversight over immigration and visa policies, we write to express our grave concerns about the seemingly inflexible position you have taken in issuing a travel ban or heightened entry requirements on individuals who may been infected with the Ebola virus.

On September 16 of this year, you spoke at the Centers for Disease Control and Prevention in Atlanta, saying,

> *"Now, here's the hard truth: In West Africa, Ebola is now an epidemic of the likes that we have not seen before. It's spiraling out of control. It is getting worse. It's spreading faster and exponentially. Today, thousands of people in West Africa are infected. That number could rapidly grow to tens of thousands. And if the outbreak is not stopped now, we could be looking at hundreds of thousands of people infected, with profound political and economic and security implications for all of us. So this is an epidemic that is not just a threat to regional security -- it's a potential threat to global security if these countries break down, if their economies break down, if people panic. That has profound effects on all of us, even if we are not directly contracting the disease."*

We couldn't agree more that an Ebola epidemic is a national security issue, and a threat to global security. And, we couldn't agree more with the American people that a travel ban must be put in place to protect our homeland and reduce any spread of the virus.

According to officials at the State Department, between March 1, 2014, and September 27, 2014, a total of 6, 398 visas were issued to nationals of the following countries; 3,135 for Liberians, 1,472 for Sierra Leoneans, and 1,791 for Guineans. Meanwhile, according to International SOS, dozens of countries – including many in Africa – have instituted travel and entry restrictions.



We urge you to immediately cease issuing visas to persons of Sierra Leone, Liberia and Guinea, and to consider expanding this ban to other countries that may not have standards in place to properly screen travelers entering the United States. We also urge you to more strongly use tools at your disposal to receive flight manifests ahead of time to screen and turn away passengers if they have traveled to or are coming from countries with an Ebola outbreak.

At this point, you and your administration must consider all options to prevent the spread of the Ebola virus. Dismissing a travel ban or a moratorium on visa issuances sends a signal that you're not serious about containing the outbreak and preventing infections of individuals on U.S. soil. We implore you to immediately use your statutory authority under Section 212(f) of the Immigration and Nationality Act to suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants who are detrimental to the interests of the United States.

Sincerely,

Congress of the United States
Washington, DC 20515

October 21, 2014

President Barack Obama
The White House
1600 Pennsylvania Avenue, NW
Washington, DC 20500

Dear President Obama:

As doctors and nurses, we have been closely monitoring the growing Ebola epidemic in West
Africa with concern. The transmission of Ebola to two health professionals who helped care for
Thomas Duncan is extremely concerning. as is the possibility that many more Americans were
potentially exposed to the virus by these individuals. Containment is the key to stopping the
spread of this highly contagious and deadly disease, and we strongly urge your administration to
consider implementing a temporary travel ban for individuals who are citizens of, or traveled to,
affected countries in West Africa. For American citizens who have been exposed to Ebola, we
support the recommended 21-day quarantine before they can enter the country.

We understand and support the continued flow of aid workers and supplies to control the spread
of Ebola at its source, but temporarily restricting entry to the United States for individuals
from—or who traveled to—affected countries could limit the possible introduction of additional
individuals carrying the virus. We strongly support continued American leadership to help the
affected countries in West Africa combat this deadly disease, and urge other members of the
global community to redouble their efforts.

Yet we must not lose sight of the fact that Ebola has reached America and has been transmitted
on our soil, despite efforts to prevent this from occurring. Already, we have expanded the scope
of our preventive measures because initial protocols were insufficient to stop the disease from
spreading. To assuage rising public anxiety about a potential health crisis—and to ensure
national preparedness if the worst should happen—we urge your administration to take proactive
steps to educate, equip, and train public health authorities to effectively contain this disease.

We look forward to working with your administration and public health officials in educating
citizens and health professionals on Ebola as we bend the curve in the spread of this disease and
strive to protect American lives both at home and abroad.

Sincerely,

Phil Roe, M.D.
Member of Congress

Phil Gingrey, M.D.
Member of Congress

PRINTED ON RECYCLED PAPER



Diane Black, R.N.
Member of Congress

Dan Benishek, M.D.
Member of Congress

Paul Broun, M.D.
Member of Congress

Michael C. Burgess, M.D.
Member of Congress

Scott DesJarlais, M.D.
Member of Congress

Paul A. Gosar. D.D.S.
Member of Congress

Tom Price, M.D.
Member of Congress

John Fleming, M.D.
Member of Congress

Charles Boustany, M.D.
Member of Congress

Larry Bucshon, M.D.
Member of Congress

Bill Cassidy, M.D.
Member of Congress

Renee Ellmers, R.N.
Member of Congress

Andy Harris, M.D.
Member of Congress

Brad Wenstrup, D.P.M.
Member of Congress

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DR ORLY TAITZ, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | CIVIL NO. B-14-119 |
| v. | § | |
| | § | |
| JEH JOHNSON, Secretary of Department | § | |
| Of Homeland Security, et al., | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' RESPONSE TO DISCOVERY DEMAND

On August 14, 2014, by e-mail only, plaintiff demanded various documents.

Discovery is premature in this case. Federal Rule of Civil Procedure 26(d) states that "a party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)," except for initial disclosures, by stipulation, by court order, or when the rules so authorize. Rule 26(f), in turn, requires the conference "at least 21 days before a scheduling conference is to be held, or a scheduling order is due under Rule 16(b)." In this case, no Rule 26(f) conference has occurred, and there is no scheduling conference or other order on the docket that would trigger the obligation to hold one. *See Riley v. Walgreen Co.*, 233 F.R.D. 496, 499 (S.D. Tex. 2005) ("not only may a party not 'serve' discovery, it may not even 'seek' discovery from any source until after the Rule 26(f) conference").

Defendants will file formal objections at a later time once discovery commences, and reserve the right to such objections. In the meantime defendants note not only that many of the documents demanded have personal identifiers and are not subject to disclosure based on the Privacy Act, HIPAA, and other statutes, but are also being sought for a fishing expedition that is improvident, overbroad, and unduly burdensome, especially since this case should be dismissed for want of jurisdiction, standing, and for the other reasons outlined in Defendants' Response to the Order to Show Cause. Docket Entry No. 20.



Finally, defendants note that some of the information sought is publically available. For example, see the following:

Written Testimony of Secretary of Homeland Security Jeh Johnson (June 24, 2014): http://www.dhs.gov/news/2014/06/24/written-testimony-dhs-secretary-jeh-johnson-house-committee-homeland-security

Written Testimony of FEMA Administrator Craig Fugate, CBP Commissioner R. Gil Kerlikowske & ICE Principal Deputy Assistant Secretary Thomas S. Winkowski (July 9, 2014): http://www.dhs.gov/news/2014/07/09/written-testimony-fema-cbp-and-ice-senate-committee-homeland-security-and

Written Testimony of CBP Border Patrol Deputy Chief Ronald D. Vitiello & ICE Enforcement and Removal Operations Executive Associate Director Thomas Homan (June 25, 2014): http://www.dhs.gov/news/2014/06/25/written-testimony-cbp-and-ice-house-committee-judiciary-hearing-titled-%E2%80%9C

Written Testimony of CBP Rio Grande Valley Sector Chief Patrol Agent Kevin Oaks: http://www.dhs.gov/news/2014/07/03/written-testimony-cbp-house-committee-homeland-security-hearing-titled-%E2%80%9Ccrisis-texas

Fact Sheet: Artesia Temporary Facility for Adults With Children in Expedited Removal: http://www.dhs.gov/news/2014/06/20/fact-sheet-artesia-temporary-facility-adults-children-expedited-removal

DHS OIG Report: ICE's Release of Immigration Detainees, OIG-14-116 (Revised) (August 2014): http://www.oig.dhs.gov/assets/Mgmt/2014/OIG_14-116_Aug14.pdf

FY 2013 ICE Immigration Removals (2013 Removal Statistics): http://www.ice.gov/removal-statistics/index.htm

2011 Operations Manual ICE Performance-Based National Detention Standards (PBNDS): https://www.ice.gov/detention-standards/2011/

United States Border Patrol, Southwest Border Sectors, Family Unit and Unaccompanied Alien Children (0-17) apprehensions, FY 14 through July, compared to the same period for FY 13: http://www.cbp.gov/sites/default/files/documents/SWB%20Family%20and%20UAC%20Apps%20through%20July.pdf

Memorandum from Secretary of Homeland Security Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012): http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf

Consideration of Deferred Action for Childhood Arrivals (DACA): http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-daca

Renew Your DACA: http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/renew-your-daca

Frequently Asked Questions (DACA): http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/frequently-asked-questions

I-821D, Consideration of Deferred Action for Childhood Arrivals: http://www.uscis.gov/i-821d

Filing Tips for Deferred Action for Childhood Arrivals: http://www.uscis.gov/humanitarian/consideration-deferred-action-childhood-arrivals-process/filing-tips-deferred-action-childhood-arrivals

General information: How do I request consideration of deferred action for childhood arrivals?: http://www.uscis.gov/sites/default/files/USCIS/Resources/daca.pdf

Consideration of Deferred Action for Childhood Arrivals (Graphic/Flowchart): http://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/daca-consider.pdf

Deferred Action for Childhood Arrivals (DACA) Toolkit: Resources for Community Partners:
http://www.uscis.gov/sites/default/files/USCIS/Humanitarian/Deferred%20Action%20for%20Childhood%20Arrivals/DACA-toolkit.pdf

Data Set: Deferred Action for Childhood Arrivals: http://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-deferred-action-childhood-arrivals

Direct Filing Addresses for Form I-821D, Consideration of Deferred Action for Childhood Arrivals: http://www.uscis.gov/i-821d-addresses

Consideration of Deferred Action for Childhood Arrivals Fee Exemption Guidance: http://www.uscis.gov/forms/forms-and-fees/consideration-deferred-action-childhood-arrivals-fee-exemption-guidance

Credible Fear Screenings: http://www.uscis.gov/uscis-tags/unassigned/credible-fear-screenings

Questions & Answers: Credible Fear Screening: http://www.uscis.gov/humanitarian/refugees-asylum/asylum/questions-answers-credible-fear-screening

Reasonable Fear Screenings: http://www.uscis.gov/humanitarian/refugees-asylum/asylum/reasonable-fear-screenings

Questions & Answers: Reasonable Fear Screenings: http://www.uscis.gov/humanitarian/refugees-asylum/asylum/questions-answers-reasonable-fear-screenings

Respectfully submitted,

/S/ Colin A. Kisor
COLIN A. KISOR
Deputy Director
District Court Section
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
450 Fifth Street NW
Washington DC 20001
Telephone: (202) 532-4331
Fax: (202) 305-7000
E-mail: colin.kisor@usdoj.gov

/s/ Daniel D. Hu
DANIEL D HU
Assistant United States Attorney
State Bar No. 10131415
S.D. I.D. 7959

Southern District of Texas
1000 Louisiana, Suite 2300
Houston TX 77002
(713) 567-9000 (PHONE);
(713) 718-3300 (FAX)
Email: Daniel.Hu@usdoj.gov

Counsel for Defendants

**Hushmail** ①    Check mail    Compose      hu deposition    Search

| Inbox | 2,869 |
| Sent | |
| Drafts | 1 |
| Junk | 542 |
| Trash | 933 |
| Manage folders | |

← Back to Inbox   Reply   Reply all   Forward    Move    Delete   Report spam      ← Previous 22 of 25 Next →

### RE: Urgent notice to appear

**Daniel Hu (USATXS) to orly.taitz,**    **Colin Kisor (CIV)** (74 days ago)   show details

Dear Dr. Taitz:

I have received your voicemail message left today and take this opportunity to respond. We are meeting with our clients next week and hope to be at August 19 or 20.

Daniel Hu

AUSA

**From:** orly.taitz@hushmail.com [mailto:orly.taitz@hushmail.com]
**Sent:** Thursday, August 14, 2014 5:50 PM
**To:** Hu, Daniel (USATXS)
**Cc:** orly.taitz@hushmail.com
**Subject:** Urgent notice to appear

<div align="center">

Law Offices of Orly Taitz

Dr. Orly Taitz, ESQ

29839 Santa Margarita, ste 100

Rancho Santa Margarita, Ca 92688

Ph. 949-683-5411 Fax 949-766-7603

Orly.Taitz@hushmail.com

</div>

08.14.2014

Attention

**Daniel David Hu**
Office of the US Attorneys Office
1000 Louisiana
Ste 2300
Houston, TX 77002
713-567-9518
Fax: 713-718-3303
Email: daniel.hu@usdoj.gov

Counsel for President Barack Obama, Secretary of Homeland Security Jeh Johnson, Secretary of Health Human Services § Patrol in Taitz v Johnson et al 14-cv-00119

<div align="center">

**NOTICE TO APPEAR**

</div>

Pursuant to 08.13.2014, court order by Judge Hanen, a motion hearing will be heard on 08.27.2014 in Taitz v Johnson

Judge Hanen requested to address the issues below. The plaintiff is requesting defendants to appear at the hearing, as scheduled by a mutual consent on or before 08.22.2014.

The plaintiff is requesting defendants' attendance at the deposition hearing and the production of any and all documen Judge Hanen, including, but not limited to :

1. Border Patrol records of all illegal aliens apprehended at the U.S. –Mexican border in 2013, 2014.

2. Any and all records of medical examinations and treatment of such illegal aliens prior to their release into the ge

3. Any and all criminal records on these illegal aliens from the countries of origin obtained by the defendants prior transportation of these illegal aliens.

4. Records of the US sponsors of such illegal aliens, and whether the sponsors, themselves, are illegal aliens.

5. Receipts of the notices to appear at the deportation hearings given to illegal aliens prior to their release from DH

6. Inspector General report showing criminal records of the illegal aliens released from the DHS/ICE custody.

7. Any and all records of individuals and classes of individuals challenging DHS and/ or ICE, and/or INS, and/or E policies of above agencies in relation to Flores v Reno and other immigration/deportation/ release and transporta records of determination by such challenges.

8. Plaintiff is seeking the defendants cooperation in accessing individuals who are the employees of the defendants the defendants for the purpose of processing and examination of illegal aliens, plaintiff is seeking the names and border patrol agents and medical professionals, who were handling processing of illegal aliens, who crossed the 2014.

Mr. Hu, since Mr. Kisor is out of the country and he designated you as an attorney in charge during his absence, and d frame, less then 2 weeks prior to the August 27 hearing, the plaintiff is requesting a response from you by the end of tl her, whether your clients will agree to appear for the hearing, for the deposition and will produce the requested docum

If, by the end of the day tomorrow, 08.15. 2014, the plaintiff will not receive a response advising her whether the defe deposition and hearing and will provide document requested, the plaintiff will file with Judge Hanen a motion to comp production of documents.

Sincerely,

/s/ Dr. Orly Taitz, ESQ

08.14.2014

[illegible]

Signed this 11th day of August, 2014.

Andrew S. Hanen
United States District Judge

Texas v. Johnson [illegible] for August 22

Texas v. Johnson: Order to show cause why the state should not rule in favor of Texas

Judge Hanen [illegible] by the government

Texas v. Johnson Application for [illegible]

Texas v. Johnson Reply to Answer to show cause

Texas v. Johnson DACA memo by Napolitano

Flores v. Reno [illegible]

Texas v. Johnson stipulation in Flores v. Janet Reno

Answer to order to show cause

Texas v. Johnson Counsel asks to postpone hearing till August 29

Texas v. Johnson [illegible]

Texas v. Johnson Certificate of interested parties

Texas v. Johnson: Order to show cause why the state should not rule in favor of Texas

Texas v. Johnson Application for [illegible]

[illegible]

← Back to Inbox Reply Reply all Forward Move Delete Report spam

← Previous 22 of 25 Next →

View as: Mobile | Desktop

| UNITED STATES DISTRICT COURT | | | SOUTHERN DISTRICT OF TEXAS | | | | |
|---|---|---|---|---|---|---|---|
| DR. ORLY TAITZ | | | BROWNSVILLE DIVISION | | | | |
| V. | | | CIVIL ACTION NO. B-14-119 | | | | |
| JEH JOHNSON, SECRETARY OF DEPARTMENT OF HOMELAND SECURITY, ET AL. | | | EXHIBIT LIST | | | | |
| LIST OF: GOVERNMENT EXHIBITS TYPE OF HEARING: INJUNCTION | | | AUSA: DANIEL D. HU & COLIN KISOR | | | | |
| JUDGE: ANDREW S. HANEN | | CLERK: CRISTINA SUSTAETA | REPORTER: BARBARA BARNARD | | | | |
| No. | DESCRIPTION | | | OFR | OBJ | ADM | DATE |
| 1. | Memorandum from Secretary of Homeland Security Janet Napolitano, Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children (June 15, 2012): http://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf | | | | | | |
| 2. | DR. MIGUEL ESCOBEDO, CV | | | | | | |
| 3. | DHS Occupational Health Advisory – May 1, 2014 | | | | | | |
| 4 | CDC LETTER TO PHYSICIANS AUGUST 7, 2014 | | | | | | |
| 5 | ADMINISTRATION FOR CHILDREN AND FAMILIES – LETTER TO TB CONTROLLERS | | | | | | |
| 6. | HHS LETTER TO HEALTH CARE PROVIDERS – GUIDANCE ON CLEARING UAC WITH TB | | | | | | |
| 7. | ACTIVE TB SCREENING ALGORITHM | | | | | | |
| 8. | NEDSS TEXAS REPORTING INSTRUCTIONS AND FORM | | | | | | |
| 9. | CDC GUIDELINES FOR PREVENTING THE TRANSMISSION OF TUBERCULOSIS IN HEALTH CARE SETTINGS - 2005 | | | | | | |
| 10. | PRIOR COURT TESTIMONY OF CHIEF OAKS, MR. FIERRO AND MS. BROOKS – 8/27/2014 | | | | | | |
| 11. | CDC TB ELIMINATION SHEET WWW.CDC.GOV/TB/PUBLICATIONS/FACTSHEETS/TESTING/DIAGNOSIS.PDF | | | | | | |
| 12. | | | | | | | |

## CERTIFICATE OF SERVICE

Counsel of record was served by ECF on October 27, 2014

/s/Daniel Hu
Daniel Hu

## MIGUEL ESCOBEDO, MD., MPH.

CURRICULUM VITAE (Summary)

Education:
- Stanford University School of Medicine, MD
- University of California at Berkeley, MPH
- New Mexico State University, BS Biology

Residency/Fellowship Program:
- Family Practice Residency – Texas Tech Medical School

Current Practice Type and/or Employer:
- Medical Officer  - Centers for Disease Control and Prevention, US-MX Border Unit, El Paso Quarantine Station

Professional Experience:
- Quarantine Medical Officer – Centers for Disease Control and Prevention
- February 2005 to present
- District Health Officer – New Mexico Department of Health, Dist. III January 2003 to October 2003
- Regional Director – Texas Department of Health, Public Health Region 9/10 January 1996 to January 2003 and October 2003 to February 2005
- Tuberculosis Control Officer – El Paso City-County Health District April 1986 to December 1996
- Medical Director, Communicable Diseases Control- El Paso City-County  Health District
- Medical Director, Preventive Health Services, El Paso City-County Health District
- Family Medicine Physician, El Paso Centro de Salud Familiar La Fe (Certified Community Health Center)
- Seasonal Agricultural Worker.

Other Pertinent Information:
- WHO consultant, International Health Regulations
- Served on National Advisory Council for TB Elimination - CDC
- Served on Council of Public Health - Texas Medical Association
- Fratis L. Duff M.D. Memorial Award, Texas Health Foundation
- Voting member, Texas Department of Health Institutional Review Board for Human Subjects

Research Interests:
- Border Health Issues
- Quarantine & Traveler's health
- Bi-national Tuberculosis Control

Dr. Escobedo is currently a Medical Health Officer with the Centers for Disease Control Quarantine Station in El Paso. He is past Regional Director for the Texas Department of State Health Services Regions 9/10 and Regional District Health Officer for the New Mexico Department of Health. He served as Tuberculosis and Control Officer and Communicable Diseases Director for El Paso City- County Health District for 10 years. Dr. Escobedo is a graduate of Stanford University School of Medicine and the University of California Berkeley School Of Public Health. He completed a Family Practice Residency Program at Texas Tech El Paso. His research interests include Tuberculosis, Border Health, and Quarantine and Travelers Health. He has authored articles in Public Health Journals.



## Occupational Health Advisory

May 1, 2014

TO:        CBP

SUBJECT:    Scabies Outbreak

This document sets forth occupational health and safety guidance for CBP personnel in the handling of subjects presenting with the signs and symptoms of scabies.

Human scabies is caused by an infestation of the skin by the human itch mite (Sarcoptes scabiei var. hominis). The microscopic scabies mite burrows into the upper layer of the skin where it lives and lays its eggs. The scabies mite usually is spread by direct, prolonged, skin-to-skin contact with a person who has scabies. Occasionally transmission occurs from direct skin contact with clothing or bedding from an infected person.

Scabies can spread rapidly under crowded conditions where close body contact is frequent. Institutions such as extended-care facilities, detention centers and prisons are often sites of scabies outbreaks.

The most common symptoms of scabies are intense itching and a skin rash. These symptoms are caused by an allergic reaction to the proteins and feces of the parasite. Severe itching, especially at night, is the earliest and most common symptom of scabies. A pimple-like rash is also common.
Itching and rash may affect much of the body, but is usually limited to these common sites:

- Between the fingers
- Wrist
- Elbow
- Armpit
- Penis
- Nipple
- Waist
- Shoulder blades
- Buttocks

The head, face, neck, palms, and soles are involved in infants and very small children, but usually not adults and older children.

Tiny burrows are sometimes seen on the skin; these are caused by the female scabies mite tunneling just beneath the skin. The burrows appear as tiny raised and crooked grayish-white or skin colored lines on

This Safety and Health Information Bulletin is not a standard or regulation, and it creates no new legal obligations. The Bulletin is advisory in nature, for internal DHS use only; informational in content, and is intended to assist supervisors and employees in providing a safe and healthful workplace. For more information about Office of Health Affairs Health Advisories, contact the OHA Watch Desk at NOC.OHA@hq.dhs.gov or 202-282-9262.

the skin surface. They are most often found in the webbing between the fingers, in the folds of the skin on the wrist, elbow, or knee.

Complications associated with scabies are usually caused by infection of the sores caused by scratching. A more severe form of scabies, called crusted scabies, may affect certain high-risk groups, including: people with chronic health conditions that weaken the immune system, such as HIV or leukemia; people who are very ill, such as hospitalized individuals or those in nursing facilities.

**Infectious Period:** When a person is infested with scabies mites the first time, symptoms usually do not appear for up to 2-6 weeks after being infested. Infested person(s) can still spread scabies even if they are not exhibiting symptoms. If a person has had scabies before, symptoms appear much sooner, 1-4 days after exposure.

Scabies mites generally do not survive more than 2 to 3 days away from human skin. Adults and children can return to work or school a day after treatment was started.

**Personal protective equipment:** Latex or non-latex gloves should be used anytime direct contact will be made with any subjects that are confirmed or suspected of having scabies.

**Treatment:** The following medications for the treatment of scabies are available only by prescription.

*Prescriptions:*

A) Permethrin cream 5%; Brand name product: Elimite*
   Permethrin is approved by the US Food and Drug Administration (FDA) for the treatment of scabies in persons who are at least 2 months of age. Permethrin is a synthetic pyrethroid similar to naturally occurring pyrethrins which are extracts from the chrysanthemum flower. Permethrin is safe and effective when used as directed. Permethrin kills the scabies mite and eggs. Permethrin is the drug of choice for the treatment of scabies. Two (or more) applications, each about a week apart, may be necessary to eliminate all mites, particularly when treating crusted (Norwegian) scabies. Treatment for confirmed or suspected cases of scabies will be Permethrin 1% lotion. The medication should be applied directly to the skin on all areas of the body except the head. After application, the medication will be left on the skin for 24 hours before being washed off. During application and rinsing contact with the eyes, the inside of the mouth, nose and vagina should be avoided as it will cause irritation. Due to potential complications, treatment for pregnant females is optional. Prescription permethrin, such as Elimite cream, is the most commonly used medicine to treat scabies. Unlike the more toxic lindane, permethrin is considered safe for infants as young as 2 months old. Only permethrin, crotamiton, and sulfur ointment are considered safe for treating children younger than age 2.

B) Crotamiton lotion 10% and Crotamiton cream 10%; Brand name products: Eurax*; Crotan*
   Crotamiton is approved by the US Food and Drug Administration (FDA) for the treatment of scabies in adults; it is considered safe when used as directed. Crotamiton is not FDA-approved for use in children. Frequent treatment failure has been reported with crotamiton.

C) Lindane lotion 1%; Brand name products: None available
   Lindane is an organochloride. Although FDA-approved for the treatment of scabies, lindane is not recommended as a first-line therapy. Overuse, misuse, or accidentally swallowing lindane can be

This Safety and Health Information Bulletin is not a standard or regulation, and it creates no new legal obligations. The Bulletin is advisory in nature, for internal DHS use only; informational in content, and is intended to assist supervisors and employees in providing a safe and healthful workplace. For more information about Office of Health Affairs Health Advisories, contact the OHA Watch Desk at NOC.OHA@hq.dhs.gov or 202-282-9262.

toxic to the brain and other parts of the nervous system; its use should be restricted to patients who have failed treatment with or cannot tolerate other medications that pose less risk. Lindane should not be used to treat premature infants, persons with a seizure disorder, women who are pregnant or breast-feeding, persons who have very irritated skin or sores where the lindane will be applied, infants, children, the elderly, and persons who weigh less than 110 pounds.

D) Ivermectin; Brand name product: Stromectol*

Ivermectin is an oral antiparasitic agent approved for the treatment of worm infestations. Evidence suggests that oral ivermectin may be a safe and effective treatment for scabies; however, ivermectin is not FDA-approved for this use. Oral ivermectin has been reported effective in the treatment of crusted scabies; its use should be considered for patients who have failed treatment with or who cannot tolerate FDA-approved topical medications for the treatment of scabies. The dosage of ivermectin is 200 mcg/kg orally. It should be taken on an empty stomach with water. A total of two or more doses at least 7 days apart may be necessary to eliminate a scabies infestation. The safety of ivermectin in children weighing less than 15 kg and in pregnant women has not been established.

E) Persistent nodular scabies may be treated with injections of steroids into the nodules or (rarely) with coal tar products applied to the skin.

*For Itching:*

Use of the following over-the-counter medicines can help relieve itching from scabies:

A) Oral antihistamines (such as Benadryl). These medicines will not interfere with the diagnosis or treatment of scabies. Don't give antihistamines to your child unless you've checked with the doctor first.

B) Corticosteroid creams (such as hydrocortisone cream). This type of medicine may make the scabies sores look different and make it harder for your doctor to diagnose the problem. Only use this medicine after your doctor has seen and diagnosed your condition.

Most creams or lotions are applied to the entire body from the neck down. On infants, the medicine is also applied to the scalp, face, and neck, taking care to avoid the area around the mouth and eyes. The medicine usually is left on for 8 to 14 hours and then washed off.

*Hygiene Guidance:*

Immediately after starting treatment for scabies, clean all the affected person's bedding and the clothing that he or she has worn during the past 2 to 3 days (48 to 72 hours). Wash all items in hot water and dry them in a hot dryer. Or dry-clean them.

Any items that cannot be washed or dry-cleaned must be placed in a closed plastic bag for at least 7 days.

This Safety and Health Information Bulletin is not a standard or regulation, and it creates no new legal obligations. The Bulletin is advisory in nature, for internal DHS use only; informational in content, and is intended to assist supervisors and employees in providing a safe and healthful workplace. For more information about Office of Health Affairs Health Advisories, contact the OHA Watch Desk at NOC.OHA@hq.dhs.gov or 202-282-9262.



**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**                    Public Health Service

Centers for Disease Control
and Prevention (CDC)
Atlanta GA 30333

August 7, 2014

Dear Colleagues:

The purposes of this letter are to give you an overview of the tuberculosis (TB) control efforts for
unaccompanied children who come into the care and custody of the Department of Health and Human
Services after being apprehended by immigration authorities and to let you know about situations when
your help might be needed.

When children apprehended by immigration authorities are unaccompanied by a parent or guardian, they
are placed in the care and custody of the Department of Health and Human Services (HHS). Typically,
HHS then releases children to an appropriate sponsor—usually a parent, relative, or family friend—who
can safely and appropriately care for them while their immigration cases proceed. The Administration for
Children and Families Office of Refugee Resettlement (ORR) at HHS operates about 100 short-term
shelters in 14 states that care for the unaccompanied children until they are released to sponsors.

Most children remain in a shelter for less than 35 days and are released to appropriate sponsors while their
immigration cases are processed. Children are not released to a sponsor if they have a medical condition
that is a public health threat. When a child is released to a sponsor, the child moves to the community in
which the sponsor lives. Although the children are in ORR custody, they are not refugees in the legal
sense, and they do not currently qualify for federal refugee benefits.

After admission to a shelter, each child undergoes health examinations, including TB screening that is
modeled on the Technical Instructions for Tuberculosis Screening and Treatment for panel physicians
developed by the CDC Division of Global Migration and Quarantine. This screening starts with a
symptom inventory for all children regardless of age. For children 15–17 years old, the shelter healthcare
providers have a choice between (1) chest radiography with further diagnostic tests as needed for
radiographic abnormalities or (2) initial testing with either a tuberculin skin test or an interferon-gamma
release assay. Children 2–14 years old undergo either a tuberculin skin test or an interferon-gamma
release assay, with the skin test preferred for children younger than 5 years old. Children younger than 2
years of age undergo no TB-specific testing unless they are known to have been exposed to contagious
TB or have signs or symptoms of TB.

The provisions for health care are different at each shelter. At some shelters, the clinic of the local health
department provides services for at least part of the TB screening. Per ORR policy, the medical services
offered by a shelter are required to follow local laws about reportable conditions, including suspected or
confirmed TB. Through this screening, a small of number of cases of TB have been identified. A local
health department has been involved in the initial TB care in each confirmed case that has come to our
attention. Children who have TB diagnosed during ORR custody are treated and kept in isolation at the
shelter until the TB is non-contagious. When a child being treated for TB who is no longer contagious is
released to a sponsor, the TB management is transferred from the local health department in the shelter's
community to the health department in the community where the sponsor resides.

If the U.S. TB case definition and the usual counting criteria are met, TB programs should report TB
cases among unaccompanied children in their jurisdictions for routine surveillance. The standard data
fields that are sent to CDC cannot distinguish the children as unaccompanied.

After a diagnosis of latent *Mycobacterium tuberculosis* infection (LTBI), few children in ORR custody start treatment because the duration of custody is brief. Instead, ORR officials notify the destination state's TB control authority with the child's name, diagnostic findings, and sponsor address (see ORR letter, attached). The personnel at ORR shelters collaborate with state or local public health authorities when initiating contact investigations after TB exposures within shelters. For children who were included in a contact investigation, but not completely examined before release from custody to a sponsor, ORR uses the same type of notification to state officials that includes details about the exposure. Neither ORR nor CDC is asking for disposition results of contacts after referrals to state officials.

We learned of one instance when TB was diagnosed after a child was released from ORR custody, and the local TB control official reported it to officials at ORR. Thanks to these efforts, a contact investigation was initiated for children and ORR shelter workers who were possibly exposed. Should this type of event occur in your jurisdiction, please notify the Director, Division of Refugee Health, ORR, at curi.kim@acf.hhs.gov, and the medical coordinators, at ducsmedical@acf.hhs.gov that TB has been diagnosed in a child who has left ORR custody. To initiate a contact investigation, the officials at ORR need at least the child's name and alien number. If your regulations forbid transmission of personally identifiable information by email, you can schedule a telephone verbal report with ORR officials after you contact them by email. ORR does not plan to provide summary data from contact investigations to CDC or to you; therefore, you might not receive data about contacts for your Aggregate Report for Program Evaluation (ARPE).

The TB Program Consultants in the Field Services and Evaluation Branch, Division of Tuberculosis Elimination, CDC, are temporarily assisting ORR personnel with collecting information about suspected TB cases in unaccompanied children. Because some of the information is at local health departments, the TB Program Consultants might ask for your assistance. This is a short-term project, and we do not expect it to require much of your time.

Thank you for your help. If you have questions about TB control for unaccompanied children in your jurisdiction, please contact the CDC TB Program Consultant (see http://www.cdc.gov/nchhstp/programintegration/MapStateLinks.html) who is assigned to your jurisdiction as the federal cooperative agreement project officer for your TB control program.

Sincerely,

Philip LoBue, MD, FACP, FCCP
Director
Division of Tuberculosis Elimination
National Center for HIV/AIDS, Viral Hepatitis, STD, and TB Prevention
Centers for Disease Control and Prevention



**ADMINISTRATION FOR**
**CHILDREN & FAMILIES**
370 L'Enfant Promenade SW, Washington DC 20447  www.acf.hhs.gov

Dear TB Controller,

Unaccompanied alien children (UAC) are undocumented migrant children who come to the
United States without a parent or guardian.  Many UAC are apprehended by the Department of
Homeland Security (DHS) at the southern border.  DHS then transfers UAC to the custody of the
Department of Health and Human Services, specifically the Administration for Children and
Families' Office of Refugee Resettlement (ORR).  Despite being in ORR custody, UAC are *not*
legally refugees and do not qualify for refugee benefits.  ORR provides UAC with a safe and
appropriate environment as well as client-focused care until they are released to a sponsor in the
United States or returned to their home country.  UAC receive initial medical exams, which
include TB screening, upon entering ORR custody.

As most UAC are in short-term custody, if a minor is diagnosed with latent TB infection (LTBI),
prophylactic treatment is generally not started.  Some UAC with initial negative TB tests who are
recent contacts of infectious TB cases may no longer be in ORR custody by the time their second
TB tests are due.

This letter is to notify you that ORR has discharged a minor either with LTBI or who has been
exposed to infectious TB but has not completed LTBI evaluation.  The child will be living in
your state.  Identifying and clinical information is enclosed.

Thank you.

Sincerely,

Curi Kim, MD, MPH
Director, Division of Refugee Health
Office of Refugee Resettlement



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

**ADMINISTRATION FOR CHILDREN AND FAMILIES**
370 L'Enfant Promenade, S.W.
Washington, D.C. 20447

Dear Healthcare Provider,

The Office of Refugee Resettlement/Division of Children Services/Unaccompanied Alien
Children (UAC) Program is providing guidance on clearing UAC with suspected or confirmed
active tuberculosis (TB) for release from ORR custody and travel.  This guidance is consistent
with the Centers for Disease Control and Prevention (CDC)'s algorithm for determining when to
clear a patient with suspected or confirmed TB for travel on a commercial aircraft.

The algorithm is primarily intended to guide decisions for pulmonary, pleural, or laryngeal TB in
persons aged ≥10 years.  In general, persons with extrapulmonary TB disease and young children
with TB disease are unlikely to pose a public health risk.

A UAC suspected or confirmed to have TB, who does not have or is not at high risk for having
multidrug-resistant (MDR) TB, can be cleared for release and travel IF the child is smear
negative (3 consecutive negative smears and no subsequent positive smears) AND has been
treated for ≥ 1 week with an appropriate regimen AND has been referred to the TB control
program of the local health department in the community to which the child will be released.
Refer to the charts below:

**If cultures or drug susceptibility testing (DST) pending,**

| AFB Smear + or Cavity on Chest X-ray | TB Culture | High Risk for MDR[a] | Current Treatment | Cleared to travel? | Criteria to be cleared for travel |
|---|---|---|---|---|---|
| Yes | Unknown | No | N/A | No | 1) 3 consecutive negative AFB smears with no subsequent positive smears and 2) Tx for ≥2 weeks with appropriate regimen |
| Yes | Unknown | Yes | N/A | No | Await DST results and manage accordingly |
| No | Unknown | No | ≥ 1 week | Yes | Not applicable |
| No | Unknown | No | < 1 week | No | Tx for ≥1 week with appropriate regimen |
| No | Unknown | Yes | N/A | No | Await DST results and manage accordingly |

**If NOT MDR TB**

| AFB Smear+ or Cavity on Chest X-ray | TB Culture | MDR Status | Current Treatment | Cleared to travel? | Criteria to be cleared for travel |
|---|---|---|---|---|---|
| Yes | + | No | N/A | No | 1) 3 consecutive negative AFB smears with no subsequent positive smears and 2) Tx for ≥2 weeks with appropriate regimen |
| No | + | No | ≥ 1 week | Yes | Not applicable |
| No | + | No | < 1 week | No | Tx with appropriate regimen for ≥1 week |

[a] MDR TB is resistant to isoniazid and rifampin. A person is considered high-risk for MDR if (1) a molecular diagnostic test on a respiratory specimen has shown mutations consistent with rifampin resistance, or he or she (2) was a known contact of an MDR TB case, or (3) has had a prior episode of treatment for TB disease or (4) has resided for >1 year in a country from which TB cases reported in the United States occurring in persons born in that country have a high proportion of MDR TB. Based on the U.S. National TB Surveillance System in 2004-2010, these are BELAUS, BHUTAN, DOMINICAN REPUBLIC, ESTONIA, HUNGARY, KAZAKHSTAN, KYRGYZSTAN, LAOS, LATVIA, LITHUANIA, MOLDOVA, MONGOLIA, NEPAL, PERU, RUSSIA, THAILAND, UKRAINE, and SUDAN. This list is updated yearly.

A UAC who the health department is counting and treating as a clinical case of TB disease, even in the absence of respiratory specimens (despite attempts at sputum induction), must be treated for $\geq 1$ week with an appropriate regimen before being cleared for release or travel.

A UAC with MDR TB must have two negative cultures obtained after $\geq 2$ weeks of treatment (and no subsequent positive cultures) and treatment for $\geq 4$ weeks with an appropriate regimen before being cleared for release or travel.

This algorithm may not apply to all situations and certain exceptions may be made on a case-by-case basis, especially if air travel is not involved. For example, for UAC being released locally, earlier release than indicated by the algorithm may be possible. For unusual or complicated cases, please work with the UAC program provider (shelter, foster care, etc.) to consult the ORR Medical Team.

The key to assuring a favorable medical outcome for the UAC and protecting public health is a smooth transfer of care from the current TB control program to the receiving one. The current TB control program should make the interjurisdictional notification to coordinate care with the receiving TB control program before the minor is released from ORR custody. This should be documented by the UAC program provider.

For UAC with suspect or confirmed TB who may be repatriated back to their home country, referral is still indicated. UAC to be repatriated back to Mexico or Central America should be referred to the CureTB program before discharge from ORR custody: http://www.sdcounty.ca.gov/hhsa/programs/phs/cure_tb/ UAC to be repatriated to Central America or any other country should be referred to TBNet before discharge from ORR custody: http://www.migrantclinician.org/services/network/tbnet.html In addition, referrals can also be made to CureTB or TBNet to obtain information about UAC previously diagnosed with TB in their country of origin.

Thank you for taking care of these most vulnerable of children in the U.S.

Sincerely,

Curi Kim, MD, MPH
Medical Officer
Office of Refugee Resettlement
Administration for Children and Families

# Active TB Screening Algorithm for UAC in ORR/DCS Care ★



10/27/2014



TB/HIV/STD/ Viral Hepatitis
Epidemiology and Surveillance

# Instructions for Reporting Tuberculosis ( TB) Identified Among Unaccompanied Alien Children (UAC) Effective June 6, 2014 Updated: August 29, 2014

The Department of State Health Services (DSHS), TB/HIV/STD/Viral Hepatitis Epidemiology and Surveillance Branch (Branch) is enhancing its reporting mechanism to capture UAC ages 0 – 17 years that are referred to a local health department or health service regional TB program for evaluation for TB effective June 6, 2014.

A simple worksheet with instructions have been sent to all case registries for weekly reporting of UAC identified with <u>TB infection</u>, suspicion of disease or confirmed TB disease.

## <u>Reporting UAC Using the Report of Verified Cases of TB (RVCT) Form</u>

1. **Report all TB cases, suspects <u>and infections</u> identified among UAC to the Branch within 24 hours of diagnosis using the RVCT form**.

2. Include the name (be specific) of the shelter on the street address section of the RVCT. Branch staff will enter the name of the shelter on Adress1 and the physical address on Adress2.

3. If an unaccompanied minor is evaluated for TB infection or disease after being placed in "sponsored custody", please include on your weekly reporting form. Enter "sponsored custody" in the column, "shelter name".

4. For question # 25, "Primary Reason Evaluated for TB Disease", default to targeted testing.

5. For question #29, "Resident of Long-Term Care Facility", default to yes and enter "type" as residential facility.

6. Send all UAC RVCT reporting forms via PHIN in a separate WinZip file. Clearly indicate that the reporting forms are for reporting UAC.


**TEXAS**
Department of
State Health Services

## Texas Department of State Health Services
## Tuberculosis Symptom Screening Form

Name: _____ DOB: _____

Facility Name: _____

Person completing form: _____ Title _____ Date _____
                          Print Name

Upon intake, all clients should be screened for symptoms consistent with tuberculosis. Please ask all clients during the intake process if they have any of the symptoms listed below. Persons with symptoms should receive a chest x-ray, regardless of TB skin test or Interferon-Gamma Release Assay (IGRA) test result.

Clients or employees with a documented history of a positive tuberculin skin or IGRA test result should not be re-tested or receive annual x-rays. In lieu of annual chest x-rays, symptom screening should be performed annually to determine the presence of TB disease. Any person with symptoms should receive a chest x-ray and be evaluated for TB disease.

If a client answers yes to any of the following questions, please document the approximate date each symptom started.

| | | | | |
|---|---|---|---|---|
| 1. | Productive cough for 2 weeks or more | No | Yes | Date _____ |
| 2. | Persistent weight loss without dieting | No | Yes | Date _____ |
| 3. | Persistent fever above 100 degrees F | No | Yes | Date _____ |
| 4. | Night sweats | No | Yes | Date _____ |
| 5. | Loss of appetite | No | Yes | Date _____ |
| 6. | Swollen glands in neck or elsewhere | No | Yes | Date _____ |
| 7. | Coughing up blood (hemoptysis) | No | Yes | Date _____ |
| 8. | Shortness of breath | No | Yes | Date _____ |
| 9. | Chest pain | No | Yes | Date _____ |
| 10. | Headaches, neck stiffness, and/or disorientation or confusion | No | Yes | Date _____ |

Notes: _____

_____

_____

Chest x-ray referral:     Date: _____ Referred to: _____

Sputum collection referral: Date: _____ Referred to: _____

Medical evaluation referral: Date: _____ Referred to: _____

**Clients that have symptoms consistent with TB should be placed in isolation under negative air pressure until a diagnosis of tuberculosis can be ruled out. Employees with symptoms consistent with TB should be placed on a work stop precaution until a TB diagnosis is ruled out.**

EF# 12-12870   (9/14)