**DR. ORLY TAITZ, ESQ**

**29839 SANTA MARGARITA, STE 100**

**RANCHO SANTA MARGARITA, CA 92688**

**PH 949-683-5411 FAX 949-766-7687**



# US DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

### BROWNSVILLE DIVISION

**TAITZ,**            )            **Case # 14-cv-00119**

**V**            )      **HONORABLE ANDREW S. HANEN PRESIDING**

**JOHNSON, ET AL  )**

**SUPPLEMENTAL BRIEF  SUBMITTED BY NOVEMBER 7, 2014 PER**

**10.29.2014 COURT ORDER**

## PRELIMINARY NOTE

Plaintiff could not obtain the transcript of October 29,2014 hearing, as she received an e-mail from Court Reporter Barb Barnard stating that since the hearing was lengthy, the transcript cannot be ready until early next week, which would be after Nov 7 deadline set by this court to submit the supplemental brief. For this reason Plaintiff is quoting the statements by the experts and the court by memory and cannot provide the court with exact citations from October 29th hearing. If the exact citations are needed, Plaintiff will need more time for this supplemental brief.

Based on the comments by the court during October 29, 2014 hearing, it appears that prior to October 29th hearing  the court did not read the First Amended Complaint and the plaintiff's Opposition to Motion to Dismiss  yet. Plaintiff incorporates by reference  all the pleadings, precedent cases, argument and exhibits from these and other pleadings previously submitted in this case, specifically lengthy discussion with precedents on the issue of standing based on injury, threat of injury and tax payer standing, as well as standing as it relates to additional causes of action for defamation and RICO.

1. **THIS COURT SHOULD NOT REWARD THE DEFENDANTS FOR THEIR OBSTRUCTION OF JUSTICE AND REFUSAL TO PROVIDE EVIDENCE OF INFECTIOUS DISEASES AMONG ILLEGAL ALIENS TRAFFICKED BY THE GOVERNMENT FROM TEXAS TO THE OTHER 49 STATES**

Dr. Orly Taitz , ESQ, plaintiff herein,  still suffers from the persistent cough which started in July of this year. On 11.05.2014 she was yet again at her doctor's office with continuous upper respiratory infection and was given antibiotics yet again (Exhibit 1 Affidavit by Taitz and prescription from Dr. Yolanda Gomez). Taitz presented this court with two  affidavits from epidemiologist Vera  Dolan (Exhibit 1 FAC and Exhibit 1 Opposition to Motion to Dismiss), who attested that in her professional opinion plaintiff got infected from treating illegal alien patients, who were transported from Texas to California by the defendants and placed by the defendants in foster care and were  illegally placed by the defendants in federal health care programs, where plaintiff is a doctor-provider. Dolan wrote:

"As an  epidemiologist, I  believe  that  Dr.  Taitz's  respiratory  infection originated

from close contact with infected patients who were sent for treatment to her office, in particular immigrants who were detained by the DHS without quarantine or medical treatment for existing communicable diseases and then transported to California.

I believe that Dr. Taitz is in further imminent danger of similar additional infections from immigrant patients detained by the DHS without quarantine or medical treatment for existing communicable diseases.

I believe that quarantine and isolation of these detainees by the DHS to the most stringent current standard of the Centers of Disease Control (CDC) for foreign nationals, examination of each detainee by a trained medical professional to the highest current standard of the CDC for foreign nationals, and a signed medical release prior to transportation and release of each of these detainees into the general public, would solve the problem of the imminent risk of contracting communicable diseases from such detainees by Dr. Taitz and other health care providers who are participating in these programs.

I declare that my assessments are true and correct based on my current knowledge and informed consent." (Exhibit 1 to FAC, Statement from an epidemiology expert Vera Dolan).

This provides clear standing in injury in fact and basis for requested injunction of a quarantine in order to stop an ongoing tort and ongoing threat of injury of re-infection.

Dolan was certified as an expert in Epidemiology by this court. As an epidemiologist she testified that this infection happened in summer and coincided with a surge of illegal immigrants trafficked by the defendants. This Infection did not happen in winter during the flu season, it did not happen in spring, during the allergy season, it happened in summer coinciding with the trafficking of illegal aliens. Additionally, Taitz provided this court with the report by the Inspector General of the DHS (Complaint and First Amended Complaint), which stated that in multiple locations, where illegal aliens were detained,   there were multiple cases of upper respiratory tract infections, Tuberculosis, scabies, lice and other infectious diseases. She also provided the court with a press release of Border Patrol union representative, Ronald Zermeno, disclosing that defendants are trafficking from Texas o California infected individuals and border patrol agent were infected (FAC). Vera Dolan, a trained epidemiologist, concluded in her two

sworn affidavits attached  as Exhibit 1 to the First Amended complaint and Exhibit 1 in Opposition to motion to dismiss that Taitz was infected by one of illegal aliens sent to her office by the defendants and not through other sources.

Defense never provided a statement by any epidemiologist, who would contest findings by Dolan. Defense brought as their witness Dr. Escobedo, who is a doctor, but not an epidemiologist. The difference between the two is in that the doctor treats the disease, but epidemiologist provides the reason for the disease, explanation, where did it come from. Since the defense    never provided a testimony of any epidemiologist, they never refuted the findings by epidemiologist Vera Dolan, who provided her expert opinion that Taitz was infected by an illegal alien, who was trafficked by the defendants from Texas to California. Not only her statement provided standing, it provided the basis for requested relief.

In their Answer to Order to Show Cause and in their Motion to Dismiss defendants stated that plaintiff cannot pinpoint a specific illegal alien patient who infected her.

Taitz requested from the defendants records showing what infections were diagnosed in some 100 camps where illegal aliens were detained and information where these individuals were transferred. Defendants refused to provide this information  claiming that they are exempt from discovery until their 12b(1) and

12(b) 6 motion to dismiss is adjudicated and until there is a Rule 26 case management conference. (Plaintiff's Exhibit 4 during October 29th hearing).

Further, during October 29. 2014 hearing defense witness Dr. Escobedo, testified that he is not the one to sign the quarantine orders for sick and exposed individuals, that such orders are signed by the Chief of the Quarantine department at CDC, Marty Cetron, in the name of the Secretary of Health and Human services Sylvia Burwell, who is one of the defendants herein.

Next day after the hearing, plaintiff e-mailed the attorney for the defense, Mr. Kisor and requested pertinent records from Dr. Martin Cetron (Exhibit 2). Mr. Kisor did not even respond to the request. Taitz submitted FOIA Request to Mr. Cetron (Exhibit 3). Taitz received a response from CDC (Exhibit 4) that her FOIA request was received and was forwarded to the FOIA department. So far there was no response.

Defendants are stating that the case needs to be dismissed due to the fact that plaintiff does not provide information, which the defendants have in their possession, but refuse to release. The defendants are obstructing justice, they are trafficking sick illegal aliens or illegal aliens who have been in contact with sick illegal aliens, while they were in detention camps, they infected the plaintiff and others. Expert, Vera Dolan, testified that she believed that recent epidemic of

Enterovirus D68 is due to defendants' trafficking of illegal aliens all over the country. Plaintiff, also, provided the court with an affidavit of  Ear Nose and Throat surgeon, Dr. Heinrich, who stated that he, anesthesiologist and the whole team of nurses were infected with  Laryngeal Tuberculosis from a patient, who was an illegal alien from Mexico. This very court, honorable Judge Hanen, stated that an illegal alien with active Tuberculosis was brought to his very courtroom and the court questioned defense witnesses, how could that happen, as this illegal alien went through different stages of detention with the border patrol and DHS, was supposed to be checked for infectious diseases and denied admission to the U.S. or at least treated,  but wasn't .

This court during October 29th hearing asked the defendant's witness, why did he violate the law, when the witness stated that sick illegal aliens were sent to different facilities, while according to 8USC 1182 and INA 202 these sick illegal aliens were supposed to be denied admission to US and were supposed to be turned around and deported.

Defense should not rewarded for its' refusal to provide information and records of sick illegal aliens trafficked by the defendants all over the country, they should not be rewarded for their Obstruction of Justice  and the motion to dismiss due to alleged lack of standing should be denied.

## 2.  SUPPLEMENTAL PLEADINGS ON STANDING BASED ON

## "THREAT OF INJURY" THEORY OF STANDING

During October 29, 2014 hearing this court questioned plaintiff Taitz in regards to standing based on "threat of injury"

Taitz argued that standing is granting not only based on injury that already occurred, but also based on the thread of injury.

Indeed, if the standing were to be limited only to injury which already occurred, then we probably would not see any injunction cases, rather all cases would have been limited to claims for damages. The whole point is to prevent injury when there is a threat of injury. Stay and injunction are the conduits for such claims.

The precedent of **NORTHWEST FOREST WORKERS ASS'N V. LYNG UNITED STATES DISTRICT COURT, DISTRICT OF COLUMBIA.APRIL 25, 1988, 688 F.SUPP. 1 clearly shows that** individuals challenging immigration decisions based on a threat of injury, not injury, which already occurred.

N. W Forest Workers Ass'n, 688 F. Supp. at 3 n.2 (holding that nonprofit

"**concerned with the economic, environmental and demographic effects of immigration" had standing to challenge immigration regulations on the ground that the regulations improperly expanded the scope of a guest worker program**." *id*

Here plaintiff is challenging an illegal and unconstitutional immigration program DACA and unlawful policies and improper interpretation of requirements under *Flores v Reno*, as well as current policies of DHS and HHS, where defendants are violating existing immigration laws which dictated that they have to refuse entrance to immigrants who do not have vaccination records  and they are trafficking all over the country illegal aliens who either have infectious diseases or ones who were exposed to infectious diseases.

Let's draw a parallel between *NW Forest workers Assn* and Taitz.

The threat of injury in *Forest Workers* was a threat that forest workers, members of the association will lose their jobs and will see their wages go down due to a large number of temporary worker visas given by the government.

In Taitz the threat of injury is much stronger, as Taitz, as a Doctor of Dental Surgery, is treating these immigrants, she is in a close contact, routinely is in contact with blood and saliva of these patients and she is in imminent threat of re-infection with upper respiratory tract diseases, as well as deadly diseases, such as Ebola, Tuberculosis and Enterovirus D68.

Based on the precedent of *NW Forest Workers,* even if Taitz cannot pinpoint a specific illegal alien, who infected her, she still has standing to seek a ban on travel and quarantine to stop re-infection under the "threat of injury" theory of standing.

Further, at October 29th hearing, this court commented that Washington Post published a report that Obama is planning massive amnesty of illegal aliens. This court questioned whether this massive amnesty will lead to an increase in illegal immigration and therefore an increase in the number of individuals with infectious diseases being transported by the government all over the country.

Chief of Border Patrol Kevin Oaks responded that based on prior amnesties he believes that indeed there will be an increase in illegal border crossing. This sentiment of chief Oaks is echoed by sheriffs all over the country:

"Rockingham County, NC Sheriff Sam Page (R) said that "we'd anticipate another surge as we saw like this summer with thousands of persons coming across our border" if the president attempted to implement immigration reform via an executive order on Wednesday's "Your World with Neil Cavuto" on the Fox News Channel.

When asked about his concerns over the prospects over executive amnesty, he said "my fear would be that we'd anticipate another surge as we saw like this summer with thousands of persons coming across our border, particularly along the Rio Grande Valley."

Page added, "my understanding, there are estimated over 400,000 illegal immigrants here in North Carolina. Of course, you can look at economic issues. I try to stay with the public safety concerns. But we have found this, because we have open and porous borders, what comes through the border does not stay at the border. Whether it be drugs, human trafficking, drug trafficking, drug cartels, gangs, you name it. Even terrorists or even someone might be a biojihadist who might want to come in bring Ebola or other type[s] of viruses into our country as we've seen."

Page also said that the border crisis over the summer was in party caused by "poor messaging from this administration and also from news services in Mexico and also from, of course, the Mexican drug cartel[s]. Because they were the ones who stood to profit on this." And "there's a lot of encouragement for persons that are illegal to come into the United States." http://www.breitbart.com/Breitbart-TV/2014/11/05/NC-Sheriff-Fears-Another-Surge-of-Illegals-Caused-By-Executive-Amnesty

"The law applies to you and I as citizens, and yet it appears there is no law when it comes to illegals," Pinal County Arizona Sheriff Paul Babeu said in a statement provided to Breitbart News. "The message the President's action will send is this: if you can get to the border, you're home free. It completely undermines the rule of law and makes the job of every law enforcement officers – which is already difficult – impossible. We already have our hands full because the border is not secure: imagine what the situation will look like when the President gives executive amnesty to those already here. It would unleash a tidal wave of illegal border crossings, overwhelming law enforcement. It will be open season for the cartels. Again: the border is not secure now – to give a presidential amnesty would be to make matters dramatically worse for our officers who are trying to do the job the President won't." http://www.breitbart.com/Big-Government/2014/11/03/Law-Enforcement-Defines-Election-As-Referendum-Obama-s-Amnesty-Means-Tidal-Wave-Of-Illegal-Immigration

Based on all of the above, the standing based on "threat of injury" for the plaintiff and for similarly situated individuals is stronger, as with the impending mega amnesty, there will be a wave of illegal immigration and stronger threat of infection.

## 3. QUARANTINE IS WARRANTED AND NECESSARY UNDER THE THREAT OF INJURY THEORY OF STANDING

US District court for the District of Columbia found standing for Association of Orchid growers **seeking quarantine of imported orchids**:

**"Hawai"i Orchid Growers Ass'n v. U.S. Dept. of Agr.**

United States District Court, District of Columbia. June 29, 2006 436 F.Supp.2d 45 2006 WL 1777488

...The Court concludes, contrary to defendants' argument, that plaintiff has adequately demonstrated for purposes of establishing standing that alien pests may invade Hawaii and its native orchids through eggs laid in the sphagnum moss, in which maturing Phalaenopsis orchids are cultivated in Taiwan (sphagnum moss that will be allowed entry into Hawaii with mature potted Phalaenopsis spp. orchid plants).... *id*

In *Orchid Growers* potential injury was in that a pest from the moss in which those orchids grew, would infect the moss of domestic orchids and the growers might potentially lose some of their orchids.

In comparison the threat of injury to Taitz is much more serious. She is under a threat of infection with a number of deadly diseases. In the case at hand granting standing is much more justified.

Other precedents show quarantine successfully upheld by federal courts:

## Smith v. St. Louis & S.W. Ry. Co.

Supreme Court of the United States. April 22, 1901 181 U.S. 248 21 S.Ct. 603

IN ERROR to the Court of Civil Appeals of the Second Supreme Judicial District of the State of Texas to review a decision reversing a decree declaring quarantine regulations unconstitutional. Affirmed. See same case below, 20 Tex. Civ. App. 451, 49 S. W. 627.

The Supreme Court has found:

...It shall also be the duty of said commission to co-operate with live-stock quarantine commissioners and officers of other states and territories, and with the United States Secretary of Agriculture, in establishing such interstate quarantine lines, rules, and regulations as shall best protect the live-stock industry of this state against Texas or splentic fever.

...If the fact that a contagious disease is liable to break out in a certain locality be sufficient to justify a quarantine against such locality, then it is possible that every port of the United States may quarantine against Cuban or other West Indian ports, since it is a well-known fact that yellow fever is liable to break out there at almost any time, and especially during the summer months....

Moreover, Supreme  Court found:

"It is urged that it does not appear that the action of the live-stock sanitary commission was taken on sufficient information. It does not appear that it was not, and the presumption which the law attaches to the acts of public officers must obtain and prevail. The plaintiff in error relies entirely on abstract right, which he seems to think cannot depend upon any circumstances, or be affected by them. This is a radical mistake. It is the character of the circumstances which gives or takes from a law or regulation of quarantine a legal quality. In some cases the circumstance would have to be shown to sustain the quarantine, as was said in *Kimmish* v. *Bell*, 129 U . S. 217, 32 L. ed. 695, 2 Inters. Com. Rep. 407, 9 Sup. Ct. Rep. 277. But the presumptions of the law are proof, and such presumptions exist in the pending case, arising from the provisions of and the duties enjoined by the statute, and **607 sanction the action of the sanitary commission and the governor of the state. If they could have been, they should have been met and overcome, and the remarks of the court of civil appeals become pertinent…"

So, even using *Kimmish v Bell*, more strict approach, quarantine is warranted , as we have seen three Ebola cases in Texas alone, one in New York, multiple cases of Tuberculosis and hundreds of children infected with Enterovirus in the recent epidemic, nine of these children were paralyzed as a result of the infection and five died.

Further the court in Smith v. St. Louis & S.W. Ry. Co found:

" As the court of civil appeals said: 'The necessities of such cases often require prompt action. **If too long delayed the end to be attained by the exercise of the power to declare a quarantine may be defeated and irreparable injury done.**' *Id*"

Similarly, in case at hand, if quarantine is not established, Taitz and similarly situated individuals, such as health providers,  border patrol agents and caregivers can get infected if timely quarantine is not established. Supreme Court of the United States is stating the same as what Taitz is stating: **there will be irreparable harm without a quarantine.**

Further, the only limitations to quarantine are:

1.  The court has to be reasonable both as to who was quarantined and he conditions of the quarantine

2.  There has to be a notice to quarantined individuals

**LAW IN THE TIME OF CHOLERA: DISEASE, STATE POWER, AND QUARANTINES PAST AND FUTURE  Temple Law Review Spring 2007 80 Temp. L. Rev. 53**

I. Introduction. 54 II. A Brief History of Quarantine. 62 III. The 1892 Threatened Epidemics: Immigrants, Pesthouses, and Oysters. 68 A. Methodology. 68 B. The Most Modern of Facilities: The New York City Board of Health. 69 C. Frontiers:

Immigration and Typhus. 72 D. The Erasure of the Juridical Being. 76 E. Awaiting Cholera. 79 F. Cholera and...

...Finally, the Court emphasized that any quarantine had to be reasonable both as to who was quarantined and the conditions of quarantine....

...[FN406] After three business days, if quarantine continues, the individual or groups of individuals quarantined must receive a written notice of quarantine....

**Moreover, 113 Congress confirms the right of both state and federal government to quarantine individuals and allocated funding for such quarantine**

**2013 CONG US HR 5464**

113th CONGRESS, 2nd Session September 15, 2014 H. R. 5464 Introduced in House

...For carrying out titles II, III, and XVII, and section 2821 of the PHS Act, titles II and IV of the Immigration and Nationality Act, and section 501 of the Refugee Education Assistance Act, with respect to emerging and zoonotic infectious diseases, $501,675,000: **Provided, That of the amounts available to pay for the transportation, medical care, treatment, and other related costs of persons quarantined or isolated under Federal or State quarantine law**, up to $1,000,000 shall remain available until expended....

...For carrying out titles II, III, and XVII of the PHS Act with respect to global health, $498,670,000, of which $128,420,000 for international HIV/AIDS shall remain available through September 30, 2016, and of which $5,000,000 shall remain available through September 30, 2016, to support national public health institutes: Provided, That funds may be used for purchase and insurance of official motor vehicles in foreign countries: Provided further, That $30,000,000 provided under this heading is for expenses necessary to respond to Ebola outbreaks and other emerging infectious diseases: Provided further, That with respect to the previous proviso, the Director may transfer these resources to any of the accounts of CDC for Ebola...

**78 FR 11522-01**

DEPARTMENT OF HEALTH AND HUMAN SERVICES Friday, February 15, 2013 RULES and REGULATIONS...

...(v) Each heating ventilation and air-conditioning unit in the quarantine facility must be designed so that there is no mixing of air among quarantine rooms and each quarantine room must remain under negative air pressure in relationship to the common hallway or anteroom(s) adjacent to the quarantine room....

...(x) An importer must ensure that different cohorts of NHPs are quarantined in separate quarantine rooms....

During October 29 hearing Taitz brought an example of Dallas County Judge Clay Jenkins issuing a 21 day quarantine order to all individuals who were in close contact with Ebola patient, Tomas Duncan.

Similarly, after two nurses were infected with Ebola and one of these nurses flew to Ohio, Judge Jenkins issued a quarantine to all health care providers, who were in contact with Ebola patients, Thomas Duncan and nurses Nina Pham and Amber Vinson, not to use public transportation and not to enter public places such as supermarkets and restaurants for 21 days.

Recently a district judge issued a quarantine order in Maine.(Exhibit 5) This case revolved around a nurse, Kaci Hickox, who treated Ebola patients in Western Africa. Originally she was ordered into quarantine in New Jersey,pursuant to it's quarantine statutes (Exhibit 6). New Jersey is the state, where Hickox first arrived into the US. Later, Hickox was allowed to travel to her home state of Maine using non-public transportation and was ordered by Maine Health Department to stay at home quarantined. When Hickox disobeyed quarantine orders, the state department of Maine thought a preliminary injunction and the chief judge of the District court

issued a preliminary injunction    ordering Hickox to stay in quarantine.(Exhibit 5)

Later, due to the fact that Hickox presented blood tests, taken in the span of some

10 days, showing that she is Ebola negative, the judge loosened the injunction.

Both Texas and Maine cases show that courts routinely quarantine individuals who

are either infected with a serious infectious disease or were exposed to a serious

infectious disease. However, the state judges have no jurisdiction to quarantine

individuals who are in federal custody. This is the jurisdiction and duty of the

federal court. For this reason Taitz filed the case at hand, in this court. This court

has a duty to issue a quarantine order for all individuals who are arriving from

Ebola Hot Zone: Liberia, Sierra Leon and Guinea, as well as illegal aliens, who do

not have any vaccination records and are either infected with serious contagious

disease or exposed to serious contagious diseases, to be in quarantine, as well as

illegal aliens, who are in BP, DHS and HHS custody and who arrived here

illegally.

## 4.  SUPPLEMENTAL INFORMATION REGARDING TAX PAYER STANDING

During October 29th hearing this court also questioned plaintiff's standing as a tax

payer

 Flast v Cohen 392 U.S. 83 (1968), quoted in the FAC, is the defense mechanism

for a tax payer. In Flast the tax payers successfully challenged  expenditure by the

federal government for religious books. Flast does not limit taxpayer standing to the Establishment clause and simply provides a three prong test: the action by the government should stem from its taxing and spending power, it affects the taxpayers and it is prohibited. Use of taxpayer money for religious institutions,  as seen in Valley Forge, is not the only prohibited action. Taitz provided multiple evidence of defense using taxpayer funds  to traffic illegal aliens around the country, pay for their health care and education and pay $84,000 per year to foster families to foster them. These actions were clearly prohibited under Flores v Reno, which prohibits release of individuals who might represent harm to themselves and others.    Defendants not only released them from custody and caused spread of infectious diseases, but they also spent millions of taxpayer dollars, which they were prohibited from spending.  Additionally, instead of suspending flights and banning travel from countries with deadly Ebola epidemic, defendants keep the borders open. Plaintiff, as a tax payer has standing in challenging government expenditure of millions  of dollars on individuals with communicable diseases, who according to 8 USC 1182 were supposed to be denied admission to US in the first place. Thomas Duncan, Liberian Ebola patient, was illegally admitted into the US. His care cost estimated half a million dollars. Care of two nurses infected by him cost another million. Additionally, monitoring of hundreds of individuals who were in contact with him cost millions of dollars. Taitz does not have a total and

final number, however in another Ebola case in New York (Exhibit 7) the city is monitoring 357 individuals who were in contact with one Ebola patient, Craig Spencer. City officials expect their response to Ebola to cost "many millions" and plan to ask the federal government for help in paying the costs. As a taxpayer, under Flast v Cohen, Taitz   is challenging such expenditure of millions of dollars and asserts that an order of quarantine would save her and other U.S. taxpayers millions of dollars of such expenditures.

## 5. <u>THIS COURT HAS JURISDICTION TO BAN TRAVEL AND QUARANTINE ANY NON-US CITIZENS UNDER 8 USC 1182, IF THEY HAVE COMMUNICABLE DISEASES OF PUBLIC SIGNIFICANCE OR IF THEY DO NOT HAVE A RECORD OF VACCINATION</u>

Under 8 USC 1182 any individuals who have communicable diseases of public significant or have no  record of vaccinations are not admissible to the United States

8 USC 1182
 **(a) Classes of aliens ineligible for visas or admission**

Except as otherwise provided in this chapter, aliens who are inadmissible under the following paragraphs are ineligible to receive visas and ineligible to be admitted to the United States:

**(1) Health-related grounds**

**(A) In general**

Any alien—

(i) who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to have a communicable disease of public health significance; [1]

(ii) except as provided in subparagraph (C), who seeks admission as an immigrant, or who seeks adjustment of status to the status of an alien lawfully admitted for permanent residence, and who has failed to present documentation of having received vaccination against vaccine-preventable diseases, which shall include at least the following diseases: mumps, measles, rubella, polio, tetanus and diphtheria toxoids, pertussis, influenza type B and hepatitis B, and any other vaccinations against vaccine-preventable diseases recommended by the Advisory Committee for Immunization Practices,

(iii) who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services in consultation with the Attorney General)—

(I) to have a physical or mental disorder and behavior associated with the disorder that may pose, or has posed, a threat to the property, safety, or welfare of the alien or others, or

(II) to have had a physical or mental disorder and a history of behavior associated with the disorder, which behavior has posed a threat to the property, safety, or welfare of the alien or others and which behavior is likely to recur or to lead to other harmful behavior, or

(iv) who is determined (in accordance with regulations prescribed by the Secretary of Health and Human Services) to be a drug abuser or addict,

is inadmissible.

Plaintiff provided evidence that illegal aliens and legal aliens from Ebola hot zone were admitted to the US and infected multiple individuals.

This court has jurisdiction and duty to order defendants to comply with 8 USC 1182.

As a matter of facts, during October 29 hearing this court demanded answers from government witnesses why they are violating the law referring to admission into the US of individuals with infectious diseases. This court specifically asked plaintiff's expert, Epidemiologist Vera Dolan, what the court can do to protect

American citizens. Miss Dolan stated that in the case of Ebola  the best protection is   provided through ban on travel from Ebola hot zone, as it was done in over 30 countries. Second best solution is quarantine of individuals who arrived . Ms. Dolan did not offer any other solutions in protecting the public.

This court questioned the government witness, Dr. Escobedo, whether ordering an Ebola  blood test for every individual arriving from Ebola region would solve the situation. Dr. Escobedo responded that it is a good idea, but stated that this is beyond his authority.

What is of a great concern, is that the defendants entered into a settlement agreement with plaintiffs in *Flores v Reno* in order to provide better accommodations for illegal aliens, who had no constitutional right to demand anything but deportation, yet the defendants are violating 8 USC 1182, infected the plaintiff and other similarly situated individuals and are subjecting the plaintiff and other similarly situated individuals to deadly diseases and yet the plaintiffs were not willing to enter into any settlement agreement to alleviate the situation and stop their violations which threaten the health and life of law abiding US citizens. As such, this court should either grant the injunctive relief as requested or order the defendants to enter mandatory mediation   and provide a settlement proposal, as to how they will comply with 8 USC 1182, either by banning travel from Ebola hot

zone, demanding mandatory Ebola testing prior to granting visas, or quarantine of all individuals arriving from Ebola region and all illegal aliens in defendant's custody.

6. **Government witness, Dr. Escobedo, is not an epidemiologist, clueless about the Ebola disease, brought as exhibits, guidelines created in anticipation of the court hearing with no evidential value**

Defendants brought as their expert, Dr. Escobedo. As stated previously, Dr. Escobedo is a medical doctor, but has no degrees in epidemiology.

His lack of knowledge of epidemiology was flagrant. When asked by Taitz about the Risk of Ebola, he stated that it is very law. This is the opposite of what it really is. Ebola is the most dangerous, most virulent risk 4 infectious disease:

**Allen v. National Institutes of Health**

United States District Court, D. Massachusetts. September 30, 2013 974 F.Supp.2d 18 2013 WL 5434817

ENVIRONMENTAL LAW - Impact Statements. EIS for bio-safety laboratories adequately analyzed risks of malevolent acts at all potential locations.

...   The Ebola virus is transmissible as a blood-borne pathogen....

...The six BSL–4 pathogens are the (1) Ebola virus, causing highly fatal hemorrhagic fever that interferes with the blood's ability to clot, causes internal bleeding, and damages the body's vascular system; (2) Marburg virus, closely related to the Ebola virus, also causing highly fatal hemorrhagic fever; (3) Lassa virus, causing a viral hemorrhagic fever; (4) Junín virus, causing the Argentine hemorrhagic fever; (5) Tick-borne Encephalitis virus, causing encephalitis transmitted through the bite of an infected tick; and (6) Nipah virus, causing viral encephalitis....

When an alleged expert claims that the highest BSL –Risk 4 disease is a "low risk" disease, he is clearly not knowledgeable in epidemiology. Additionally Dr. Escobedo provided anecdotal evidence, where he stated that he talked to a doctor from one Mexican state of Chihuahua and was told that there is no Enterovirus in that state. Of course, Mexico has 53 states and District Federal. The fact that there is no Enterovirus epidemic in one state means absolutely nothing in relation to origin of Enterovirus epidemic.

Further, Dr. Escobedo admitted that CDC, which is under the supervision of the defendant Secretary of Health and Human Services Sylvia Burwell, indeed has a quarantine unit, which is headed by Dr. Martin Centron, which is supposed to quarantine individuals. However, Dr. Escobedo did not provide this court with any evidence to show that HHS and CDC did anything to protect individuals from

infectious diseases carried by hundreds of thousands of illegal aliens crossing the U.S. border. He did not have with him one single quarantine order which would quarantine individuals with active Tuberculosis, Enteroviris, Ebola or any other disease. Dr. Escobedo brought with him as exhibits a few instructions in regards to Tuberculosis, however the date on most of the exhibits was August, September and October of 2014. Some exhibits had a stamp of October 25th, 2014, which clearly showed that these documents were created in preparation to this court hearing and there is no evidence that any instructions were actually related to any HHS and DHS employees in the field and that any quarantine was actually set.

Further, Dr. Escobedo had no answer to a question, what happens when individuals lie on their immigration forms and do not report their contact with Ebola patients, as it happened with Ebola patient Thomas Duncan in Dallas, TX.

Dr. Escobedo stated that they have "a sort of a quarantine", where they give individuals from Ebola hot zone, arriving in 5 US airports, kits with some phone numbers and a thermometer. Even this court, Honorable Judge Hanen asked Dr. Escobedo, what kind of quarantine is it, if people are riding subway and going bowling? Judge Hanen even joked that he always says that one should bring his own shoes for bowling (meaning not to catch any diseases).

Moreover, Dr. Escobedo was mistaken in relation to transmission of Ebola. He stated that Ebola can be transmitted only by touching bodily fluids of the patient. His claims were disputed by the plaintiff's witness Epidemiologist, Vera Dolan, who stated that Ebola can be transmitted through aerosol, meaning through droplets related to sneezing, coughing, sweat.

In this supplemental brief plaintiff submits the latest CDC guidelines (Exhibit 8), which show that Ebola indeed can be transmitted by aerosols to a distance of 6 feet, which makes the case stronger for the plaintiff, as the plaintiff is more likely to be infected by working with an infected patient.

## 7. ENORMOUS PUBLIC CONCERN IN THE OUTCOME OF THIS CASE

One of the prongs in granting injunctive relief, is Public concern and Public Policy. It is axiomatic that protecting the public from deadly infectious diseases is in public interest. Plaintiff has already pled fully all prongs of injunctive relief in her FAC and Opposition to Motion to Dismiss, however in this supplemental brief Plaintiff  provides (Exhibit 9) some of the links, showing that multiple schools, school districts, particularly in Texas, as well as border patrol organizations, law enforcement organizations and professional health care organizations published

Enquirer and other articles which described this case. These school districts and other professional organizations are following this case and these organizations and school districts are eagerly awaiting decision by Judge Hanen to see if the health of U.S. citizens will be protected.

## CONCLUSION

Based on pleadings in the First Amended Complaint, Opposition to Motion to Dismiss, supplemental pleadings, oral argument and expert testimony provided during August 27, 2014 and October 29, 2014 hearings and supplemental pleading herein, this court should find that the plaintiff indeed has standing and the relief requested in the First Amended Complaint should be granted.

Respectfully,

Dr. Orly Taitz, ESQ

11.06.2014

# EXHIBIT 1

Supplemental declaration of Orly Taitz

I have personal knowledge of the facts below and declare as follows:

1. I am a Doctor of dental Surgery
2. I am a doctor-provider for Medical, California division of Federal Medicaid program, which provides medical care for new immigrants.
3. In June-July 2014 DHS and HHS transported a large number of illegal aliens, mostly minors, to California and they were places in Foster Care and enrolled in federal programs, such as Medicaid
4. According to Inspector General of DHS, many of these illegal alien minors suffered from Tuberculosis, other respiratory diseases, lice and scabies.
5. According to the press release of Ronald Zermeno, spokesman of the local Border Patrol unit. these infected  individuals were flown by the defendants to California and infected some Border Patrol Agents, who came into contact with them
6. To the best of my knowledge I was infected with an upper respiratory disease from one of my patients, who was transported by the defendants and sent to my office
7. At the time of infection, in July of 2014, there  was no flu epidemic, it is not an allergy season and there is no other source of infection.
8. From July till November 2014 I have been taking intermittently  antibiotics, had chest x-rays, blood and sputum tests and multiple doctors visits due to upper respiratory infection.
9. Previously I submitted to this court an order from my doctor requiring me to have C-Pap oxygen machine, to be used at night for the rest of my life.
10. I do not have a history of smoking, Tuberculosis, Asthma, airway constriction or any other reasons for insufficiency of oxygen in blood.
11. I contacted the defendants and requested information on individuals transported by the defendants to my region, yet defendants refused to provide any information.
12. I consulted epidemiologist Vera Dolan who concluded in her professional opinion that my upper respiratory illness and need for Oxygen machine is due to infection from one of those illegal alien individuals, who were transported by the defendants and sent to my office.

I declare under penalty of perjury that all of the above is correct and to the best of my knowledge

Orly Taitz

11.06.2014

**YOLANDA P. GOMEZ, M.D.**
22342 Avenida Empressa, Suite 195
Rancho Santa Margarita, CA 92688
Phone (949) 713-9705   Fax (949) 858-3826

LIC # C50624                                        DEA # AG 2905125

Patient Name

ORLY MITZ

Date

11/3/14          7  0430

Address

℞ 1

℞ 2

℞ 3

| QUANTITY | 1-24 | 25-49 | 50-74 |
|---|---|---|---|
| 75-100 | 101-150 | 151 & OVER | Units |
| Do not substitute - Dispense As Written |
| REFILL: NR 1 2 3 4 |

| QUANTITY | 1-24 | 25-49 | 50-74 |
|---|---|---|---|
| 75-100 | 101-150 | 151 & OVER | Units |
| Do not substitute - Dispense As Written |
| REFILL: NR 1 2 3 4 |

| QUANTITY | 1-24 | 25-49 | 50-74 |
|---|---|---|---|
| 75-100 | 101-150 | 151 & OVER | Units |
| Do not substitute - Dispense As Written |
| REFILL: NR 1 2 3 4 |

No. of Drugs Prescribed: 2

X

Prescription is void if the number of drugs prescribed is not noted.

SP 60                                           PGS  Reorder # 662765S

**EXHIBIT 2**

----- Forwarded message from orly.taitz@hushmail.com -----
Date: Thu, 30 Oct 2014 20:43:02 +0000
Subject: Request for quarantine/isolation forms
To: colin.kisor@usdoj.gov
Cc: orly.taitz@hushmail.com


Att. Colin Kisor,

Assistant US Attorney
Department of Justice
10.30.2014

Dear, Mr. Kisor,
yesterday, at the hearing in Taitz v Johson et al, your witness, quarantine officer, Dr.
Escobedo, stated that he is a quarantine officer, however he did not have with him any
quarantine forms to show the court, what quarantine orders are actually given to
individuals who need to be in quarantine or isolation in order to protectt he public health.
I am requesting a generic quarantine form and isolation form, which shows who is
issuing such quarantine forms and by what authority. I, also, would like to know if any
quarantine orders were issued to Ebola patients or any individuals exposed to Ebola. If
so, was there an order of quarantine for an individual by name Kaci Hilcox, who
reportedly just came back to the US treating Ebola patients in Sierra Leon and is
refusing to stay in quarantine in Maine.

Further, I am requesting to know, whether any quarantine/ isolation orders were issued
by Dr. Martin Citron, Director for the Division of Global Migration
and **Quarantine** (DGMQ) at the U.S. Centers for Disease Control  or any other
individuals within CDC or other federal agencies from 2012 till now, during the surge of
illegal alien minors.

Respectfully,

/s/ Dr. Orly Taitz, ESQ
Att. Colin Kisor,

Assistant US Attorney
Department of Justice
10.30.2014

Dear, Mr. Kisor,
yesterday, at the hearing in Taitz v Johson et al, your witness, quarantine officer, Dr.
Escobedo, stated that he is a quarantine officer, however he did not have with him any
quarantine forms to show the court, what quarantine orders are actually given to
individuals who need to be in quarantine or isolation in order to protectt he public health.

1

I am requesting a generic quarantine form and isolation form, which shows who is issuing such quarantine forms and by what authority. I, also, would like to know if any quarantine orders were issued to Ebola patients or any individuals exposed to Ebola. If so, was there an order of quarantine for an individual by name Kaci Hilcox, who reportedly just came back to the US treating Ebola patients in Sierra Leon and is refusing to stay in quarantine in Maine.

Further, I am requesting to know, whether any quarantine/ isolation orders were issued by Dr. Martin Citron, Director for the Division of Global Migration and **Quarantine** (DGMQ) at the U.S. Centers for Disease Control  or any other individuals within CDC or other federal agencies from 2012 till now, during the surge of illegal alien minors.

Respectfully,

/s/ Dr. Orly Taitz, ESQ

2

**EXHIBIT 3**

Dr. Orly Taitz, ESQ

29839 Santa Margarita ste 100

Rancho Santa Margarita, CA 92688

ph. 949-683-5411 fax 949-766-7603

orly.taitz@hushmail.com


Attention  Dr. Martin Cetron,

Director for the Division of Global Migration
and **Quarantine** (DGMQ)

U.S. Centers for Disease Control

- Centers for Disease Control and Prevention
  1600 Clifton Rd
  Atlanta, GA 30333
- 800-CDC-INFO
  (800-232-4636)
  TTY: (888) 232-6348
- Contact CDC-Info


# REQUEST FOR INFORMATION UNDER 5 USC 552-FREEDOM OF INFORMATION ACT.


Per 5 USC Freedom of Information act I am requesting any and all documents relative to the request below and providing the following information:

1. During October 29, 2014 hearing in Taitz v Johnson US District Court Southern District of TX 14-cv-00119 Judge Andrew S.

Hanen, a government witness, Quarantine Officer, Miguel Escobedo testified that you, Martin Cetron, sign quarantine orders on behalf of the federal government and the Secretary of Health and Human Services. Based on this testimony I am requesting a form quarantine order, which explains under which federal statutes/ authority individuals are being quarantined and/or isolated.

2. Any and all quarantine/isolation orders issued for Ebola patients or individuals exposed to Ebola.

3. Any and all Tuberculosis/ quarantine orders issued since 2012.

Any and all Enterovirus D-68 quarantine/ isolation orders issues since 2012.

4. Any other quarantine/isolation orders issued since 2012.

5. Certification of Ebola Risk level.

6. If any of the orders contain names of the individuals or any other identifying information, which is redactable under HIPAA, please, redact this information.

7. Prediction of total Ebola cases expected by January 2015.

8. Any and all documents showing quarantine/isolation of sick individuals in HHS camps created to accommodate the surge of minor illegal aliens from 2012-2014.

9. Any and all documents relating to rabies quarantine, particularly regarding rabies related death of one of illegal aliens in Ladero, Texas detention facility.

10. Report on the total amount of US taxpayer dollars allocated to the Quarantine and Migration department of CDC and a breakdown showing how these taxpayer monies were spent from 2012-2014.

Respectfully,

Dr. Orly Taitz, ESQ

10.31.2014

Screen shot of the FOIA request above sent to CDC on 11.02.2014  via communication page on the official CDC web site http://wwwn.cdc.gov/dcs/RequestForm.aspx





# EXHIBIT 4

# RE: CDC-INFO: Inquiry [ ref:_00DU0YCBU._500U0FPyko:ref ]

**CDC INFO to orly.taitz** (4 days ago) show details

Thank you for your inquiry to CDC-INFO regarding Freedom of Information Act (FOIA) request.

Your request has been forwarded to the CDC's FOIA office on your behalf. They will contact you directly if they have questions.

In the future, you may send your FOIA request to:

Mail:

CDC/ATSDR

Attn: FOIA Office

Williams Building

Floor 2

2877 Brandywine Road

Atlanta, GA 30341

Email: FOIARequests@cdc.gov

For more information, please call 1-800-CDC-INFO (800-232-4636),
visit www.cdc.gov and click on "Contact CDC-INFO," or go to www.cdc.gov/info. If you
have questions or comments, please send them via our online form
at www.cdc.gov/info.

CDC-INFO is a service of the Centers for Disease Control and Prevention (CDC) and
the Agency for Toxic Substances and Disease Registry (ATSDR). This service is
provided by Verizon and its subcontractors under the Networx Universal contract to
CDC and ATSDR.

-----------------------------------------------------------------------------------------------

A.D.H.

-------------- Original Message --------------
From: [cdcinfoforms@cdc.gov]
Sent: 11/2/2014 7:50 AM
To: cdcinfo@cdc.gov
Subject: CDC-INFO: Inquiry

Subject: Quarantine of people exposed to an infectious disease

From: Clinician

Email Address: orly.taitz@hushmail.com

1

Your Question: Dr. Orly Taitz, ESQ
29839 Santa Margarita ste 100
Rancho Santa Margarita, CA 92688
ph. 949-683-5411 fax 949-766-7603
orly.taitz@hushmail.com

Attention  Dr. Martin Cetron,
Director for the Division of Global Migration and Quarantine (DGMQ)
U.S. Centers for Disease Control
•   Centers for Disease Control and Prevention
1600 Clifton Rd
Atlanta, GA 30333
•   800-CDC-INFO
(800-232-4636)
TTY: (888) 232-6348
•   Contact CDC-Info

REQUEST FOR INFORMATION UNDER 5 USC 552-FREEDOM OF INFORMATION
ACT.

Per 5 USC Freedom of Information act I am requesting any and all documents relative
to the request below and providing the following information:
1. During October 29, 2014 hearing in Taitz v Johnson US District Court Southern
District of TX 14-cv-00119 Judge Andrew S. Hanen, a government witness, Quarantine
Officer, Miguel Escobedo testified that you, Martin Cetron, sign quarantine orders on
behalf of the federal government and the Secretary of Health and Human Services.
Based on this testimony I am requesting a form quarantine order, which explains under
which federal statutes/ authority individuals are being quarantined and/or isolated.
2. Any and all quarantine/isolation orders issued for Ebola patients or individuals
exposed to Ebola.
3. Any and all Tuberculosis/ quarantine orders issued since 2012.
Any and all Enterovirus D-68 quarantine/ isolation orders issues since 2012.
4. Any other quarantine/isolation orders issued since 2012.
5. Certification of Ebola Risk level.
6. If any of the orders contain names of the individuals or any other identifying
information, which is redactable under HIPAA, please, redact this information.
7. Prediction of total Ebola cases expected by January 2015.
8. Any and all documents showing quarantine/isolation of sick individuals in HHS camps
created to accommodate the surge of minor illegal aliens from 2012-2014.
 9. Any and all documents relating to rabies quarantine, particularly regarding rabies
related death of

Optional Information

Contact: Dr. Orly Taitz, ESQ, Doctor of Dental surgery, Dr. Taitz

2

# EXHIBIT 5

# Court Order Temporarily Restricts Nurse's Movement

FORT KENT, Maine — Oct 31, 2014, 10:43 AM ET

By ROBERT F. BUKATY Associated Press



OFF



Maine health officials obtained a 24-hour court order restricting Kaci Hickox's movement after the nurse repeatedly defied the state's quarantine for medical workers who have treated Ebola patients.

A judge granted the order Thursday limiting Hickox's travel, banning her from public places and requiring a 3-foot buffer until there's a further decision Friday.

The state went to court Thursday, following through with a threat to try to isolate her until the 21-day incubation period for Ebola ends no Nov. 10. In court documents, the judge indicated further action was anticipated Friday.

Police remained outside her home Friday. Fort Kent Police Chief Tom Pelletier went inside the home briefly Friday morning and said afterward, "We just had a good conversation." He said he was not there to arrest or detain her.

Police were under orders to monitor her movements after she twice let home, once to talk to reporters Wednesday and again for a bike ride with her boyfriend on Thursday.

The legal action is shaping up as the nation's biggest test case yet in the struggle to balance public health and fear of Ebola against personal freedom.

Hickox, who treated Ebola patients in Sierra Leone, says confinement violates her rights. She says that she has no symptoms and poses no risk to the public.

Hickox, 33, stepped into the media glare when she returned from treating Ebola patients in Sierra Leone to become subject to a mandatory quarantine in New Jersey. After being released from a hospital there, she returned to this small town, where she was placed under what Maine authorities called a voluntary quarantine.

She said she is following the federal Centers for Disease Control and Prevention recommendation of daily monitoring for fever and other signs of the disease.

"I'm not willing to stand here and let my civil rights be violated when it's not science-based," she said Wednesday evening.

Some states like Maine are going above and beyond the CDC guidelines to require quarantines. So is the U.S military.

President Barack Obama, the nation's top infectious-disease expert and humanitarian groups have warned that overly restrictive measures could cripple the fight against the disease at its source by discouraging volunteers like Hickox from going to West Africa, where the outbreak has sickened more than 13,000 people and killed nearly 5,000 of them.

"These kinds of restrictions could dissuade hundreds, if not thousands, of skilled volunteers from helping stop Ebola's spread, which is in the national interest of every one of our countries," Samantha Power, U.S. ambassador to the United Nations, said Thursday in Brussels

http://abcnews.go.com/Health/wireStory/life-nurse-standoff-ebola-26592772

# EXHIBIT 6

NJ Home | Services A to Z | Departments/Agencies | FAQs

Search This Site [ ▼ ] [                    ] Submit

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| DOH Home | About Us | Topics A - Z | Consumer Reports /Data | Vital Records | Senior Benefits | Diseases & Conditions | Family Health | Minority Health | Senior Services & Health Systems | Contact Our Programs |

2014
2013
2012
2011
2010
2009
2008
2007
2006
2005
2004
2003
2002
2001
2000
1999

Home > 2014 > New Jersey Mandatory Quarantine and Screening Protocols

PO Box 360
Trenton, NJ 08625-0360

Mary E. O'Dowd, M.P.H.
Commissioner

For Release:
10/31/2014

For Further Information Contact:
Office of Communications
(609) 984-7160

## New Jersey Mandatory Quarantine and Screening Protocols

TO:
Col. Rick Fuentes, Superintendent, State Police
David Hespe, Commissioner, Department of Education
John Jay Hoffman, Acting Attorney General
Chris Rodriguez, Director, Office of Homeland Security and Preparedness
Jennifer Velez, Commissioner, Department of Human Services

FROM:
Mary E. O'Dowd, MPH, Commissioner, Department of Health
Chair, Ebola Virus Disease Joint Response Team (EVD-JRT)

SUBJECT:  New Jersey Mandatory Quarantine and Screening Protocols

On October 22, 2014, pursuant to Executive Order No.164 (2014), Governor Chris Christie created an Ebola Virus Disease Joint Response Team (EVD-JRT) to coordinate the efforts needed to appropriately prepare for and respond to the Ebola Virus Disease public health hazard.  The New Jersey Department of Health (NJDOH) and its state, local, and federal health care and public health partners are taking a comprehensive approach in responding to Ebola through coordinated steps to prevent potential exposure, ensure the health care system's preparedness, and provide community education.

This memo is intended to provide guidance to our partners by formally documenting the quarantining and screening protocols previously implemented in New Jersey pursuant to statutory authority to "maintain and enforce proper and sufficient quarantine, wherever deemed necessary."

### I.      Christie Administration Staffing at Newark Liberty International Airport

As Governor Christie indicated on Wednesday, October 22, 2014 in a public briefing on Ebola preparedness, the following New Jersey State officials have been and will continue to be deployed at Newark Liberty International Airport.

These officials are there to supplement Centers for Disease Control and Prevention (CDC) and Customs and Border Protection (CBP) staffing in order to provide real-time information and decision-making.

- New Jersey Department of Health (NJDOH) epidemiologists and physicians remain in regular communication with the CDC officials at the airport and responding hospitals to collaborate on management of passenger evaluation and follow up protocols.
- Office of Homeland Security and Preparedness (OHSP) will continue to lead coordination efforts with Newark Liberty International Airport for passengers identified for enhanced screening.
- The Office of the Attorney General (OAG) is providing legal staff at Newark Liberty International Airport and counsel to OHSP and the NJDOH regarding coordination with our federal partners on all necessary actions, including quarantining.

### II.      Protocols For Passengers Traveling From Ebola Affected Country Exhibiting Symptoms During Flight

If a passenger exhibits symptoms during a connecting flight to Newark Liberty International Airport, originating from one of the three West African nations that have been identified with widespread transmission of Ebola (Guinea, Liberia, and Sierra Leone), CDC notifies NJDOH.  Following this notification:

- Immediate transport to a designated Tier 2 hospital for medical evaluation and treatment accompanied by pre-designated Emergency Medical Services personnel.  Emergency Medical Services personnel will wear appropriate personal protective equipment (PPE).

- The symptomatic individual is placed in isolation at a designated Tier 2 hospital and infection prevention measures are implemented.
- The individual is subject to NJDOH mandatory quarantine order based on risk assessment.
- Ebola testing is conducted as necessary after consultation with NJDOH and CDC, based on clinical symptoms and possible exposure.
- If an alternate diagnosis is identified (such as malaria), the individual remains in isolation as clinically appropriate. Depending upon evaluation of the risk factors the individual may still be subject to a mandatory quarantine order.

**III.       Protocols For Passengers Traveling From Ebola Affected Country Exhibiting Fever During Non-Contact Fever Check**

If a passenger arrives in Newark Liberty International Airport from a flight originating from one of the three West African nations that have been identified with widespread transmission of Ebola (Guinea, Liberia, and Sierra Leone), a non-contact fever check is conducted by the U.S Coast Guard. If the passenger exhibits a temperature, CDC notices NJDOH. Following this notification:

- Immediate transport to a designated Tier 2 hospital for medical evaluation and treatment accompanied by pre-designated Emergency Medical Services personnel.  Emergency Medical Services personnel will wear appropriate personal protective equipment (PPE).
- The symptomatic individual is placed in isolation at a designated Tier 2 hospital and infection prevention measures are implemented.
- The individual is subject to NJDOH mandatory quarantine order based on risk assessment.
- Ebola testing is considered in consultation with NJDOH and CDC, based on clinical symptoms and possible exposure to the Ebola Virus.
- If an alternate diagnosis is identified (such as malaria), the individual remains in isolation as clinically appropriate. Depending upon evaluation of the risk factors, detailed below, the individual may still be subject to a mandatory quarantine order.

**IV.       Protocols For Passenger Traveling From Ebola Affected Country Exhibiting No Fever During Non-Contact Fever Check**

If a passenger arrives in Newark Liberty International Airport from a flight originating from one of the three West African nations that have been identified with widespread transmission of Ebola (Guinea, Liberia, and Sierra Leone), they are evaluated for symptoms and a non-contact fever check is conducted.

All passengers who exhibit no fever at the non-contact fever check must still complete a traveler declaration form providing all pertinent contact information, an Ebola Virus Risk questionnaire and an interview. The passenger's risk is then determined by evaluating travel history and potential exposure.  This assessment includes a determination of credibility or lack of credibility based on the consistency, responsiveness, and accuracy of the documentation and interview questions as factors in the evaluation of risk.

**A. Low Risk:**

If the individual traveled to one of the three affected West African nations, but had no known exposure to anyone with the Ebola Virus, the individual is considered **Low Risk** and the following actions will be taken:

- If the individual is a New Jersey resident, Division of Global Migration and Quarantine (DGMQ) send the individual's contact information to NJDOH.
  - CDC provides the individual with an Ebola Care Kit and a 24/7 phone number for NJDOH.
  - NJDOH contacts the individual's local health department for active monitoring for 21 days from the date of their departure from the affected country.
  - Local health department provides the individual contact information for area hospitals and Emergency Medical Services.
- If the individual is a non-New Jersey resident, they are released and NJDOH sends the individual's contact information to the Department of Health in their home state.

If the passenger is determined to have had some risk following the questionnaire and oral interview, the passenger completes a more detailed exposure and risk assessment. Following the more detailed exposure and risk assessment, the passenger is moved into one of two other risk categories:

**B. Some Risk:**

If the individual traveled to one of the three affected West African nations, and for example, was a health care worker who treated an Ebola patient with active symptoms while wearing PPE, the individual is considered to have **Some Risk** and the following actions will be taken in such a case:

- Individual is subject to NJDOH mandatory quarantine order.
- No commercial conveyance or movement by the individual is permitted.
- NJDOH will contact the individual's local health department for active monitoring for 21 days       from the date of their last exposure.
- The local health department will provide the individual contact information for area hospitals and Emergency Medical Services.

**C. High Risk:**

If the individual traveled to one of the three affected West African nations and had direct contact with the body fluids of an individual with the Ebola Virus, he/she is considered to have **High Risk** and the following actions will be

taken:

- Individual is subject to NJDOH mandatory quarantine order.
- No commercial conveyance or movement by the individual is permitted.
- NJDOH will contact the individual's local health department for active monitoring for 21 days from the date of their last exposure.
- The local health department will provide the individual contact information for area hospitals and Emergency Medical Services.

All other scenarios will be addressed on a case-by-case basis for possible mandatory quarantine, with the following additional measures as appropriate:

- CDC provides an Ebola Care Kit with 24/7 phone number for NJDOH.
- NJDOH sends information to local health department.
- NJDOH limits or prohibits commercial conveyance or movement of the individual.
- Local health departments will contact the individual for direct active monitoring for symptoms for 21 days and provide contact information for area hospitals and Emergency Medical Services.
- Controlled movement and conditional release based upon person's compliance and adherence to local health department's instructions.

**V.      Housing and Transportation For Residents and Non-Residents Subject to a Mandatory Quarantine Order**

As the EVD-JRT announced on Wednesday, October 22, 2014, New Jersey will make every reasonable effort to ensure New Jersey residents subject to a mandatory quarantine order are able to do so in their home. This policy was first explained by EVD-JRT member DHS Commissioner Jennifer Velez on October 22nd: "Travelers who are New Jersey residents will quarantine in their own homes."

Governor Christie reiterated this on Friday, October 24th at a joint briefing with New York Governor Andrew Cuomo: "We will make those judgments and the Department of Health will make those judgments where need be, what the most appropriate location for that is, if the person is not a resident of our state already. Obviously if they're already a resident of New Jersey then they can quarantine in their own homes under a quarantine order."

- Residents will be transported from Newark Liberty International Airport to home quarantine location with a NJ State Police escort.
  - Arrangements include provisions for day-to-day necessities and comfort, as necessary.
  - As permitted by law, the State will provide assistance to quarantined individuals if they are being denied compensation for lost time at work.

- NJDHS is working to designate and support suitable housing locations in New Jersey for the quarantine of asymptomatic individuals should the need arise, such as in the event a non-resident cannot safely be transported to their home state. DHS is working with State and local health officials, as appropriate.
- Travelers or their families can call 877.294.HELP (877-294-4357) for phone support, and DHS will make available crisis counselors, as needed.

As members of the EVD-JRT, I understand you will be implementing these protocols through your own efforts and internal guidelines. As previously stipulated at our briefing on Wednesday, October 22nd, OHSP will be taking the lead on coordinating these efforts.

CC:

Robert C. Garrett, President & CEO
Hackensack University Medical Center

James R. Gonzalez, President & CEO
University Hospital

Stephen K. Jones, FACHE, President & CEO
Robert Wood Johnson University Hospital

Elizabeth Ryan, President & CEO
NJ Hospital Association

John Degnan, Chairman
Port Authority of New York and New Jersey

 **OPRA | Open Public Records Act**     NJDOH Notice of Privacy Practices      Contact Us  |  Privacy Notice  |  Legal Statement  |  Accessibility Statement  |

Statewide: NJ Home | Services A to Z | Departments/Agencies | FAQs
Department: NJDOH Home | Topic A to Z | Programs/Services
Copyright © State of New Jersey, 1996-2014
Department of Health
P. O. Box 360
Trenton, NJ 08625-0360

**EXHIBIT 7**

# City Monitoring 357 People for Ebola Symptoms



By **Jeff Mays** on November 6, 2014 3:36pm

@JeffCMays



Ebola in New York City

MANHATTAN — The city is now monitoring 357 people for Ebola symptoms, a three-fold increase from last week, according to health department officials.

Most of those being monitored are travelers arriving in the city after spending time in the three West African nations with active Ebola outbreaks.

The new figure — up from 117 last week — also includes Bellevue Hospital staff responsible for treatment of the city's only Ebola patient, Dr. Craig Spencer, as well as FDNY and EMS workers who transported Spencer to the hospital and the lab workers who conducted blood work for the doctor.

"All of these individuals are being monitored out of an abundance of caution, and none are showing any symptoms," said health officials.

Under active monitoring, health officials have to check in with affected individuals daily, rather than just allowing people to monitor their own symptoms.

The number of people being monitored is expected to fluctuate as more people arrive from West Africa.

The number could also increase after Gov. Andrew Cuomo and Mayor Bill de Blasio announced an effort last week to provide incentives for New York health care workers to travel to West Africa to help stop the virus at its source.

The active monitoring lasts for 21 days, the incubation period of the virus.

Only one of the three people who had close contact with Spencer remains under quarantine, said health officials.

Two of Spencer's friends and his fiancèe Morgan Dixon were placed under quarantine nearly two weeks ago because they had close contact with the doctor.

Spencer, a fellow of international emergency medicine at New York-Presbyterian, contracted the disease while treating Ebola patients in Guinea with the international aid organization Doctors Without Borders.

Only Dixon remains under mandatory isolation at the Hamilton Heights apartment she shares with Spencer.

Both friends, who have not been publicly identified, have been released from quarantine after examination by a doctor and review by DOH staff.

Health officials said on Saturday that the first of Spencer's friends was released after a "thorough review with the quarantined individual" on Halloween by a senior DOH official found that their "exposure was not consistent with how Ebola is transmitted."

The two friends will still be subject to twice daily active monitoring for 21 days.

The only way to contract the disease is through contact with bodily fluids from an infected individual while they are displaying symptoms.

Spencer's condition continues to improve, said health officials.

"The patient being treated for Ebola at HHC Bellevue Hospital Center continues to show improvement and is stable. He remains in isolation and is receiving treatment," the agencies said.

City officials expect their response to Ebola to cost "many millions" and plan to ask the federal government for help in paying the costs. City officials were unable to provide the amount of taxpayer dollars that went into the Ebola response Thursday.

http://www.dnainfo.com/new-york/20141106/civic-center/city-monitoring-357-people-for-ebola-symptoms

**EXHIBIT 8**



# CDC NOW SAYS EBOLA DROPLETS CAN SPREAD SIX FEET, NOT THREE

### CDC changes facts yet again as public backlash intensifies

*by* **MIKAEL THALEN** | **INFOWARS.COM** | OCTOBER 31, 2014

**The Centers for Disease Control and Prevention has released a new document that doubles the previous length in which Ebola droplets can spread through sneezing and coughing.**

Posted to the Ebola information section of the CDC's website, the new document states that a person within 6 feet of an Ebola victim may potentially become infected.



**DROPLET SPREAD**

Droplet spread happens when droplets that are coughed or sneezed from a sick person splash the eyes, nose, or mouth of another person, or cause environmental contamination, like a soiled bathroom surface or handrails, from which another person can pick up the infectious material.

A person might also get infected by touching a surface or object that has germs on it and then touching their eyes, mouth or nose. Droplets generally travel shorter distances, less than about 6 feet from a source patient.

Germs like plague, meningitis, and Ebola can be spread through large droplets.

"A person might also get infected by touching a surface or object that has germs on it and then touching their eyes, mouth or nose," the document states. "Droplets generally travel shorter distances, less than about 6 feet from a source patient."

A previous document, which was pulled down from the CDC website without explanation, argued that droplets could only spread 3 feet, a claim the CDC originally worked to deny altogether.



"Droplets travel short distances, less than 3 feet (1 meter) from one person to another," the document claimed.



**Ebola is spread through droplets.**

**Droplet spread** happens when germs traveling inside droplets that are coughed or sneezed from a sick person enter the eyes, nose, or mouth of another person. Droplets travel short distances, less than 3 feet (1 meter) from one person to another.

A person might also get infected by touching a surface or object that has germs on it and then touching their mouth or nose.

Droplet spread diseases include: plague, Ebola.

Despite spending the last several months working to convince the public that such transfers were impossible, A CDC advisory from early last August entitled *Interim Guidance about Ebola Virus Infection for Airline Flight Crews, Cleaning Personnel, and Cargo Personnel* clearly showed that the agency was in fact aware of the potential danger posed by airborne droplets.

Airline workers were asked to not only wear surgical masks in order "to reduce the number of droplets expelled into the air by talking, sneezing, or coughing," but also told to "not use compressed air, which might spread infectious material through the air" when cleaning an airplane.

Even with documentation pointing out the danger, the CDC continued to deny the possibility of the spread of Ebola through droplets at an October 7 press conference.

"Ebola spreads by direct contact with someone who is sick or with the body fluids of someone who is sick or died from it," CDC Director Tom Frieden claimed at the time. "We do not see airborne transmission in the outbreak in Africa. We don't see it elsewhere in what we've seen so far."

In reality, as noted by Washington's Blog, engineers at MIT have shown that sneezes can travel up to 20 feet, more than 200 times farther than previously believed.

The CDC's constant flip-flopping on important facts and refusal to implement proper protocols has caused a massive backlash among the American public, with only 37 percent believing the agency has done an "excellent or good job" in major polls.

Facebook @ https://www.facebook.com/mt.examiner
Follow Mikael Thalen @ https://twitter.com/MikaelThalen



*Receive The Underground Insider!*

| Enter your email address | SUBSCRIBE |

Subscribe to the Underground Insider for Exclusive Content, Breaking News, Messages from Alex and More

# HOW GERMS SPREAD

## AIRBORNE SPREAD

**Airborne spread** happens when germs float through the air after a person talks, coughs, or sneezes. Those germs can be inhaled even after the original person is no longer nearby.

Direct contact with the infectious person is NOT needed for someone else to get sick.

**Germs like chicken pox and TB are spread through the air.**



## DROPLET SPREAD

**Droplet spread** happens when droplets that are coughed or sneezed from a sick person splash the eyes, nose, or mouth of another person, or cause environmental contamination, like a soiled bathroom surface or handrails, from which another person can pick up the infectious material.





A person might also get infected by touching a surface or object that has germs on it and then touching their eyes, mouth or nose. Droplets generally travel shorter distances, less than about 6 feet from a source patient.

**Germs like plague, meningitis, and Ebola can be spread through large droplets.**

## HOW DO I PROTECT MYSELF FROM GETTING SICK?

- **Wash your hands** often with soap and water. If soap and water are not available, use an alcohol-based hand sanitizer.

- **Avoid close contact with people who are sick.**

- **Avoid touching your eyes, nose and mouth.** Germs spread this way.

- **Routinely clean and disinfect commonly touched surfaces** like bathroom surfaces, since some germs can stay infectious on surfaces for hours or days and lead to transmission.



## HOW EBOLA SPREADS

### Is Ebola airborne?

**No.** Ebola is not spread through the airborne route.

### Is Ebola spread through droplets?

**Yes.** To get Ebola, you have to directly get body fluids (e.g., blood, diarrhea, vomit, urine, semen, breast milk) from someone who is sick with Ebola in your mouth, nose, eyes or through a break in your skin or through sexual contact. That can happen by being splashed with droplets, or through other direct contact, like touching infectious body fluids.

Healthcare providers caring for Ebola patients and the family and friends in close contact with Ebola patients are at the highest risk of getting sick when they touch or are splashed by infectious blood or body fluids from a sick patient.

There has been no recognized spread of Ebola through the air or water.

CDC

**EXHIBIT 9**

**Brownsville Rivera High School - Texas - WebSchoolPro**

***texas.webschoolpro.com/rivera-high-school_TX031901004/news.html***

- **Cached**

**Education related news covering the area of Rivera High School and ... Decision on Ebola ban and quarantine coming soon from Texas Federal judge**

**Dental Offices News - Dental Industry Today**

*dental.einnews.com/news/dental-offices*

- Cached

Dental Offices News Service from **EIN News**. ... **Decision** on **Ebola ban and quarantine coming soon from Texas Federal judge**. Oct 28, 2014 - 19:51 GMT ...

**U.S. Customs and Border Protection News - US Politics Today**

*uspolitics.einnews.com/news/customs-border-protection*

- Cached
- Similar

U.S. Customs and Border Protection News Service from **EIN News**. ... U.S. to funnel travelers from **Ebola**-hit region through five airports. Nov 3, 2014 - 13:35 GMT .... **Decision** on **Ebola ban and quarantine coming soon from Texas Federal judge**. Oct 21, 2014 - 11:36 GMT ...

**Texas Crime News - World News Report - EIN News**

*world.einnews.com/news/**texas**-crime*

- Cached
- Similar

**Texas** Rare Earth Resources Signs Agreements With the **Texas** General Land Office. Oct 28, 2014
... **Decision** on **Ebola ban and quarantine coming soon from Texas Federal judge**. Nov 1 .... Ex-
South **Texas** judge accused of accepting bribes.

## United States Illegal Immigration News - World News Report

*world.**einnews**.com/news/united-states-immigration*

- Cached
- Similar

Today - 00:15 GMT. **Decision** on **Ebola ban and quarantine coming soon from Texas Federal judge**.
Nov 1, 2014 - 20:47 GMT. U.S. House District 8: Bucshon vs.

## Texas U.S. Politics News - US Politics Today

*uspolitics.**einnews**.com/state/**texas***

- Cached
- Similar

**Texas** U.S. Politics News Service from **EIN News**; Media Monitoring & Online ... **Decision** on **Ebola ban
and quarantine coming soon from Texas Federal judge**.

## Illinois Crime News - World News Report

*world.**einnews**.com/news/illinois-crime*

- Cached
- Similar

Illinois Crime News Service from **EIN News**. ... Judge Orders Alstory Simon Freed In 1982 Murder Case. Oct
30, 2014 - 13:14 GMT ... **Decision**on **Ebola ban and quarantine coming soon from Texas Federal
judge**. Nov 1, 2014 - 21:58 GMT ...

## Texas Immigration News - US Politics News - EIN News

*uspolitics.**einnews**.com/news/**texas**-immigration*

- Cached

- Similar

Tea Party Poised To Push **Texas** Even Further To The Right ... **Decision** on **Ebola ban and quarantine coming soon from Texas Federal judge.** Nov 1, 2014 ...

## New Jersey Immigration News - US Politics Today

*uspolitics.**einnews**.com/news/new-jersey-immigration*

- Cached
- Similar

New Jersey Immigration News Service from **EIN News**. ... Nurse **Quarantined** In New Jersey Could Face More Isolation At Home In ...**Decision** on **Ebola ban and quarantine coming soon from Texas Federal judge** .... U.S. Judges for Sale.

## Brownsville Rivera High School - Texas - WebSchoolPro

*texas.webschool**pro**.com/**rivera-high-school**_TX031901004/news.html*

- Cached

Education related news covering the area of Rivera High School and ... Decision on Ebola ban and quarantine coming soon from Texas Federal judge

## Lucio Middle School - Texas - WebSchoolPro

*texas.webschool**pro.com/lucio-middle**-school_TX031901051/news.html*

- **Cached**

**News, Sports, Videos and Images in the Lucio Middle School area. Local News. Decision on Ebola ban and quarantine coming soon from Texas Federal judge ... By Rose Ybarra,Catholic News Service BROWNSVILLE, Texas -- Every ... in their race for the District 108 seat in the South Carolina House of Representatives.**

## Besteiro Middle School - Texas - WebSchoolPro

*texas.webschool**pro.com/besteiro-middle**-school.../news.html*

- **Cached**

3

**Decision on Ebola ban and quarantine coming soon from Texas Federal judge ... in their race for the District 108 seat in the South Carolina House of Representatives. ... Teachers and students from Besteiro Middle School in Brownsville, Texas, discuss a new way of learning math and science with Adaptive Curriculum.**

**Garza Elementary School - Texas - WebSchoolPro**

*texas.webschoolpro.com/garza-elementary-school.../news.html*

- Cached

**News, Sports, Videos and Images in the Garza Elementary School area. Local News. Decision on Ebola ban and quarantine coming soon from Texas Federal judge ... By Rose Ybarra,Catholic News Service BROWNSVILLE, Texas -- Every ... McAllen ISD teachers are using the district issued iPads to enhance student ...**

**I, Lila Dubert, attest that on 11.06.2014 I served the defense by First Class mail with a copy of attached pleadings**

**Signed**

**Lila Dubert**