DR. ORLY TAITZ, ESQ

29839 SANTA MARGARITA, STE 100

RANCHO SANTA MARGARITA, CA 92688

PH 949-683-5411 FAX 949-766-7687



United States District Court
Southern District of Texas
FILED

MAR 1 1 2016

David J. Bradley, Clerk of Court

## US DISTRICT COURT

## SOUTHERN DISTRICT OF TEXAS

## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **TAITZ,** | ) | **Case # 14-cv-00119** |
| **V** | ) | **HONORABLE ANDREW S. HANEN PRESIDING** |
| **JOHNSON, ET AL** | ) | |

### SUPPLEMENTAL BRIEF PER 03.01.2015 ORDER

During 03.01.2015 hearing in the above captioned case, the court stated that the

parties can submit additional information and argument by 03.11.2016.

Accordingly, the plaintiff is providing the following information:

# 1. DEFENDANTS ARE ATTEMPTING TO NULLIFY DECISION BY THIS COURT BY RECLASSIFYING DISEASES OF PUBLIC SIGNIFICANCE INTO DISEASES OF NO PUBLIC SIGNIFICANCE

This case is seeking an injunctive relief whereby the defendants, Secretary of DHS and HHS, will have to obtain medical releases, showing no infectious diseases of public significance prior to release of illegal alien detainees from the DHS and HHS custody.

Defendants are currently engaged in a trick, where they are reclassifying diseases of public significance into diseases of **no** public significance. This would undermine and nullify the decision by this court, should the court issue an injunction as requested by the plaintiff.

As an example, Obama administration reclassified a deadly disease, AIDS/HIV, from a disease of public significance into a disease of no public significance, even though U.S. has the largest number of cases and millions of dollars are spent on treatments. Last month three more diseases were reclassified, with Obama administration arguing that only about $100 million is spent per year to treat those diseases and this amount according to Obama administration does not constitute public significance (Exhibit 1)

Plaintiff is greatly concerned that by the end of Obama administration all of the infectious diseases will be reclassified as diseases of no public significance, including TB and Ebola.

At first blush these policies are totally unfathomable. However, one can understand the reasoning behind these decisions by looking at a greater picture.

We are seeing Obama administration releasing into the general population over 60,000 criminals after incarceration instead of deporting them. Similarly, in order to avoid deportation of illegal aliens with infectious diseases of public significance as required by 8 USC 1182, Obama administration is engaged in trickery, in reclassifying diseases into diseases of no public significance. These concerted actions remove all impediments to flooding this nation with cheap foreign labor. This appears to be a repayment by Mr. Obama to his donors, who bought his presidency for him for a total of 2 billion dollars and are seeking a payback in the form of a massive supply of cheap foreign labor. As a consequence, the plaintiff, who is a doctor working with immigrants is exposed to multiple infectious diseases. Exposure is an injury in itself.

In order to stop this trickery, the court should specify in its' injunction order that:

a.   The court will issue an injunction whereby the detainees prior to their release from DHS and HHS will need to be free of diseases of public significance and the list of diseases of public significance is the one that existed on January 20, 2009, when this administration took office. Or alternatively:

b.   The court will issue an injunction whereby the detainees prior to their release from DHS and HHS detention will need to be free of diseases of public significance and the list of diseases of public significance is the one that existed on July 14, 2014, when this case was filed.

## 2.  EXPOSURE TO INFECTIOUS DISEASE IS A DAMAGE IN ITSELF

This country is watching a medical disaster in Flint, MI. A number of people were exposed to water with high concentration of lead. In the case of Flint, MI, most residents are not sick; however they are exposed to possible sickness.

Similarly, in the case at hand it was proven that the plaintiff and her staff are exposed to infectious diseases. Report of the Inspector General of DHS, that was produced previously, shows that multiple detainees have infectious diseases, including TB. The letter from the spokesperson of the local border patrol union states that the detainees with the infectious diseases were transferred from Texas to California. These detainees were placed in MediCal (Division of Medicare/Medicaid) program, where plaintiff is a doctor-provider. The plaintiff

was exposed to infectious diseases. She went through months of persistent cough and bronchitis and had to have repeated X-rays and other tests due to her exposure to aforementioned immigrants, many of whom have infectious diseases, including Tuberculosis. This is a classic *Roe v Wade* case, where the plaintiff cannot file a separate law suit every instance she gets sick. There is an ongoing exposure to infectious diseases due to actions by the defendants and immediate risk of infection can only be alleviated through the injunction, as requested.

### 3. FLORES V RENO PRECEDENT SHOWS THAT THE COURT CAN AND SHOULD ISSUE THE INJUNCTION, AS REQUESTED BY THE PLAINTIFF

During March 1 hearing Hon. Judge Hanen asked if the parties already submitted to him the latest ruling in Flores v Reno and if it was not submitted previously, to submit it now. Plaintiff submits the original agreement in Flores v Reno 85-cv-4544 RJK signed 01.13.97 (Exhibit 2) and the latest 07.24.2015 decision in the case by the new judge, Dolly Ge, recent Obama appointee.

The plaintiff submits that extensive application and current overbroad interpretation of Flores v Reno and the actions by the defendants and the federal court placed her in imminent danger of contracting infectious diseases and, as such, there is a need for an injunction, which would assert that Flores v Reno

agreement has to comply with all immigration laws, including 8 USC 1182, and such injunction would provide a mechanism for compliance with both 8USC 1182 and Flores v Reno.

Original agreement in 1985 merely sought to allow immigration officials to release minor illegal aliens to the custody of other relatives, not parents, while they are awaiting their deportation hearings. The rationale behind it was the fact that a number of illegal alien minors stayed in detention for a long time because their illegal alien parents were afraid to appear at the detention center to pick them up, as they knew that the whole family was likely to be deported.

President Obama, who is one of the defendants in this case, vastly expanded his interpretation and application of this relatively minor dormant agreement from 30 years ago. He used the agreement to release tens of thousands of illegal alien minors or in many instances adults, who claimed to be minors, and he transported them all over the country, providing his donors with a massive supply of cheap labor.

Further, Federal Judge, Dolly Ge, in the Central District of California, expanded this agreement by ordering immediate release from detention of all illegal alien minors together with illegal alien adults, who traveled with those minors. This expansion was done as Judge Ge felt that is not good for minors to be in detention,

as they may get depressed and, of course, it is not good to release them alone without adults, who travel with them. So, as a result of this agreement the whole families, whole clans, thousands of people were released from DHS and HHS detention immediately.

So, the plaintiff submits to the court that no agreement could be approved by the court, if it violates the existing laws, as it would be pari delicto and null and void.

As such, the original agreement had to comply with all existing immigration laws, including 8USC 1182,  and all illegal aliens with infectious diseases of public significance had to be removed (deported). However, there is a great shortage of doctors, defense admitted that the detainees are not checked by doctors while in DHS and Border Patrol facilities and there are only 2 doctors for 90 HHS facilities with thousands of detainees. Defense witnesses testified that minors were released within 48 hours according to Flores v Reno, they were not checked by doctors and ones with infectious diseases were released into the general population. Plaintiff, who is a doctor working with immigrants through government programs, MediCal (Ca division of Medicare/Medicaid) ended up being in the zone of danger and is a victim, who should have been protected under 8 USC 1182.

As such, the injunction is justified and justiciable. The court will not be changing any existing laws. The court will be merely asserting that **Flores v Reno**

**agreement has to comply with 8USC 1182** and, as such, illegal aliens in DHS

and HHS custody need to be checked for infectious diseases of public significance

prior to their release into general population. The ones, who have infectious

diseases of public significance, have to be removed in accordance with 8 USC

1182, and the rest should receive, prior to their release, a medical clearance stating

that they do not have infectious diseases of public significance.

## 4. DEFENSE FALSIFIED THE WORDING OF THE STATUTE 8USC1226(e) IN ORDER TO CLAIM THAT THIS COURT DOES NOT HAVE JURISDICTION IN THIS CASE

Lastly, defense claims that this court does not have any jurisdiction to issue

an injunction and this is flagrantly wrong. The defense stated:

"… But this Court's July Opinion did not discuss the jurisdictional bars to injunctive relief,
including 8 U.S.C. § 1226(e),
which states:
The [Secretary of DHS's] discretionary judgment regarding the application of
[Section 1226] shall not be subject to review. No court may set aside any action or
decision by the **[Secretary of DHS]** under this section regarding the detention **or
release of any alien** or the grant, revocation, or denial of bond or parole" ECF 74 p15 12.29.15.

The plaintiff respectfully directs attention of this court to the actual true wording of 8USC 1226

e:

" (e) Judicial review **The Attorney General's** discretionary judgment

regarding the application of this section shall not be subject to

review. No court may set aside any action or decision by the

**Attorney General** under this section regarding the detention or

release of any alien or the grant, revocation, or denial of bond or

parole".

http://codes.lp.findlaw.com/uscode/8/12/II/IV/1226#sthash.pA6hf

Wdm.dpuf

So, none of the actions in this case related to the judgment of the

Attorney General.

**Defense attorneys defrauded this court by providing this court with the falsified statute, where they replaced the word "Attorney General" with the word :"Secretary of DHS".** Not only the court should rule in favor of the plaintiff, the court should sanction all four government attorneys who defrauded the court and submitted to the court pleadings with a falsified wording of the statute.

What is even more egregious is that during March 1, 2016 hearing the court asked the government attorneys directly: are you telling me that nobody can sue for damages and no court can adjudicate? Let's take a hypothetical, what if the

government sets a home for Ebola patients and does not tell anybody that these are Ebola patients and let's say the mayor of Brownsville comes to visit those people to greet them with cookies and pancakes and contracts Ebola. Are you telling me that he can't sue and no judge can adjudicate? The response from the attorneys representing the government was: according to 8 USC 1226 they can't and the only redress is to go to Congress to change the statute.

At all time while writing their MSJ and during the March 1, 2016 hearing the government attorneys knew that they falsified the quotation of the statute and replaced the word "Attorney General" with "Secretary of DHS", that this statute does not relate to this case and Hon Judge Hanen actually has jurisdiction and can adjudicate the case. So, the actions by the attorneys for the government are really sanctionable. Moreover, the plaintiff was told by the court to provide information on her patients to the government and for the government to advise whether they have any matches in their records. Plaintiff was supposed to rely on the assertions by the government that they could not find any matches. If the government could change the wording of the statute, how can the government be believed in their assertions that they did not find any matching records? The assertions by the government are tainted. Wherefore, as stated previously, just as Judge Ge in Flores v Reno could issue an injunction ordering the government to release immediately the detainees, similarly, this court has jurisdiction to issue an injunction ordering

defendants to comply with 8 USC 1182 and have those detainees checked for infectious diseases of public significance, remove ones who are infected and provide a medical release to ones who are released from detention into the general population.

Plaintiff respectfully submits that this brief is supplemental to all pleadings and exhibits previously submitted by her in this case.

Respectfully submitted,

/s/ Dr. Orly Taitz, ESQ

03.08.2016

**EXHIBIT 1**

# HHS: Immigrants with HIV, STDs welcome

By PAUL BEDARD (@SECRETSBEDARD) • 2/23/16 4:38 AM

The administration has decided to let immigrants with three sexually transmitted diseases known for causing sores or lesions on genitalia to enter the United States, an expansion of a previous decision to let in those with HIV.

The Department of Health and Human Services this month opened the borders to those with the STDs, deeming the communicable diseases not a big threat to the United States.

A report from the Centers for Immigration Studies said that HHS does not believe that the costs to taxpayers to handle the immigrants with STDs will be significant.

Now, said the Center, the list of inadmissible communicable diseases only includes syphilis, gonorrhea, tuberculosis, and leprosy.

"So what about the costs associated with the new rule change on the three remaining STDs? Don't worry, Obama's HHS secretary ran the numbers and explained in the Federal Register that, 'The results are not economically significant, i.e. more than $100 million of costs and benefits in a single year.' In other words, the cost of welcoming in aliens with these STDs will be below $100 million every year," said the CIS report.

The website Law 360 first revealed the rules change. "Under the change, the STIs granuloma inguinale, chancroid and lymphogranuloma venereum would no longer be considered a 'communicable disease of public health significance,'" said the website. Quoting HHS, it added, "The three bacterial infections are transmitted through sexual contact, have never been common in the United States and over the past two decades are observed to be increasingly rare throughout the world."

The administration had already pulled HIV off the list of diseases that bar immigrants from coming to the U.S.

"Despite the declaration that HIV was no longer a communicable disease of public health significance, the CDC estimates that approximately 50,000 people in the United States are newly infected with HIV each year and that over 1.2 million persons in the country are HIV positive. The United States has the highest prevalence of HIV infection of any developed country," said CIS in a report released at midnight.

The HHS rule change is set to take place in less than 60 days. HHS said that there are other diseases that demand their focus.

CIS wrote: "The administration argues that this change is beneficial because physicians who would otherwise be administering the exams 'will be able to devote more time and training to other, more common and/or more serious health issues.' Sound familiar? This is the same argument the Obama administration makes for directing ICE to only focus on deporting 'the worst of the worst' criminal aliens. By ignoring the run-of-the-mill illegal aliens, law enforcement can better focus on the most egregious offenders, they claim. But it means that plenty of dangerous aliens get a pass and it means that violence has largely become a prerequisite for immigration enforcement. Similarly, the change in STD policies means that many infections are potentially being ignored."

Author Jon Feere added: "And not to worry, HHS also explains that these 'primarily tropical infections can be prevented through improved personal hygiene and protected sex' and that if you do get them, the STDs can be cured 'with a short, uncomplicated course of antibiotic therapy.' Hopefully they're telling the immigrants that."

Feere, the Center's legal policy analyst, added, "This change in policy illustrates, once again, that increased immigration is the main goal of the Obama administration, no matter the costs. The administration itself estimates that more people will become infected and that there will be increased health care costs as a result of these changes. But obviously these are considerations that have little relevance for those with an open-border perspective."

*Paul Bedard, the Washington Examiner's "Washington Secrets" columnist, can be contacted at pbedard@washingtonexaminer.com. http://www.washingtonexaminer.com/hhs-immigrants-with-hiv-stds-welcome/article/2583913*

# Exhibit 2

8/12/96

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA 90057
(213) 388-8693

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA 94104
(415) 453-3307

FILED
CLERK, U.S. DISTRICT COURT

JAN 1 7 1997

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

Attorneys for Plaintiffs

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA 90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

Attorneys for Defendants

Additional counsel listed next page

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JENNY LISETTE FLORES, et al., | ) | Case No. CV 85-4544-RJK(Px) |
| | ) | |
| Plaintiffs, | ) | Stipulated Settlement |
| | ) | Agreement |
| -vs- | ) | |
| | ) | |
| JANET RENO, Attorney General | ) | |
| of the United States, et al., | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs' Additional Counsel

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta
1616 Beverly Boulevard
Los Angeles, CA 90026
Telephone: (213) 977-9500

STREICH LANG
Susan G. Boswell
Jeffrey Willis
1500 Bank of America Plaza
33 North Stone Avenue
Tucson, AZ 85701
Telephone: (602) 770-8700

Defendants' Additional Counsel:

Arthur Strathern
Mary Jane Candaux
Office of the General Counsel
U.S. Immigration & Naturalization Service
425 I St. N.W.
Washington, DC 20536
/ / /

2

## STIPULATED SETTLEMENT AGREEMENT

WHEREAS, Plaintiffs have filed this action against Defendants, challenging, *inter alia*, the constitutionality of Defendants' policies, practices and regulations regarding the detention and release of unaccompanied minors taken into the custody of the Immigration and Naturalization Service (INS) in the Western Region; and

WHEREAS, the district court has certified this case as a class action on behalf of all minors apprehended by the INS in the Western Region of the United States; and

WHEREAS, this litigation has been pending for nine (9) years, all parties have conducted extensive discovery, and the United States Supreme Court has upheld the constitutionality of the challenged INS regulations on their face and has remanded for further proceedings consistent with its opinion; and

WHEREAS, on November 30, 1987, the parties reached a settlement agreement requiring that minors in INS custody in the Western Region be housed in facilities meeting certain standards, including state standards for the housing and care of dependent children, and Plaintiffs' motion to enforce compliance with that settlement is currently pending before the court; and

WHEREAS, a trial in this case would be complex, lengthy and costly to all parties concerned, and the decision of the district court would be subject to appeal by the losing parties with the final outcome uncertain; and

WHEREAS, the parties believe that settlement of this action is in their best interests and best serves the interests of justice by avoiding a complex, lengthy and costly trial, and subsequent appeals which could last several more years;

NOW, THEREFORE, Plaintiffs and Defendants enter into this Stipulated Settlement Agreement

3

(the Agreement), stipulate that it constitutes a full and complete resolution of the issues raised in this action, and agree to the following:

I    DEFINITIONS

As used throughout this Agreement the following definitions shall apply:

1. The term "party" or "parties" shall apply to Defendants and Plaintiffs. As the term applies to Defendants, it shall include their agents, employees, contractors and/or successors in office. As the term applies to Plaintiffs, it shall include all class members.

2. The term "Plaintiff" or "Plaintiffs" shall apply to the named plaintiffs and all class members.

3. The term "class member" or "class members" shall apply to the persons defined in Paragraph 10 below.

4. The term "minor" shall apply to any person under the age of eighteen (18) years who is detained in the legal custody of the INS. This Agreement shall cease to apply to any person who has reached the age of eighteen years. The term "minor" shall not include an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult. The INS shall treat all persons who are under the age of eighteen but not included within the definition of "minor" as adults for all purposes, including release on bond or recognizance.

5. The term "emancipated minor" shall refer to any minor who has been determined to be emancipated in an appropriate state judicial proceeding.

6. The term "licensed program" shall refer to any program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children, including a program operating group homes, foster homes, or facilities for special needs minors. A licensed program must also meet those standards for licensed programs set forth in

4

Exhibit 1 attached hereto. All homes and facilities operated by licensed programs, including facilities for special needs minors, shall be non-secure as required under state law; provided, however, that a facility for special needs minors may maintain that level of security permitted under state law which is necessary for the protection of a minor or others in appropriate circumstances, *e.g.*, cases in which a minor has drug or alcohol problems or is mentally ill. The INS shall make reasonable efforts to provide licensed placements in those geographical areas where the majority of minors are apprehended, such as southern California, southeast Texas, southern Florida and the northeast corridor.

7. The term "special needs minor" shall refer to a minor whose mental and/or physical condition requires special services and treatment by staff. A minor may have special needs due to drug or alcohol abuse, serious emotional disturbance, mental illness or retardation, or a physical condition or chronic illness that requires special services or treatment. A minor who has suffered serious neglect or abuse may be considered a minor with special needs if the minor requires special services or treatment as a result of the neglect or abuse. The INS shall assess minors to determine if they have special needs and, if so, shall place such minors, whenever possible, in licensed programs in which the INS places children without special needs, but which provide services and treatment for such special needs.

8. The term "medium security facility" shall refer to a facility that is operated by a program, agency or organization licensed by an appropriate State agency and that meets those standards set forth in Exhibit 1 attached hereto. A medium security facility is designed for minors who require close supervision but do not need placement in juvenile correctional facilities. It provides 24-hour awake supervision, custody, care, and treatment. It maintains stricter security measures, such as intensive staff supervision, than a facility operated by a licensed program in order to control problem behavior and to prevent escape. Such a facility may have a secure perimeter but shall not be equipped internally with

5

major restraining construction or procedures typically associated with correctional facilities.

## II    SCOPE OF SETTLEMENT, EFFECTIVE DATE, AND PUBLICATION

9. This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS and shall supersede all previous INS policies that are inconsistent with the terms of this Agreement. This Agreement shall become effective upon final court approval, except that those terms of this Agreement regarding placement pursuant to Paragraph 19 shall not become effective until all contracts under the Program Announcement referenced in Paragraph 20 below are negotiated and implemented. The INS shall make its best efforts to execute these contracts within 120 days after the court's final approval of this Agreement. However, the INS will make reasonable efforts to comply with Paragraph 19 prior to full implementation of all such contracts. Once all contracts under the Program Announcement referenced in Paragraph 20 have been implemented, this Agreement shall supersede the agreement entitled Memorandum of Understanding Re Compromise of Class Action: Conditions of Detention (hereinafter "MOU"), entered into by and between the Plaintiffs and Defendants and filed with the United States District Court for the Central District of California on November 30, 1987, and the MOU shall thereafter be null and void. However, Plaintiffs shall not institute any legal action for enforcement of the MOU for a six (6) month period commencing with the final district court approval of this Agreement, except that Plaintiffs may institute enforcement proceedings if the Defendants have engaged in serious violations of the MOU that have caused irreparable harm to a class member for which injunctive relief would be appropriate. Within 120 days of the final district court approval of this Agreement, the INS shall initiate action to publish the relevant and substantive terms of this Agreement as a Service regulation. The final regulations shall not be inconsistent with the terms of this Agreement. Within 30 days of final court approval of this

6

Agreement, the INS shall distribute to all INS field offices and sub-offices instructions regarding the processing, treatment, and placement of juveniles. Those instructions shall include, but may not be limited to, the provisions summarizing the terms of this Agreement, attached hereto as Exhibit 2.

III    CLASS DEFINITION

10. The certified class in this action shall be defined as follows: "All minors who are detained in the legal custody of the INS."

IV    STATEMENTS OF GENERAL APPLICABILITY

11. The INS treats, and shall continue to treat, all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors. The INS shall place each detained minor in the least restrictive setting appropriate to the minor's age and special needs, provided that such setting is consistent with its interests to ensure the minor's timely appearance before the INS and the immigration courts and to protect the minor's well-being and that of others. Nothing herein shall require the INS to release a minor to any person or agency whom the INS has reason to believe may harm or neglect the minor or fail to present him or her before the INS or the immigration courts when requested to do so.

V    PROCEDURES AND TEMPORARY PLACEMENT FOLLOWING ARREST

12.A. Whenever the INS takes a minor into custody, it shall expeditiously process the minor and shall provide the minor with a notice of rights, including the right to a bond redetermination hearing if applicable. Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to

7

protect minors from others, and contact with family members who were arrested with the minor. The INS will segregate unaccompanied minors from unrelated adults. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours. If there is no one to whom the INS may release the minor pursuant to Paragraph 14, and no appropriate licensed program is immediately available for placement pursuant to Paragraph 19, the minor may be placed in an INS detention facility, or other INS-contracted facility, having separate accommodations for minors, or a State or county juvenile detention facility. However, minors shall be separated from delinquent offenders. Every effort must be taken to ensure that the safety and well-being of the minors detained in these facilities are satisfactorily provided for by the staff. The INS will transfer a minor from a placement under this paragraph to a placement under Paragraph 19, (i) within three (3) days, if the minor was apprehended in an INS district in which a licensed program is located and has space available; or (ii) within five (5) days in all other cases; except:

1. as otherwise provided under Paragraph 13 or Paragraph 21;

2. as otherwise required by any court decree or court-approved settlement;

3. in the event of an emergency or influx of minors into the United States, in which case the INS shall place all minors pursuant to Paragraph 19 as expeditiously as possible; or

4. where individuals must be transported from remote areas for processing or speak unusual languages such that the INS must locate interpreters in order to complete processing, in which case the INS shall place all such minors pursuant to Paragraph 19 within five (5) business days.

B. For purposes of this paragraph, the term "emergency" shall be defined as any act or event that prevents the placement of minors pursuant to Paragraph 19 within the time frame provided. Such

8

emergencies include natural disasters (e.g., earthquakes, hurricanes, etc.), facility fires, civil disturbances, and medical emergencies (e.g., a chicken pox epidemic among a group of minors). The term "influx of minors into the United States" shall be defined as those circumstances where the INS has, at any given time, more than 130 minors eligible for placement in a licensed program under Paragraph 19, including those who have been so placed or are awaiting such placement.

C. In preparation for an "emergency" or "influx," as described in Subparagraph B, the INS shall have a written plan that describes the reasonable efforts that it will take to place all minors as expeditiously as possible. This plan shall include the identification of 80 beds that are potentially available for INS placements and that are licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children. The plan, without identification of the additional beds available, is attached as Exhibit 3. The INS shall not be obligated to fund these additional beds on an ongoing basis. The INS shall update this listing of additional beds on a quarterly basis and provide Plaintiffs' counsel with a copy of this listing.

13. If a reasonable person would conclude that an alien detained by the INS is an adult despite his claims to be a minor, the INS shall treat the person as an adult for all purposes, including confinement and release on bond or recognizance. The INS may require the alien to submit to a medical or dental examination conducted by a medical professional or to submit to other appropriate procedures to verify his or her age. If the INS subsequently determines that such an individual is a minor, he or she will be treated as a minor in accordance with this Agreement for all purposes.

VI    GENERAL POLICY FAVORING RELEASE

14. Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that

9

of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to:

    A.    a parent;

    B.    a legal guardian;

    C.    an adult relative (brother, sister, aunt, uncle, or grandparent);

    D.    an adult individual or entity designated by the parent or legal guardian as capable and willing to care for the minor's well-being in (i) a declaration signed under penalty of perjury before an immigration or consular officer or (ii) such other document(s) that establish(es) to the satisfaction of the INS, in its discretion, the affiant's paternity or guardianship;

    E.    a licensed program willing to accept legal custody; or

    F.    an adult individual or entity seeking custody, in the discretion of the INS, when it appears that there is no other likely alternative to long term detention and family reunification does not appear to be a reasonable possibility.

    15. Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of Support (Form I-134) and an agreement to:

    A.    provide for the minor's physical, mental, and financial well-being;

    B.    ensure the minor's presence at all future proceedings before the INS and the immigration court;

    C.    notify the INS of any change of address within five (5) days following a move;

    D.    in the case of custodians other than parents or legal guardians, not transfer custody of the minor to another party without the prior written permission of the District Director;

10

E.    notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to a grant of voluntary departure or order of deportation; and

F.    if dependency proceedings involving the minor are initiated, notify the INS of the initiation of such proceedings and the dependency court of any immigration proceedings pending against the minor.

In the event of an emergency, a custodian may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 72 hours. For purposes of this paragraph, examples of an "emergency" shall include the serious illness of the custodian, destruction of the home, etc. In all cases where the custodian, in writing, seeks written permission for a transfer, the District Director shall promptly respond to the request.

16. The INS may terminate the custody arrangements and assume legal custody of any minor whose custodian fails to comply with the agreement required under Paragraph 15. The INS, however, shall not terminate the custody arrangements for minor violations of that part of the custodial agreement outlined at Subparagraph 15.C above.

17. A positive suitability assessment may be required prior to release to any individual or program pursuant to Paragraph 14. A suitability assessment may include such components as an investigation of the living conditions in which the minor would be placed and the standard of care he would receive, verification of identity and employment of the individuals offering support, interviews of members of the household, and a home visit. Any such assessment should also take into consideration the wishes and concerns of the minor.

11

18. Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above. Such efforts at family reunification shall continue so long as the minor is in INS custody.

VII    INS CUSTODY

19. In any case in which the INS does not release a minor pursuant to Paragraph 14, the minor shall remain in INS legal custody. Except as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program until such time as release can be effected in accordance with Paragraph 14 above or until the minor's immigration proceedings are concluded, whichever occurs earlier. All minors placed in such a licensed program remain in the legal custody of the INS and may only be transferred or released under the authority of the INS; provided, however, that in the event of an emergency a licensed program may transfer temporary physical custody of a minor prior to securing permission from the INS but shall notify the INS of the transfer as soon as is practicable thereafter, but in all cases within 8 hours.

20. Within 60 days of final court approval of this Agreement, the INS shall authorize the United States Department of Justice Community Relations Service to publish in the Commerce Business Daily and/or the Federal Register a Program Announcement to solicit proposals for the care of 100 minors in licensed programs.

21. A minor may be held in or transferred to a suitable State or county juvenile detention facility or a secure INS detention facility, or INS-contracted facility, having separate accommodations for minors whenever the District Director or Chief Patrol Agent determines that the minor:

A.     has been charged with, is chargeable, or has been convicted of a crime, or is the subject

12

of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; provided, however, that this provision shall not apply to any minor whose offense(s) fall(s) within either of the following categories:

i. Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person or the use or carrying of a weapon (Examples: breaking and entering, vandalism, DUI, etc. This list is not exhaustive.);

ii. Petty offenses, which are not considered grounds for stricter means of detention in any case (Examples: shoplifting, joy riding, disturbing the peace, etc. This list is not exhaustive.);

As used in this paragraph, "chargeable" means that the INS has probable cause to believe that the individual has committed a specified offense;

B. has committed, or has made credible threats to commit, a violent or malicious act (whether directed at himself or others) while in INS legal custody or while in the presence of an INS officer;

C. has engaged, while in a licensed program, in conduct that has proven to be unacceptably disruptive of the normal functioning of the licensed program in which he or she has been placed and removal is necessary to ensure the welfare of the minor or others, as determined by the staff of the licensed program (Examples: drug or alcohol abuse, stealing, fighting, intimidation of others, etc. This list is not exhaustive.);

D. is an escape-risk; or

E. must be held in a secure facility for his or her own safety, such as when the INS has

13

reason to believe that a smuggler would abduct or coerce a particular minor to secure payment of smuggling fees.

22. The term "escape-risk" means that there is a serious risk that the minor will attempt to escape from custody. Factors to consider when determining whether a minor is an escape-risk or not include, but are not limited to, whether:

    A.    the minor is currently under a final order of deportation or exclusion;

    B.    the minor's immigration history includes: a prior breach of a bond; a failure to appear before the INS or the immigration court; evidence that the minor is indebted to organized smugglers for his transport; or a voluntary departure or a previous removal from the United States pursuant to a final order of deportation or exclusion;

    C.    the minor has previously absconded or attempted to abscond from INS custody.

23. The INS will not place a minor in a secure facility pursuant to Paragraph 21 if there are less restrictive alternatives that are available and appropriate in the circumstances, such as transfer to (a) a medium security facility which would provide intensive staff supervision and counseling services or (b) another licensed program. All determinations to place a minor in a secure facility will be reviewed and approved by the regional juvenile coordinator.

24.A. A minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case, unless the minor indicates on the Notice of Custody Determination form that he or she refuses such a hearing.

B. Any minor who disagrees with the INS's determination to place that minor in a particular type of facility, or who asserts that the licensed program in which he or she has been placed does not comply with the standards set forth in Exhibit 1 attached hereto, may seek judicial review in any

14

United States District Court with jurisdiction and venue over the matter to challenge that placement determination or to allege noncompliance with the standards set forth in Exhibit 1. In such an action, the United States District Court shall be limited to entering an order solely affecting the individual claims of the minor bringing the action.

C. In order to permit judicial review of Defendants' placement decisions as provided in this Agreement, Defendants shall provide minors not placed in licensed programs with a notice of the reasons for housing the minor in a detention or medium security facility. With respect to placement decisions reviewed under this paragraph, the standard of review for the INS's exercise of its discretion shall be the abuse of discretion standard of review. With respect to all other matters for which this paragraph provides judicial review, the standard of review shall be *de novo* review.

D. The INS shall promptly provide each minor not released with (a) INS Form I-770, (b) an explanation of the right of judicial review as set out in Exhibit 6, and (c) the list of free legal services available in the district pursuant to INS regulations (unless previously given to the minor).

E. Exhausting the procedures established in Paragraph 37 of this Agreement shall not be a precondition to the bringing of an action under this paragraph in any United District Court. Prior to initiating any such action, however, the minor and/or the minors' attorney shall confer telephonically or in person with the United States Attorney's office in the judicial district where the action is to be filed, in an effort to informally resolve the minor's complaints without the need of federal court intervention.

VIII    TRANSPORTATION OF MINORS

25. Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults except:

A. when being transported from the place of arrest or apprehension to an INS office, or

15

B. where separate transportation would be otherwise impractical.

When transported together pursuant to Clause B, minors shall be separated from adults. The INS shall take necessary precautions for the protection of the well-being of such minors when transported with adults.

26. The INS shall assist without undue delay in making transportation arrangements to the INS office nearest the location of the person or facility to whom a minor is to be released pursuant to Paragraph 14. The INS may, in its discretion, provide transportation to minors.

IX    TRANSFER OF MINORS

27. Whenever a minor is transferred from one placement to another, the minor shall be transferred with all of his or her possessions and legal papers; provided, however, that if the minor's possessions exceed the amount permitted normally by the carrier in use, the possessions will be shipped to the minor in a timely manner. No minor who is represented by counsel shall be transferred without advance notice to such counsel, except in unusual and compelling circumstances such as where the safety of the minor or others is threatened or the minor has been determined to be an escape-risk, or where counsel has waived such notice, in which cases notice shall be provided to counsel within 24 hours following transfer.

X MONITORING AND REPORTS

28A. An INS Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation shall monitor compliance with the terms of this Agreement and shall maintain an up-to-date record of all minors who are placed in proceedings and remain in INS custody for longer than 72 hours. Statistical information on such minors shall be collected weekly from all INS district offices and Border Patrol stations. Statistical information will include at least the following: (1)

16

biographical information such as each minor's name, date of birth, and country of birth, (2) date placed in INS custody, (3) each date placed, removed or released, (4) to whom and where placed, transferred, removed or released, (5) immigration status, and (6) hearing dates. The INS, through the Juvenile Coordinator, shall also collect information regarding the reasons for every placement of a minor in a detention facility or medium security facility.

B. Should Plaintiffs' counsel have reasonable cause to believe that a minor in INS legal custody should have been released pursuant to Paragraph 14, Plaintiffs' counsel may contact the Juvenile Coordinator to request that the Coordinator investigate the case and inform Plaintiffs' counsel of the reasons why the minor has not been released.

29. On a semi-annual basis, until two years after the court determines, pursuant to Paragraph 31, that the INS has achieved substantial compliance with the terms of this Agreement, the INS shall provide to Plaintiffs' counsel the information collected pursuant to Paragraph 28, as permitted by law, and each INS policy or instruction issued to INS employees regarding the implementation of this Agreement. In addition, Plaintiffs' counsel shall have the opportunity to submit questions, on a semi-annual basis, to the Juvenile Coordinator in the Office of the Assistant Commissioner for Detention and Deportation with regard to the implementation of this Agreement and the information provided to Plaintiffs' counsel during the preceding six-month period pursuant to Paragraph 28. Plaintiffs' counsel shall present such questions either orally or in writing, at the option of the Juvenile Coordinator. The Juvenile Coordinator shall furnish responses, either orally or in writing at the option of Plaintiffs' counsel, within 30 days of receipt.

30. On an annual basis, commencing one year after final court approval of this Agreement, the INS Juvenile Coordinator shall review, assess, and report to the court regarding compliance with the

terms of this Agreement. The Coordinator shall file these reports with the court and provide copies to the parties, including the final report referenced in Paragraph 35, so that they can submit comments on the report to the court. In each report, the Coordinator shall state to the court whether or not the INS is in substantial compliance with the terms of this Agreement, and, if the INS is not in substantial compliance, explain the reasons for the lack of compliance. The Coordinator shall continue to report on an annual basis until three years after the court determines that the INS has achieved substantial compliance with the terms of this Agreement.

31. One year after the court's approval of this Agreement, the Defendants may ask the court to determine whether the INS has achieved substantial compliance with the terms of this Agreement.

XI      ATTORNEY-CLIENT VISITS

32.A. Plaintiffs' counsel are entitled to attorney-client visits with class members even though they may not have the names of class members who are housed at a particular location. All visits shall occur in accordance with generally applicable policies and procedures relating to attorney-client visits at the facility in question. Upon Plaintiffs' counsel's arrival at a facility for attorney-client visits, the facility staff shall provide Plaintiffs' counsel with a list of names and alien registration numbers for the minors housed at that facility. In all instances, in order to memorialize any visit to a minor by Plaintiffs' counsel, Plaintiffs' counsel must file a notice of appearance with the INS prior to any attorney-client meeting. Plaintiffs' counsel may limit any such notice of appearance to representation of the minor in connection with this Agreement. Plaintiffs' counsel must submit a copy of the notice of appearance by hand or by mail to the local INS juvenile coordinator and a copy by hand to the staff of the facility.

B. Every six months, Plaintiffs' counsel shall provide the INS with a list of those attorneys who

18

may make such attorney-client visits, as Plaintiffs' counsel, to minors during the following six month period. Attorney-client visits may also be conducted by any staff attorney employed by the Center for Human Rights & Constitutional Law in Los Angeles, California or the National Center for Youth Law in San Francisco, California, provided that such attorney presents credentials establishing his or her employment prior to any visit.

C. Agreements for the placement of minors in non-INS facilities shall permit attorney-client visits, including by class counsel in this case.

D. Nothing in Paragraph 32 shall affect a minor's right to refuse to meet with Plaintiffs' counsel. Further, the minor's parent or legal guardian may deny Plaintiffs' counsel permission to meet with the minor.

XII    FACILITY VISITS

33. In addition to the attorney-client visits permitted pursuant to Paragraph 32, Plaintiffs' counsel may request access to any licensed program's facility in which a minor has been placed pursuant to Paragraph 19 or to any medium security facility or detention facility in which a minor has been placed pursuant to Paragraphs 21 or 23. Plaintiffs' counsel shall submit a request to visit a facility under this paragraph to the INS district juvenile coordinator who will provide reasonable assistance to Plaintiffs' counsel by conveying the request to the facility's staff and coordinating the visit. The rules and procedures to be followed in connection with any visit approved by a facility under this paragraph are set forth in Exhibit 4 attached, except as may be otherwise agreed by Plaintiffs' counsel and the facility's staff. In all visits to any facility pursuant to this Agreement, Plaintiffs' counsel and their associated experts shall treat minors and staff with courtesy and dignity and shall not disrupt the normal functioning of the facility.

19

XIII TRAINING

34. Within 120 days of final court approval of this Agreement, the INS shall provide appropriate guidance and training for designated INS employees regarding the terms of this Agreement. The INS shall develop written and/or audio or video materials for such training. Copies of such written and/or audio or video training materials shall be made available to Plaintiffs' counsel when such training materials are sent to the field, or to the extent practicable, prior to that time.

XIV DISMISSAL

35. After the court has determined that the INS is in substantial compliance with this Agreement and the Coordinator has filed a final report, the court, without further notice, shall dismiss this action. Until such dismissal, the court shall retain jurisdiction over this action.

XV RESERVATION OF RIGHTS

36. Nothing in this Agreement shall limit the rights, if any, of individual class members to preserve issues for judicial review in the appeal of an individual case or for class members to exercise any independent rights they may otherwise have.

XVI NOTICE AND DISPUTE RESOLUTION

37. This paragraph provides for the enforcement, in this District Court, of the provisions of this Agreement except for claims brought under Paragraph 24. The parties shall meet telephonically or in person to discuss a complete or partial repudiation of this Agreement or any alleged non-compliance with the terms of the Agreement, prior to bringing any individual or class action to enforce this Agreement. Notice of a claim that a party has violated the terms of this Agreement shall be served on plaintiffs addressed to:

/ / /

20

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos Holguín
Peter A. Schey
256 South Occidental Boulevard
Los Angeles, CA 90057

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales
114 Sansome Street, Suite 905
San Francisco, CA 94104

and on Defendants addressed to:

Michael Johnson
Assistant United States Attorney
300 N. Los Angeles St., Rm. 7516
Los Angeles, CA 90012

Allen Hausman
Office of Immigration Litigation
Civil Division
U.S. Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC 20044

XVII  PUBLICITY

38.  Plaintiffs and Defendants shall hold a joint press conference to announce this Agreement.
The INS shall send copies of this Agreement to social service and voluntary agencies agreed upon by
the parties, as set forth in Exhibit 5 attached. The parties shall pursue such other public dissemination
of information regarding this Agreement as the parties shall agree.

XVIII ATTORNEYS' FEES AND COSTS

39.  Within 60 days of final court approval of this Agreement, Defendants shall pay to Plaintiffs
the total sum of $374,110.09, in full settlement of all attorneys' fees and costs in this case.

/ / /

21

XIX    TERMINATION

40. All terms of this Agreement shall terminate the earlier of five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors.

XX    REPRESENTATIONS AND WARRANTY

41. Counsel for the respective parties, on behalf of themselves and their clients, represent that they know of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law. Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service, and acknowledge that Plaintiffs enter into this Agreement in reliance on such representation. Plaintiffs' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Plaintiffs, and acknowledge that Defendants enter into this Agreement in reliance on such representation. The undersigned, by their signatures on behalf of the Plaintiffs and Defendants, warrant that upon execution of this Agreement in their representative capacities, their principals, agents, and successors of such principals and agents shall be fully and unequivocally bound hereunder to the full extent authorized by law.

For Defendants: Signed: _Doris Meissner_ Title: Commissioner, INS

Dated: _9/16/96_

For Plaintiffs: Signed: per next page _____ Title: _____

Dated: _____

22

The foregoing stipulated settlement is approved as to form and content:

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Carlos Holguin
Peter Schey

NATIONAL CENTER FOR YOUTH LAW
Alice Bussiere
James Morales

ACLU FOUNDATION OF SOUTHERN CALIFORNIA
Mark Rosenbaum
Sylvia Argueta

STEICH LANG
Susan G. Boswell
Jeffery Willis

Date: __1/13/97__          By _____

Date: __11/13/96__         By _____

# Exhibit 3

Case 1:14-cv-00119 Document 87 Filed in TXSD on 03/11/16 Page 39 of 64

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 1 of 25 |
|---|---|---|---|

Present: The Honorable     DOLLY M. GEE, UNITED STATES DISTRICT JUDGE

| KANE TIEN | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

Proceedings: **IN CHAMBERS—ORDER RE PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT OF CLASS ACTION AND DEFENDANTS' MOTION TO AMEND SETTLEMENT AGREEMENT [100, 120]**

**I.**
**INTRODUCTION**

The original complaint in this action was filed on July 11, 1985. [Doc. # 1.] On January 28, 1997, the Court approved a class-wide settlement of this action pursuant to Fed. R. Civ. P. 23. (*See* Plaintiffs' First Set of Exhibits in Support of Motion to Enforce Settlement ("Ps' First Set"), Exh. 1 ("Agreement").)

Plaintiffs Jenny L. Flores and other class members filed a motion to enforce the Agreement on February 2, 2015.[1] [Doc. # 100.] On February 27, 2015, Defendants Jeh Johnson and the U.S. Department of Homeland Security ("DHS") and its subordinate entities, U.S. Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP"), filed an opposition to Plaintiffs' motion.[2] [Doc. # 121.] On March 13, 2015, Plaintiffs filed a reply. [Doc. # 127.]

---

[1] According to the parties' 2001 Stipulation extending the Agreement, "[a]ll terms of this Agreement shall terminate 45 days following defendants' publication of final regulations implementing this Agreement." (*See* Ps' First Set, Exh. 3 ("Stipulation Extending Settlement of Class Action, December 7, 2001").) Because such regulations were never published, the Agreement is still in force.

[2] Defendants explain that the original Complaint named as Defendants Edwin Meese, Attorney General of the United States; Immigration and Naturalization Service ("INS"); Harold W. Ezell, Western Regional Commissioner, INS; Behavior Systems Southwest; and Corrections Corporation of America. The Agreement names as Defendants Attorney General Janet Reno, *et al.*, but does not indicate who the other Defendants were at the time. Under Fed. R. Civ. P. 25(d), Attorney General Loretta Lynch replaces Attorney General Reno as the named Defendant. In Plaintiffs' motion, Plaintiffs named Jeh Johnson, Secretary of Homeland Security, *et al.* Plaintiffs' counsel, however, confirmed that the intended Defendants are DHS and its subordinate entities, ICE and CBP. (Defendants' Motion to Amend at 1, n.1 [Doc. # 120].)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | Page | 2 of 25 |

On February 27, 2015, Defendants filed a motion to amend the Agreement. [Doc. # 120.] On March 6, 2015, Plaintiffs filed an opposition. [Doc. # 122.] On March 13, 2015, Defendants filed a reply. [Doc. # 126.]

A hearing on the motions was held on April 24, 2015.

Having duly considered the respective positions of the parties as presented in their briefs and at oral argument, the Court now renders its decision.

## II.
## MOTION TO ENFORCE

Beginning in the summer of 2014, in response to a "surge" of Central Americans arriving at the U.S.-Mexico border, ICE adopted a blanket policy to detain all female-headed families, including children, in secure,[3] unlicensed facilities for the duration of the proceedings that determine whether they are entitled to remain in the United States. (Mot. to Enforce at 2; *see* Ps' First Set, Exh. 9 ("U.S. Immigrations & Customs Enforcement, News Release, November 18, 2014"); Ps' First Set, Exh. 10 (Declaration of Bridget Cambria ("Cambria Decl.")) ¶¶ 3-5 ("Since June, ICE has begun detaining all Central American families without the possibility of release on bond, recognizance, supervision or parole if it believes that those families arrived in the United States as part of the 'surge' of unauthorized entrants—mostly children—that purportedly began in the summer of 2014.").)

Plaintiffs argue that this "no-release" policy violates the Agreement. More specifically, Plaintiffs challenge the following policies and practices: (1) ICE's no-release policy, which Plaintiffs argue breaches the Agreement's requirements that Defendants must minimize the detention of children and must consider releasing class members to available custodians in the order of preference specified in the Agreement; (2) ICE's practice of confining children in secure, unlicensed facilities; and (3) ICE's practice of exposing children in Border Patrol custody to "harsh, substandard" conditions and treatment. (Mot. to Enforce at 5-21.)

///
///
///
///

---

[3] "Secure" in this context refers to a detention facility where individuals are held in custody and are not free to leave. Conversely, "non-secure" facilities are those where individuals are not held in custody.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | Page | 3 of 25 |
|---|---|---|---|

## A.    Legal Standard

This Court has the inherent power to enforce the terms of the Agreement because, with certain exceptions not relevant here, the Agreement "provides for the enforcement, in this District Court, of the provisions of this Agreement. . . ." (*See* Agreement ¶ 37; Ps' First Set, Exh. 2 ("Order Approving Settlement of Class Action, January 28, 1997").) *See also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994); *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978). "[T]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)).

Moreover, the parties agree that the Agreement is a consent decree. "Consent decrees have the attributes of both contracts and judicial acts," and in interpreting consent decrees, courts use contract principles, specifically the contract law of the situs state. *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990). Under California law, a court must interpret a contract with the goal of giving effect to the mutual intention of the parties as it existed at the time of contracting. Cal. Civ. Code § 1636. "It is the outward expression of the agreement, rather than a party's unexpressed intention, which the court will enforce." *Winet v. Price*, 4 Cal. App. 4th 1159, 1166, 6 Cal. Rptr. 2d 554 (1992). Where the parties dispute the meaning of specific contract language, "the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 798, 79 Cal. Rptr. 2d 273 (1998). Where the contract is clear, the plain language of the contract governs. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264, 10 Cal. Rptr. 2d 538 (1998).

The Court must construe the contract as a whole, being sure "to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011) (quoting Cal. Civ. Code § 1641) (internal quotation marks omitted). "Courts must interpret contractual language in a manner that gives force and effect to every provision, and not in a way that renders some clauses nugatory, inoperative or meaningless." *Id.* When necessary, a court can look to the subsequent conduct of the parties as evidence of their intent. *See Crestview Cemetery Assn. v. Dieden*, 54 Cal. 2d 744, 754, 8 Cal. Rptr. 427 (1960). Finally, "[i]n cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code § 1654.

///
///

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page  4 of 25 |

---

**B.**   **Discussion**

    **1.**   **"Preference for Release" Provision**

Plaintiffs argue that Defendants' no-release policy—*i.e.*, the policy of detaining all female-headed families, including children, for as long as it takes to determine whether they are entitled to remain in the United States—violates material provisions of the Agreement.

These provisions require ICE (1) to "release a minor from its custody without unnecessary delay" to a parent, a legal guardian, or other qualified adult custodian, except where the detention of the minor is required "either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others"; and (2) "[u]pon taking a minor into custody, . . . [to] make and record prompt and continuous efforts on its part toward family reunification and the release of the minor . . . ." (Agreement ¶¶ 14, 18.)

Plaintiffs contend that Defendants, by making no effort to locate custodians for minors who are apprehended with their mothers and by refusing to release these minors even when a qualified custodian is available, have not only breached the Agreement but also have unilaterally revised it to create an additional exception to release—for minors who have been apprehended as part of a female-headed family. *See Walnut Creek Pipe Distrib., Inc. v. Gates Rubber Co. Sales Div.*, 228 Cal. App. 2d 810, 816, 39 Cal. Rptr. 767 (1964) (courts should not imply additional terms, except in cases of "obvious necessity").

    **a.**   **The Agreement Encompasses Accompanied Minors**

As a threshold matter, the parties dispute whether minors who are apprehended as part of a female-headed family are class members covered by the Agreement. The plain language of the Agreement clearly encompasses accompanied minors.   First and most importantly, the Agreement defines the class as the following: "*All minors* who are detained in the legal custody of the INS." (*See* Agreement ¶ 10 (emphasis added).) The Agreement defines a "minor" as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS." (*See id.* ¶ 4.) Defendants argue in their brief that this definition should not be dispositive of who was intended to be in the class because the parties' purpose in defining "minor" in that manner was merely to distinguish the Agreement's definition of a minor from the INA's definition of a "child" as "an unmarried person under 21 years of age," 8 U.S.C. § 1101(b)(1).  The language defining "minor" in the Agreement, however, is wholly unambiguous and Defendants have offered no reasonable alternative reading that would make it ambiguous.  As such, extrinsic evidence of intent is inadmissible, even if Defendants had proffered any, which they did not.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 5 of 25 |

The text of the Agreement provides further support for the finding that the Agreement encompasses all minors who are in custody, without qualification as to whether they are accompanied or unaccompanied. In Paragraph 9, for example, the parties describe the scope of the Agreement in the following way: "This Agreement sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." In Paragraph 12A, the Agreement specifically acknowledges the possibility of accompanied minors when it notes that "[f]acilities will provide . . . contact with family members who were arrested with the minor." Moreover, the Agreement provides special guidelines with respect to unaccompanied minors in some situations—*e.g.*, Paragraph 12A ("The INS will segregate unaccompanied minors from unrelated adults. Where such segregation is not immediately possible, an unaccompanied minor will not be detained with an unrelated adult for more than 24 hours."), and Paragraph 25 ("Unaccompanied minors arrested or taken into custody by the INS should not be transported by the INS in vehicles with detained adults . . . ."). It would make little sense to write rules making special reference to unaccompanied minors if the parties intended the Agreement as a whole to be applicable only to unaccompanied minors. Finally, the Agreement expressly identifies those minors to whom the class definition would not apply—"an emancipated minor or an individual who has been incarcerated due to a conviction for a criminal offense as an adult" (*see* Agreement ¶ 4)—an exclusion that does not mention accompanied minors. Had the parties to the Agreement intended to exclude accompanied minors from the Agreement, they could have done so explicitly when they set forth the definition of minors who are excluded from the Agreement.

Defendants contend that the definition of a class member should be read narrowly to exclude accompanied minors because Plaintiffs' lawsuit originally challenged "the constitutionality of INS's policies, practices, and regulations regarding the detention and release of *unaccompanied* minors." (*See* Agreement at 3 (emphasis added); *see also* Order re Class Certification [Doc. # 142-1].) This argument is unavailing in light of the fact that a consent decree may benefit individuals who were not victims of a defendant's illegal practices and provide "broader relief than the court could have awarded after a trial." *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*, 478 U.S. 501, 525, 106 S. Ct. 3063, 92 L. Ed. 2d 405 (1986). To the extent that Defendants are arguing that Plaintiffs' original intent in filing the lawsuit should inform the Court's understanding of what the parties meant when they defined the class in their Agreement, Defendants' argument is not sufficiently compelling to outweigh the plain language of the Agreement indicating the parties' intent to make "all minors," without qualification, part of the class.

Because the plain language of the Agreement is clear that accompanied minors are part of the class, the inquiry can end here. Nonetheless, the Court notes that other evidence supports its

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.   **CV 85-4544 DMG (AGRx)**                          Date   July 24, 2015

Title   *Jenny L. Flores, et al. v. Jeh Johnson, et al.*                      Page   6 of 25

interpretation of the Agreement. For example, the regulatory framework in place at the time the parties formed the Agreement further reinforces the Court's conclusion that the Agreement applies to all minors. Defendants' primary argument is that the "preference for release" provision should not be construed to apply to accompanied minors in family residential centers because the procedures and conditions of release, as discussed in Section VI of the Agreement, "clearly contemplate" that the parent or other individual to whom the child would be released would already be present in the interior of the United States. As discussed in greater detail *infra*, however, the Court finds strong evidence to the contrary. Furthermore, just because the Agreement does not explicitly provide for the release of parents and legal guardians or address the rights of adult detainees does not mean that the Agreement does not apply to accompanied minors. To the extent Defendants are asserting that releasing accompanying relatives would have been considered an unusual step at the time the Agreement was formed, the following regulation governing the release of detained minors in a narrower context, which was in place when the parties formed the Agreement and which is still in force, belies Defendants' assertion:

> (i)      Juveniles may be released to a relative (brother, sister, aunt, uncle, or grandparent) not in Service detention who is willing to sponsor a minor and the minor may be released to that relative *notwithstanding that the juvenile has a relative who is in detention.*
> (ii)     If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released *with an accompanying relative* who is in detention.

8 C.F.R. § 212.5(a)(3) (1997) (emphasis added). Given the regulatory context in which the parties formed the Agreement, it is reasonable to infer that the parties contemplated the release of an accompanied minor together with a relative in detention.

Finally, at least one other district court has held, at the preliminary injunction stage, that the Agreement applies to all minors, including accompanied minors, even though it saw the preference for release provision as having limited utility in the context of family detention. *See Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007) ("[T]he *Flores* Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors."). The Court finds the reasoning in *Bunikyte* persuasive on this issue, and Defendants have not offered a reason why this case is distinguishable.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 7 of 25 |

In light of the Agreement's clear and unambiguous language, which is bolstered by the regulatory framework in which the Agreement was formed and Defendants' past practice,[4] the Court finds that the Agreement applies to accompanied minors.

### b. Defendants' No-Release Policy is a Material Breach of the Agreement

Even if the Agreement applies to accompanied minors, Defendants assert that ICE's no-release policy nonetheless complies with the Agreement. Defendants argue that, because separating a child from his or her parent endangers the minor's safety, its policy of detaining an

---

[4] Plaintiffs point out that Defendants' no-release policy unfairly penalizes women who are apprehended with children. According to Plaintiffs, until June 2014, Defendants exercised individualized discretion to release women who were statutorily eligible, such as bona fide asylum seekers, regardless of whether they were apprehended with their children. (*See* Ps' First Set, Exh. 17 (Declaration of Barbara Hines ("Hines Decl.")) ¶ 9; Cambria Decl. ¶ 2.) Furthermore, Defendants, even now, individually assess women apprehended *without* children and nearly all adult males to see whether detention is warranted. (*See* Hines Decl. ¶ 17.) Starting in June 2014, however, Defendants ceased exercising such individualized discretion for women who are apprehended *with* children. (*See* Hines Decl. ¶ 14.)

On May 13, 2015, Defendants lodged a press release announcing a series of changes with respect to the family residential centers. (Defendants' May 13, 2015 Press Release ("May 13, 2015 Press Release") [Doc. # 153-1].) These changes included a policy of reviewing the cases of any families detained beyond 90 days, and every 60 days thereafter, to evaluate whether detention or the designated bond amount continues to be appropriate during the pendency of their immigration case. On July 8, 2015, Defendants announced additional reforms, including "a plan to offer release with an appropriate monetary bond or other condition of release to families at residential centers who are successful in stating a case of credible or reasonable fear of persecution in their home countries." (Defendants' July 8, 2015 Press Release ("July 8, 2015 Press Release") [Doc. # 164-1].)

Defendants contend that these reforms should "affect the content and/or ultimate disposition of the Court's order such that the Court should rule in Defendants' favor on the pending motions." (Defendants' Notice of Objection to Premature Lodging of Amended Proposed Order ("Ds' Objection") [Doc. # 175].) This rather cryptic comment does not clarify Defendants' reasons for filing these press releases with the Court. If Defendants are trying to argue that the intervening reforms render the case moot, then Defendants are incorrect. *See Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014), *cert. denied sub nom. Rosebrock v. Hoffman*, 135 S. Ct. 1893 (2015) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). "A defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *McCormack v. Herzog*, 788 F.3d 1017, 1025 (9th Cir. 2015).

Merely issuing a press release announcing a change in policy from detaining all female-headed families to releasing those who have successfully stated a case of credible or reasonable fear of persecution does not satisfy Defendants' substantial burden of showing that it is "absolutely clear" that the violations of the Agreement could not reasonably be expected to recur. Even assuming Defendant's new policy complies with the Agreement, Defendants could easily revert to the former challenged policy as abruptly as they adopted the new one.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 8 of 25 |
|---|---|---|---|

accompanied minor together with his or her parent, rather than releasing the minor to another individual, falls within the exception set forth in Paragraph 14 of the Agreement, which allows for continued detention "to ensure the minor's safety or that of others."

In their reply, Plaintiffs do not squarely address this argument. Plaintiffs do contend, however, that the Agreement's "preference for release" provision requires ICE to exercise its discretion to release the accompanying mothers, so long as they do not present a danger or flight risk. (*See* Agreement ¶ 14 ("[T]he INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to: a parent . . . .").) If true, Plaintiffs' contention could resolve the issue Defendants identified—of potentially endangering the minor's safety by separating a minor from his or her parent—by releasing rather than detaining the parent and child together if no danger or flight risk is identified.

To determine whether the Agreement requires Defendants to release an accompanying parent, the Court examines the Agreement's text, Defendants' conduct subsequent to the formation of the Agreement, and the regulatory framework at the time the Agreement was formed and as it exists today. It is true that the Agreement does not contain any provision that explicitly addresses adult rights and treatment in detention. But ICE's blanket no-release policy with respect to mothers cannot be reconciled with the Agreement's grant to class members of a right to preferential release to a parent. (*See* Agreement ¶ 14.) Although Defendants argue that the provision could be read to mean a child should be released to a parent only if that parent is already lawfully in the United States, Paragraph 15 clearly contemplates the possible release of a child to an adult who is not lawfully in the United States:

> Before a minor is released from INS custody pursuant to Paragraph 14 above, the custodian must execute an Affidavit of support (Form I-134) and an agreement to . . . notify the INS at least five days prior to the custodian's departing the United States of such departure, whether the departure is voluntary or pursuant to *a grant of voluntary departure or order of deportation* . . . .

(Agreement ¶ 15 (emphasis added).) In light of the contract interpretation principle that a "written contract must be read as a whole and every part interpreted with reference to the whole," *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir. 1989), this provision makes clear that the Agreement does not require that the parent to whom the child is released in Paragraph 14 must already be lawfully in the United States.

Defendants' conduct over the last two decades since the Agreement was signed also clarifies what the parties understood to be the meaning of the preference for release provision.

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |

| | | | |
|---|---|---|---|
| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | | Page 9 of 25 |

*See Crestview Cemetery*, 54 Cal. 2d at 754 (when necessary, a court can look to the subsequent conduct of the parties as evidence of their intent). It is uncontroverted that, prior to June 2014, ICE generally released children and parents upon determining that they were neither a significant flight risk nor a danger to safety. (*See* Cambria Decl. ¶ 2; Ps' First Set, Exh. 11 (Declaration of Carol Ann Donohoe) ¶ 2.) Thus, ICE's conduct subsequent to the formation of the Agreement bolsters Plaintiffs' argument that the preference for release provision requires the release of the accompanying mother along with the child, so long as she does not present a significant flight risk or danger to safety.

Finally, the existing regulatory framework, discussed *supra*, suggests that the parties would have contemplated releasing an accompanying relative. Whereas the regulation provides for the release of an accompanying relative only if no other suitable relative can be found, the Agreement, under the preference for release provision, would presumably release the accompanying parent first. Despite this difference between the regulation and the preference for release provision in the Agreement, the regulation provides contextual support for Plaintiffs' contention that the parties intended to allow for the release of the accompanying parent, so long as the release does not create a flight risk or safety risk.

In light of all the evidence, the Court agrees with Plaintiffs' interpretation of the preference for release provision, described in Paragraph 14 of the Agreement. As such, Defendants must release an accompanying parent as long as doing so would not create a flight risk or a safety risk. Since releasing the parent along with the child in this case would, in most instances, obviate Defendants' concern that releasing the child alone would endanger the child's safety, Defendants' argument that this policy falls within the safety risk exception as a blanket matter is unavailing.[5] Therefore, the Court finds that Defendants' blanket no-release policy with respect to minors accompanied by their mothers is a material breach of the Agreement.

### c. **Defendants' Policy Argument In Favor of Detaining Children**

Defendants make a separate policy argument to justify detaining children who are accompanied by their mothers even though the Agreement requires otherwise. Defendants

---

[5] Neither side directly addresses the possibility that releasing the mother and child together might create a risk to safety of both mother and child, if neither has a place to stay within the United States. The parties also do not address the situation where the mother chooses to stay in the detention facility or has been deemed a flight or safety risk. As a practical matter, Defendants would be justified in detaining both mother and child in that case, but the examples presented in this case typically concern a mother and child who have relatives already residing in the United States who are willing to ensure their safety.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.    **CV 85-4544 DMG (AGRx)**                          Date   July 24, 2015

Title   *Jenny L. Flores, et al. v. Jeh Johnson, et al.*                    Page   10 of 25

contend that release of accompanied children and their parents gives families a strong incentive
to undertake the dangerous journey to this country. Defendants support this argument with the
following observations of Border Patrol officer Kevin W. Oaks:

> [F]amily units apprehended by Border Patrol . . . claimed that a principal motive
> for entering the United States was to take advantage of the "permisos" that the
> United States was granting to family units. The term "permiso" in this context is
> used to refer to a Notice to Appear which permits aliens to depart the Border
> Patrol station without detention. . . .
>
> While this impression [that the U.S. government was planning to stop issuing
> 'permisos' in June or July 2014] was incorrect, it speaks to the understanding of
> the family units that detention, and the ability to simply depart a Border Patrol
> station, factor strongly into their determination on when and whether to cross into
> the United States. . . .
>
> Based on my experience as a Border Patrol Agent, the use of detention has
> historically been effective at deterring aliens (specifically aliens from countries
> other than Mexico) from entering the United States through the South Texas
> region. For example, in 1989 when there was a dramatic increase of Central
> American aliens illegally entering the United States, the former Immigration and
> Naturalization Service detailed staff to South Texas, opened temporary detention
> camps, and instituted a one-day expedited review of asylum applications, which
> dramatically reduced the average daily apprehensions of non-Mexicans along the
> Texas border. Similarly, in 2005 when the RGV Sector was experiencing an
> influx of Brazilian nationals, the implementation of expedited removal with
> detention quickly and significantly reduced the number of Brazilian nationals
> illegally entering the United States.
>
> Consistent with the information contained in paragraphs 26 and 27, Border Patrol
> apprehension statistics demonstrate that, year-over-year, there has been an
> approximate 16% reduction in family units apprehended in the RGV Border
> Patrol Sector. Moreover, from July 10, 2014 until the present, there has been an
> approximate 63% reduction in family units apprehended in the RGV Border
> Patrol Sector as compared to the period between December 1, 2013 to July 9,
> 2014.

(Declaration of Kevin W. Oaks ("Oaks Decl.") ¶¶ 25-29.)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.   **CV 85-4544 DMG (AGRx)**                             Date   July 24, 2015

Title   *Jenny L. Flores, et al. v. Jeh Johnson, et al.*                         Page   11 of 25

Setting to one side the question of whether this policy argument is relevant to interpreting the Agreement, the Court is unconvinced of the persuasive value of the statistical evidence Defendants proffer in support of this argument. Without discounting the value of Oaks' personal observations, the Court finds that the statistical evidence he cites, as presented in his declaration, is insufficient to establish causation between Defendants' current policy of detaining female-headed families in family detention centers and the decline in family units apprehended at the border. Oaks bases his conclusion on evidence that past actions taken by Defendant in 1989 and 2005 resulted in reductions in apprehensions. But even assuming the prior reductions in apprehensions were in fact caused by the actions Defendant took in 1989 and 2005 (which itself is not clearly established), those actions, which consisted of expedited review and removal, are notably different from the policy that is now being contested, of detaining minors accompanied by their mothers in family detention centers for the duration of their asylum proceedings. Thus, the helpfulness of the outcomes of measures taken by Defendants in 1989 and 2005 in assessing the effectiveness of Defendants' current family detention policy is minimal at best.

Moreover, although apprehensions of family units in his sector have declined 63% from an approximately six-month period immediately before the challenged policy took effect, Oaks also mentions that apprehensions of family units had been declining 16% year-over-year for an unspecified period of time. This statistic further calls into question whether and to what extent the decline in apprehensions of family units is attributable to Defendants' recent family detention policy, given that such apprehensions were already on the decline prior to the implementation of the policy in 2014.[6]

In sum, even assuming the dubious proposition that the Court can consider a policy argument to alter the terms of the Parties' Agreement, the Court is not persuaded by the evidence presented in support of Defendants' policy argument.[7]

_____

[6] Further, at the hearing, Defendants mentioned that summer is the "high season" in border crossings. Defendants failed to account for how much of the 63% decline in family unit apprehensions from the prior six-month period could have been attributable to normal seasonal fluctuation. At the very least, Defendants could have provided family unit apprehension statistics by season from prior years so that the statistical significance of the 63% decline could be more readily determined.

[7] In the May 13, 2015 Press Release, ICE announced that, following a Washington, D.C. federal district court's injunction against invoking general deterrence in custody determinations, it "has presently determined that it will discontinue invoking general deterrence as a factor in custody determinations in all cases involving families." [Doc. # 153-1.] This announcement does not clarify, however, whether ICE has decided that it will no longer invoke general deterrence as an argument for amending the Agreement. In the absence of such clarification, the

Case 1:14-cv-00119 Document 87 Filed in TXSD on 03/11/16 Page 50 of 64
Case 2:85-cv-04544-DMG-AGR Document 177 Filed 07/24/15 Page 12 of 25 Page ID
#:2685

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | Page | 12 of 25 |

### 2. "Non-Secure, Licensed Facilities" Provision

Plaintiffs assert that Defendants have materially breached the Agreement because they are obligated, but have failed, to house the children they do *not* release in non-secure facilities that are licensed to care for dependent children. (Mot. to Enforce at 2-3; *see* Ps' First Set, Exh. 23 (Declaration of Carlos Holguín ("Holguín Decl.")) ¶¶ 4-5; Ps' First Set, Exh. 16 ("Affidavit of Adriana Piñon") (confirming that the Karnes Family Residential Center, in Karnes City, Texas, and the T. Don Hutto Residential Center, in Taylor, Texas, are not licensed by the state's Department of Family and Protective Services).)

The Agreement provides the following: "In any case in which the INS does not release a minor pursuant to Paragraph 14, . . . [e]xcept as provided in Paragraphs 12 or 21, such minor shall be placed temporarily in a licensed program . . . ." (Agreement ¶ 19.) A "licensed program" is defined as a "program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children . . . ." (*Id.* ¶ 6.) The Agreement further requires that '[a]ll homes and facilities operated by licensed programs . . . shall be non-secure as required under state law . . . ." (*Id.* ¶ 23.) Thus, according to the language of the Agreement, Defendants must house children who are not released in a non-secure facility that is licensed by an appropriate state agency to care for dependent children.

Defendants argue that the licensing provision cannot be interpreted to apply to family residential centers because (1) these centers did not exist at the time the agreement was formed, and (2) there is no state licensing process available now—nor was there in 1997—for facilities that hold children along with their parents or guardians. Defendants reason backwards. Rather than considering whether the policy Defendants decided to enact in 2014 was contemplated by the parties to the Agreement in 1997, the Court's task is to examine whether Defendants' actions in 2014 satisfy the obligations set forth in the 1997 Agreement. Under the Agreement, Defendants are required to provide children who are not released temporary placement in a licensed program. The fact that the family residential centers cannot be licensed

---

Court proceeds on the assumption that general deterrence continues to be Defendants' primary policy justification for their detention of accompanied minors.

Alternatively, if Defendants mean they are no longer invoking general deterrence as a reason to amend the Agreement as well, this change would only strengthen the Court's finding, discussed *infra*, that no change in factual circumstances warrants modification of the Agreement. The primary, if not *only*, justification that Defendants presented for detaining female-headed families was the supposed deterrent effect that such a measure would have on prospective entrants. If Defendants have indeed abandoned this rationale for family detention, then Defendants have no other basis—at least, none that they have presented to this Court—for detaining female-headed families.

Case 2:85-cv-04544-DMG-AGR Document 177 Filed 07/24/15 Page 13 of 25 Page ID
#:2686
Case 1:14-cv-00119 Document 87 Filed in TXSD on 03/11/16 Page 51 of 64

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|----------|----------------------|------|---------------|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 13 of 25 |
|-------|--------------------------------------------------|------|----------|

by an appropriate state agency simply means that, under the Agreement, class members cannot be housed in these facilities except as permitted by the Agreement.[8]

Furthermore, Defendants contend that even if they are not following the letter of the law, they are following the spirit. Defendants argue that ICE family residential facilities substantially comply with the requirements of the Agreement despite the absence of licensing. *See Jeff D. v. Otter*, 643 F.3d 278, 283-84 (9th Cir. 2011) ("Because consent decrees have many of the attributes of ordinary contracts [and] . . . should be construed basically as contracts, the doctrine of substantial compliance, or substantial performance, may be employed.") (internal citation and quotation marks omitted).

According to Defendants, ICE family residential centers comply with ICE Family Residential Standards (available at http://www.ice.gov/detention-standards/family-residential), which were developed with input from medical, psychological, and educational experts, as well as civil rights organizations. These centers, according to Defendants, afford detainees many amenities, including meals, medical and dental services, recreational opportunities, and education for school-age children.[9]

---

[8] Defendants concede that the logical outcome of applying the licensing provision to family residential centers would be to make it impossible for ICE to house families at the family residential centers. Defendants also contend that it would have to mean separating accompanied children from their parents or legal guardians. Although the Agreement does not mandate that Defendants must release parents or legal guardians in all circumstances, Defendants certainly can and must make individualized determinations about whether releasing the parent is appropriate in a given situation. Defendants can also use the family residential centers as temporary facilities consistent with Paragraph 12A of the Agreement.

[9] Chief of Juvenile and Family Residential Management Unit ("JFRMU") Stephen M. Antokowiak attests to the conditions described below at the Karnes Family Residential Center ("KFRC"), in Karnes, Texas, which opened on July 31, 2014 and has 532 beds, and the South Texas Family Residential Center ("STFRC"), in Dilley, Texas, which opened on December 18, 2014 and has 480 beds. (*See* Declaration of Stephen M. Antkowiak ("Antkowiak Decl.") ¶¶ 5, 18.)

Upon arrival at the KFRC, families are brought into the intake room, where there is seating and a refrigerator stocked with beverages and snacks. (*See* Antkowiak Decl. ¶ 6, Exh. 2 ("Photograph of KFRC Intake Room").) Families may then select their own non-institutional clothing from a clothing storage room or wear the clothing they brought with them. (*See* Antkowiak Decl. ¶ 7, Exh. 2 ("Photograph of KFRC Clothing Storage Room").) For every two KFRC housing suites, each of which contains six beds to accommodate one or more families, there is an indoor day room, which features a flat-screen television, access to telephones, a refrigerator with snacks and beverages, and playpens and toys. (*See* Antkowiak Decl. ¶ 8, Exh. 4 ("Photograph of a KFRC Sleeping Area of Housing Suite"); Antkowiak Decl. ¶ 9, Exh. 5 ("Photograph of a KFRC Day Room").) Meanwhile, a typical STFRC housing unit consists of two bedrooms of four beds each, which can accommodate one or more families. (*See* Antkowiak Decl. ¶ 17, Exh. 16, 17 ("Photographs of STFRC Bedroom Areas of a Housing Unit").) Each housing unit has a family room featuring a sitting area, a flat-screen television, a telephone, and a kitchenette

---

Case 1:14-cv-00119-Document 87 Filed in TXSD on 03/11/16 Page 52 of 64

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 14 of 25 |

With evidence in the form of declarations, Plaintiffs contradict aspects of Defendants' rosy account of the conditions in the centers and contend that they are not acceptable. (*See, e.g.*, Ps' First Set, Exh. 12 ("J_H_M Decl.") ¶¶ 10, 11 ("There are no classes for my children here; we are told they will start the 29th of this month. . . . We are not permitted visits with our family members."); Ps' First Set, Exh. 14 ("M_F_S Decl.") ¶ 9 ("My two sons have both been ill since we arrived in Artesia. They had fever and coughs for about a week, and were also vomiting and diarrhea [sic]. . . . The doctor told me they didn't have medicine for them and that they should just drink water. More recently medicine arrived, and now both are getting better.").

Assuming the conditions are acceptable or even outstanding, however, Defendants cannot be in substantial compliance with the Agreement because the facilities are secure and non-licensed. The purpose of the licensing provision is to provide class members the essential protection of regular and comprehensive oversight by an independent child welfare agency. Defendants agree with Plaintiffs that oversight was the animating concern behind the licensing provision. Defendants respond that the facilities are subject to inspections by the ICE Office of Professional Responsibility's Office of Detention Oversight and an independent compliance inspector. (*See* Declaration of Tae D. Johnson ("Johnson Decl.") ¶ 19.) Furthermore, Defendants have filed a motion to modify the Agreement to allow for Plaintiffs to have oversight regarding compliance. Nonetheless, Defendants' responses do not satisfy the Agreement's unambiguous mandate to place children it does not release in "a program, agency or organization that is licensed by an appropriate State agency to provide residential, group, or foster care services for dependent children." (Agreement ¶ 6.)

---

with a refrigerator that is re-stocked with beverages and snacks twice a day. (*See* Antkowiak Decl. ¶ 18, Exh. 18, 19 ("Photographs of an STFRC Family Room of a Housing Unit").)

The centers also contain open recreational areas for sports and play areas for younger children. (*See* Antkowiak Decl. ¶ 10, Exh. 6, 7 ("Photographs of the KFRC Soccer Field and Play Area"); Antkowiak Decl. ¶ 19, Exh. 20 ("Photograph of STFRC Recreational Areas").) In addition, the centers provide state-licensed teachers to all school-age children, where the classroom ratio is one teacher to 20 students, and both recreational and law library services to residents. (*See* Antkowiak Decl. ¶ 11, Exh. 8 ("Photograph of a KFRC Classroom"); Antkowiak Decl. ¶ 12, Exh. 9 ("Photograph of KFRC's Recreational Library with Play Areas"); Antkowiak Decl. ¶ 20, Exh. 21, 22, 23, 24 ("Photographs of STFRC Classrooms"); Antkowiak Decl. ¶ 22, Exh. 27, 28 ("Photographs of STFRC's Recreational and Law Libraries").) Residents have access to medical, dental, and social services. (*See* Antkowiak Decl. ¶ 13, Exh. 10, 11 ("Photographs of KFRC Dental Examining Rooms"); Antkowiak Decl. ¶ 24, Exh. 32, 33 ("Photographs of STFRC Medical Examining/Treatment Rooms").) Finally, the centers also serve three dietician-approved meals a day. (*See* Antkowiak Decl. ¶ 14, Exh. 12, 13 ("Photographs of KFRC's Salad Bar and Snack Refrigerator"); Antkowiak Decl. ¶ 23, Exh. 29, 30, 31 ("Photographs of STFRC's Dining Room and Food Service").)

| **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | Page | 15 of 25 |
|---|---|---|---|

Moreover, even if the Court disregards the conditions in, and the unlicensed status of, the facilities, the facilities are secure, which violates the Agreement's requirement that "[a]ll homes and facilities operated by licensed programs . . . shall be non-secure as required under state law . . . ." (Agreement ¶ 23.) Plaintiffs proffer evidence showing that ICE's detention facilities are secure.

The Karnes City facility is a large block building, which appeared to have only one entrance. To enter, my colleagues and I were required to deposit our cell phones in a metal locker, exchange our driver's licenses for visitor's badges, pass our personal items through an X-ray machine, and walk through a metal detector. We were then directed to a sally port, which comprised two heavy metal doors with a small room between. We passed through one door, it closed behind us; we were then directed to display our visitor's badges to a guard behind heavy glass; the second door was opened, we walked through, and we then reached the interior of the facility.

The Karnes facility is constructed of concrete block. A staff member stated the facility had been designed to house adult male prisoners. . . . In the central open area I saw neither a direct view nor access to the outside: it was effectively surrounded by the high block walks of the facility itself, denying those inside any means of ingress or egress except via the secure entrance I earlier described. Facility staff stated that children detained at Karnes have never been permitted outside the facility to go to the park, library, museum, or other public places. Children attend school exclusively within the walls of the facility itself. Detainees, including children, are required to participate in a "census" or head-count three times daily.

(Holguín Decl. ¶¶ 4-5.)

Defendants do not dispute that the facilities are secure. Nor have Defendants argued that this provision is not a material term in the Agreement. Plaintiffs present evidence that secure confinement can inflict long-lasting psychological, developmental, and physical harm on children regardless of other conditions. (*See* Ps' First Set, Exh. 24 (Declaration of Luis H. Zayas ("Zayas Decl.")) ¶¶ 1-6.) Plaintiffs also proffer evidence that the children at KFRC specifically "are suffering emotional and other harms as a result of being detained." (*Id.* ¶ 10.)

Because the centers are secure, unlicensed facilities, and the provision is a material term in the Agreement, Defendants cannot be deemed in substantial compliance with the Agreement.

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 16 of 25 |

Thus, Defendants have materially breached the Agreement's requirement that children who are not released be housed in non-secure, licensed facilities.

### 3.   "Custody" Provision

Upon apprehension, class members are taken to a Border Patrol station, where they spend one to several nights in holding cells before they are turned over to the Office of Refugee Resettlement, if unaccompanied, or to ICE for longer-term housing, if accompanied. *See* 6 U.S.C. § 279. Plaintiffs argue that Defendants have materially breached the Agreement by holding recently apprehended children in facilities that do not comply with the following provision:

> Following arrest, the INS shall hold minors in facilities that are safe and sanitary and that are consistent with the INS's concern for the particular vulnerability of minors. Facilities will provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation; . . . .

(Agreement ¶ 12.)

Plaintiffs proffer evidence, in the form of numerous declarations from recent detainees, testifying to conditions that do not meet the "safe and sanitary" standard described in Paragraph 12 of the Agreement. These conditions include extreme cold. Numerous declarants referred to CBP facilities as *hieleras* or "iceboxes" and described being given coverings of aluminum foil that were inadequate to keep them warm. (*See, e.g.*, Ps' First Set, Exh. 18 ("D_V_A Decl.") ¶ 4 ("We were given nothing to keep warm except a cover of aluminum foil"); Ps' First Set, Exh. 44 ("A_F_D Decl.") ¶ 5 ("The very big room was very cold. It was like a 'hielera' (ice box). . . . There were no blankets or mattresses, and they only gave us one aluminum blanket each to keep ourselves warm. It was not enough, and my daughter and I were both very cold."); Ps' First Set, Exh. 45 ("H_M_P Decl.") ¶ 8 ("When I was in the 'Perrera,' I was with 8 moms, with their small babies. We were given a small mattress and an aluminum blanket. . . . It was also super cold in that place . . . .").)

Recent detainees also testified to overcrowding. Children and their mothers were held for one to three days in rooms with 100 or more unrelated adults and children, which forced children to sleep standing up or not at all. (*See, e.g.*, D_V_A Decl. ¶ 4 ("The Border Patrol put us in a cell with 100 other women and children. There were so many of us that only perhaps half of us could lie down."); A_F_D Decl. ¶ 5 ("There were about one hundred and fifty people in the

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 17 of 25 |

room. It was very crowded, and there was no space to even lie down on the floor. . . . My
daughter and I had to sleep standing up.").)

Inadequate nutrition and hygiene were also reported. (*See, e.g.*, D_V_A Decl. ¶ 5 ("The
cell had only two toilets for all of us to use. . . . There was no waste basket in the stalls, so
people had to throw used Kotex and used toilet paper on the floors."); Ps' First Set, Exh. 49
("L_B_S Decl.") ¶ 6 ("In the jail in McAllen . . . [t]he moms slept there in the bathroom, with
their babies in their arms. . . . The immigration officials, when the people asked for something to
drink or to eat they answered that it wasn't their country, it wasn't their house. So they didn't
bring them anything."); Ps' First Set, Exh. 39 ("S_B_D Decl.") ¶ 5 ("We were fed twice, and
both times it was just bread with ham and a juice box.").)

In response, Defendants contend that given the volume of individuals passing through a
Border Patrol station each day as well as the short duration of their stay at a Border Patrol
station, it would be impossible to provide the same level of care at a Border Patrol station as one
would expect at a longer-term facility. Nevertheless, Defendants argue that they have met the
minimal standards set forth in the Agreement. Defendants rely solely on their Hold Rooms and
Short Term Custody Policy and Oaks' declaration to support the proposition that they have met
the appropriate standards.

According to Oaks, after an individual has been brought to a Border Patrol station, the
individual undergoes a preliminary health screening. (*See* Oaks Decl. ¶ 10.) If the individual
displays any symptoms of illness or complains of illness, the individual is either treated by a
contract medical provider at the facility or taken to the appropriate medical facility, such as the
local emergency department. (*Id.* ¶¶ 10, 11.) After the health screening, the detainees are
separated by age and gender, although "every effort is made to keep young children with their
parents." (*Id.* ¶ 12.) Border Patrol policy mandates that each facility be kept "safe, secure, and
clean with sufficient space and the appropriate number of toilets for the occupants it is designed
to accommodate." (*Id.* ¶ 13.) A hold room is typically constructed of "impervious materials that
can be easily cleaned and are hygienic," and "supervisors are required to ensure that each cell is
regularly cleaned and sanitized." (*Id.* ¶ 15.) There are no trash cans in the hold rooms for safety
reasons, as they may be used as a weapon. (*Id.* ¶ 16.) Similarly, the lights are kept on at all
times for security reasons and operational necessity. (*Id.* ¶ 19.) According to Defendants, the
temperature is maintained at a "comfortable temperature," although "those who are not
accustomed to air conditioning at times find it cooler than they are accustomed to." (*Id.* ¶ 20.)
Defendants also explain that the use of mylar blankets is necessary in order to provide cost-
effective, sanitary bedding that does not require routine laundering or transmit communicable
diseases such as lice or scabies. (*Id.* ¶ 21.)

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |
|---|---|---|

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |

| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | Page | 18 of 25 |

The testimony of one Border Patrol official regarding CBP's policies is insufficient to outweigh the evidence presented by Plaintiffs of the widespread and deplorable conditions in the holding cells of the Border Patrol stations. It is true that the Agreement holds Defendants to a lower standard—"safe and sanitary"—with respect to the temporary holding cells. But Defendants have wholly failed to meet even that minimal standard. With respect to the overcrowded and unhygienic conditions of the holding cells, all that Defendants have done is point to their own policies requiring sufficient space, an appropriate number of toilets, and regular cleaning and sanitizing. The mere existence of those policies tells the Court nothing about whether those policies are actually implemented, and the current record shows quite clearly that they were not. Furthermore, with respect to the temperature of the cells, the provision of mylar coverings, the absence of trash cans, and the policy of keeping the lights on at all times, Defendants have only confirmed the veracity of Plaintiffs' testimony in the course of attempting to justify these conditions. Finally, Defendants have said nothing to contradict Plaintiffs' accounts of inadequate nutrition, nor to offer impossibility or similar doctrines as a defense to the apparent contractual violation.

In light of the voluminous evidence that Plaintiffs have presented of the egregious conditions of the holding cells, the Court finds that Defendants have materially breached the Agreement's term that Defendants provide "safe and sanitary" holding cells for class members while they are in temporary custody.

### III.
### MOTION TO AMEND

Because the Court has found Defendants in material breach of the Agreement in the respects described *supra*, Defendants move to modify the Agreement pursuant to Fed. R. Civ. P. 60(b)(5) and (6).

Defendants seek to modify the Agreement in four ways. First, Defendants seek to eliminate or amend portions of the Agreement that have been superseded by, or are inconsistent with, the HSA and the TVPRA. Defendants ask that the Agreement reflect the changed responsibilities of DHS and HHS, and the abolishment of the INS, following the HSA and the TVPRA. In particular, Defendants seek to amend Section VI of the Agreement relating to the "General Policy Favoring Release," which provides:

Where the INS determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or immigration court, or to

| CV-90 | **CIVIL MINUTES—GENERAL** | Initials of Deputy Clerk KT |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **CV 85-4544 DMG (AGRx)** | Date | July 24, 2015 |
|---|---|---|---|

| Title | ***Jenny L. Flores, et al. v. Jeh Johnson, et al.*** | Page | 19 of 25 |

---

ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay, in the following order of preference, to: A. a parent; B. a legal guardian; C. an adult relative (brother, sister, aunt, uncle, or grandparent) . . . .

(Agreement ¶ 14.) Defendants argue that "significant portions of this paragraph have been substantially superseded by the TVPRA," and to the extent the Agreement is inconsistent with the statute it should be modified.

Second, Defendants would like clarification that the preference for release of alien minors to a parent, legal guardian, or adult relative, does not apply to minors who arrive in the United States accompanied by a parent or legal guardian. Defendants argue that, if the provision is enforced as written, ICE would be required to separate families if it wishes to detain an adult alien accompanied by a child. This outcome would negatively impact ICE's ability to exercise its discretion to detain individuals as necessary and as it is authorized to do under the INA. The enforcement of the provision would also hamper Defendants' ability to operate the family residential facilities, which in turn would deprive Defendants of a tool in sending a message to families that they cannot illegally cross the border.

Third, Defendants would like to make clear that the state licensing requirement for housing minors does not apply to family residential facilities. Defendants reason that, because state licensing requirements cannot be applied to the facilities, the licensing requirement should be eliminated. Defendants have instead proposed that ICE be bound by the requirements in Attachment 1 with respect to the conditions at these facilities, as well as independent monitoring and reporting requirements to ensure compliance.

Fourth, Defendants seek to amend ongoing reporting requirements to eliminate the reporting requirements that applied to the implementation of the original Agreement in 1997 and to add reporting requirements related to the inspection of family residential facilities.

## A. **Legal Standard**

A court may, on "motion and just terms," "relieve a party or its legal representative from a final judgment, order, or proceeding" if "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5); *see Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383, 112 S. Ct. 748, 116 L. Ed. 2d 867 (1992) ("Rule 60(b)(5) provides that a party may obtain relief from a court order when it is no longer equitable that the judgment should have prospective application, not

---

Case 1:14-cv-00119   Document 87   Filed in TXSD on 03/11/16   Page 58 of 64

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 20 of 25 |

when it is no longer convenient to live with the terms of a consent decree.") (internal quotation marks omitted).

"[The] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Id.* "A party seeking modification of a consent decree may meet its initial burden by showing either a significant change either in factual conditions or in law." *Id.* The change in the law must be so significant that complying with both statute and a prior agreement would be "impermissible." *Miller v. French*, 530 U.S. 327, 347-48, 120 S. Ct. 2246, 147 L. Ed. 2d 326 (2000) (internal quotation marks omitted). Modification of a consent decree may also be appropriate when changed factual conditions make compliance with the decree "substantially more onerous," "unworkable because of unforeseen obstacles," or "when enforcement . . . without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 383.

A court may also "relieve a party or its legal representative from a final judgment, order, or proceeding" for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). "Rule 60(b)(6) has been used sparingly as an equitable remedy to prevent manifest injustice." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). "The rule is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *Id.* (citing, as an example, an instance where the rule was used to set aside a default judgment in a denaturalization proceeding because the petitioner had been ill, incarcerated, and without counsel for the four years following the judgment).

## B. Discussion

Defendants assert that two changes—one in the law and the other in factual conditions—justify modification of the Agreement.

### 1. There Has Been No Change in Law Warranting Modification

First, with respect to changes in the law, Defendants contend that the Agreement applied only to the U.S. Department of Justice ("DOJ") and the legacy U.S. Immigration and Nationality Service ("INS"). The Homeland Security Act of 2002 ("HSA") abolished the latter agency and transferred several of its functions related to the detention, transportation, and removal of minors to the newly formed DHS and its components, including CBP and ICE.[10] Plaintiffs argue that

---

[10] Defendants mention that HSA transferred INS's functions with respect to unaccompanied minors to Health and Human Services ("HHS"), Office of Refugee Resettlement. *See* 6 U.S.C. §§ 279, 552. The William

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page 21 of 25 |

there are no actual conflicts between the Agreement and subsequent legislation. In fact, under
HSA § 1512, *codified at* 6 U.S.C. § 552, Congress, in the following provisions, directed that ICE
should remain bound by agreements existing before the enactment of the HSA:

> (a)(1) Completed administrative actions of an agency *shall not be affected by the
> enactment of this Act* or the transfer of such agency to the Department, but shall
> continue in effect according to their terms . . . .
> (2) For purposes of paragraph (1), the term "completed administrative action"
> includes . . . *agreements*, [and] *contracts* . . . .
> (c) PENDING CIVIL ACTIONS.—Subject to the authority of the Secretary
> under this Act, pending civil actions shall continue notwithstanding the enactment
> of this Act or the transfer of an agency to the Department, and in such civil
> actions, . . . *judgments [shall be] enforced in the same manner and with the same
> effect as if such enactment or transfer had not occurred.*

*Id.* (emphasis added).

Furthermore, Defendants have proffered no evidence that they have experienced any
difficulty implementing the Agreement with respect to unaccompanied children and children
apprehended with their fathers in the 13 years since the HSA was passed. In light of the HSA's
savings clause and Defendants' practice with respect to minors for the last 13 years since the
enactment of the HSA, Defendants' argument that the change in the law created by the HSA
compels modification of the Agreement falls flat.

Defendants also allege that a second change in the law, the William Wilberforce
Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, §
235 (codified in principal part at 8 U.S.C. § 1232), conflicts with the Agreement and is reason to
modify the Agreement. The TVPRA requires CBP to determine whether the child is a national
or habitual resident of a country contiguous to the United States, and if so, to screen the child to
see if she is a victim of trafficking, fears return because of a credible fear of persecution, or is
otherwise unable to consent to return. 8 U.S.C. § 1232(a)(2)(A). If none of those factors are
present, the child is offered an opportunity to withdraw his application for admission to the
United States and return to his country. 8 U.S.C. § 1232(a)(2)(B). When the necessary

---

Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), Pub. L. No. 110-457, § 235
(codified in principal part at 8 U.S.C. § 1232), also directed DHS to develop policies and procedures to ensure that
unaccompanied minors are safely repatriated to their country of nationality or of last habitual residence. Because
this action concerns Defendants' policy regarding minors who are accompanied by their mothers, these changes with
respect to unaccompanied minors do not appear relevant to the Court's analysis.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | | Page    22 of 25 |

---

screening determination cannot be made within 48 hours of the child's apprehension, or the child does not or cannot voluntarily withdraw her application for admission, or the child is from a non-contiguous country, the child is transferred to HHS within 72 hours of determining that the child is an unaccompanied minor and may be placed in removal proceedings before an immigration judge. 8 U.S.C. §§ 1232(a)(4), (a)(5)(D), (b)(3). HHS must then place the child "in the least restrictive setting that is in the best interest of the child," taking into consideration "danger to self, danger to the community, and risk of flight." 8 U.S.C. § 1232(c)(2). Accompanied minors do not fall under the provisions of the TVPRA. *See* 6 U.S.C. § 279(g)(2); 8 U.S.C. § 1232.

Defendants argue that because CBP, under the TVPRA, may not release an unaccompanied minor from its custody other than by returning her to her home country if she is from a contiguous country, 8 U.S.C. § 1232(a)(2)(B), or by transferring her to HHS custody within 72 hours of determining that she is an unaccompanied minor, 8 U.S.C. § 1232(b)(3), Defendants cannot comply with (1) Paragraph 14 of the Agreement, which requires release of minors following a certain order of preference; (2) Paragraph 12A of the Agreement, which provides the government up to 3 days to transfer an unaccompanied minor to a licensed program in the same district, and up to 5 days to transfer an unaccompanied minor to a licensed facility outside the area; and (3) Paragraph 21 of the Agreement, which provides that a minor may be transferred to a suitable state or county juvenile detention facility (or secure INS facility) under certain conditions.

Defendants' argument regarding the TVPRA misses the mark since the Agreement's provision controls release *pending removal proceedings* and does not interfere with the grounds for removal itself. Further, the Agreement does not interfere with the TVPRA's requirement that CBP transfer a minor to HHS custody within 72 hours of determining that she is an unaccompanied minor. Once CBP makes the determination that a minor is unaccompanied and transfers her to HHS custody, it is then HHS's responsibility to comply with the provisions cited *supra*. Defendants have not demonstrated that HHS has had any difficulty complying with the Agreement's provisions.

Moreover, Plaintiffs have pointed to provisions in the TVPRA that are consistent with the Agreement's preference for release provision, such as the TVPRA's requirement that CBP find "[s]afe and secure placements" for children "in the least restrictive setting that is in the best interests of the child"—typically, "a suitable family member." 8 U.S.C. § 1235(c)(2). The same argument can be made that, similar to the Agreement's non-secure facilities provision, the TVPRA also mandates that "[a] child shall not be placed in a secure facility absent a determination that the child poses a danger to self or others or has been charged with having committed a criminal offense." *Id.*

---

| CV-90 | CIVIL MINUTES—GENERAL | Initials of Deputy Clerk KT |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date July 24, 2015 |
|---|---|---|

| Title *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page   23 of 25 |
|---|---|

Finally, the TVPRA is simply inapplicable to accompanied children. The fact that the TVPRA requires HHS to decide whether unaccompanied children should be released or housed in secure facilities has little relevance to whether ICE is unable to do the same with accompanied children.

Accordingly, Defendants have not met their burden of showing that a significant change in the law, such that complying with the Agreement would be impermissible, has occurred, thus requiring modification of the Agreement. *See Miller*, 530 U.S. at 347-48.

## 2.    There is No Change in Factual Circumstances Warranting Modification

With respect to changed factual conditions, Defendants note that, unlike in 1993, when an influx of approximately 8,500 children was considered a "serious" problem, *Reno v. Flores*, 507 U.S. 292, 295 (1993), the number of unaccompanied and accompanied children has increased. In fiscal year 2014, the number of accompanied children apprehended was 38,845 and the number of unaccompanied minors apprehended reached 68,541.    (Mot. to Amend at 5.) Defendants contend that the surge is due to the mistaken belief that the release of detained individuals with a Notice to Appear is equivalent to a *permiso*, allowing them to stay in the United States. Defendants also appear to assert not only that the Agreement caused the surge but also that their female-headed family detention policy has deterred others who would have come. Defendants are effectively proposing that the Court unilaterally modify the Agreement because enforcement of the Agreement without modification would be detrimental to the public interest. *See Rufo*, 502 U.S. at 383.

The Court agrees that what Defendants describe is a serious problem, even though it appears the problem has abated somewhat. With respect to whether the Agreement's provisions caused the surge, Defendants do not satisfactorily explain why the Agreement, after being in effect since 1997, should only now encourage others to enter the United States without authorization.    Nor do Defendants proffer *any* competent evidence that ICE's detention of a subset of class members in secure, unlicensed facilities has deterred or will deter others from attempting to enter the United States. As discussed *supra*, the Court has considered in detail the evidence Defendants presented of the deterrent effect of the detention policy and finds the evidence distinctly lacking in scientific rigor. It is astonishing that Defendants have enacted a policy requiring such expensive infrastructure without more evidence to show that it would be compliant with an Agreement that has been in effect for nearly 20 years or effective at achieving

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544 DMG (AGRx) | Date | July 24, 2015 |
|---|---|---|---|

| Title | *Jenny L. Flores, et al. v. Jeh Johnson, et al.* | Page | 24 of 25 |

---

what Defendants hoped it would accomplish.[11]  It is even more shocking that after nearly *two decades* Defendants have not implemented appropriate regulations to deal with this complicated area of immigration law.  In light of the evidence, or lack thereof, the Court finds that Defendants have failed to meet their burden of showing that a change in factual circumstances requires modification of the Agreement.

## IV.
## CONCLUSION

Based on the foregoing, the Court finds that Defendants are in breach of the Agreement and **GRANTS** Plaintiffs' motion to enforce the Agreement.  Defendants' motion to amend the Agreement is **DENIED**.  Defendants are hereby ordered to show cause why the following remedies should not be implemented within 90 days.

1.  As required by Paragraph 18 of the Agreement, Defendants, upon taking an accompanied class member into custody, shall make and record prompt and continuous efforts toward family reunification and the release of the minor pursuant to Paragraph 14 of the Agreement.

2.  Unless otherwise required by the Agreement, Defendants shall comply with Paragraph 14A of the Agreement by releasing class members without unnecessary delay in first order of preference to a parent, including a parent who either was apprehended with a class member or presented herself or himself with a class member.  Class members not released pursuant to Paragraph 14 of the Agreement will be processed in accordance with the Agreement, including, as applicable, Paragraphs 6, 9, 21, 22, and 23.

3.  Accompanied class members shall not be detained by Defendants in unlicensed or secure facilities that do not meet the requirements of Paragraph 6 of the Settlement, or

---

[11] Even were there such evidence that Defendants' modifications would act as a successful deterrent, Plaintiffs contend that deterrence is not a lawful criterion for denying release.  *See R.I.L.R. v. Johson*, No. 15-0011, Opinion ECF No. 33, at 34-35 (D.D.C. Feb. 20, 2015) ("The justifications for detention previously contemplated by the Court relate wholly to characteristics inherent in the alien himself or in the category of aliens *being* detained— that is, the Court countenanced detention . . . on the basis of *those aliens'* risk of flight or danger to the community . . . .  In discussing civil commitment more broadly, the Court has declared . . . 'general deterrence' justifications impermissible.") (internal citation omitted) (emphasis in original).  Because Defendants have failed to present any evidence that the policy they have implemented either causes or addresses the recent change in factual circumstances, the Court need not rule on the issue of whether deterrence is a lawful criterion for denying release.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

Case No.  **CV 85-4544 DMG (AGRx)**                    Date  July 24, 2015

Title  *Jenny L. Flores, et al. v. Jeh Johnson, et al.*                    Page  25 of 25

---

in appropriate cases, as set forth in the Agreement, in facilities that do not meet the
requirements of Paragraphs 12A, 21, and 23. Defendants shall not selectively apply
the "influx" provision of Paragraph 12C of the Agreement to house class members
apprehended with a parent in facilities that do not comply with the Agreement.

4.  To comply with Paragraph 14A of the Agreement and as contemplated in Paragraph
15, a class member's accompanying parent shall be released with the class member in
a non-discriminatory manner in accordance with applicable laws and regulations
unless after an individualized custody determination the parent is determined to pose
a significant flight risk, or a threat to others or the national security, and the flight risk
or threat cannot be mitigated by an appropriate bond or conditions of release.

5.  In consultation with Plaintiffs, Defendants shall propose standards, and procedures
for monitoring compliance with such standards, for detaining class members in
facilities that are safe and sanitary, consistent with concern for the particular
vulnerability of minors, and consistent with Paragraph 12 of the Agreement,
including access to adequate drinking water and food, toilets and sinks, medical
assistance if the minor is in need of emergency services, temperature control,
ventilation, adequate supervision to protect minors from others, and contact with
family members who were arrested with the minor. Defendants shall file such
proposed standards within 90 days of the date of this Order. Plaintiffs shall file
objections thereto, if any, 14 days thereafter.

6.  Defendants shall monitor compliance with the Agreement and this Order and shall
provide Class Counsel on a monthly basis statistical information collected pursuant to
Paragraph 28A of the Agreement.

Defendants shall file a response to the OSC by August 3, 2015. Plaintiffs shall file a response
thereafter by August 10, 2015, after which the matter will stand submitted.

**IT IS SO ORDERED.**

---

I, Lila Dubert, declare that the defense was served with the attached pleadings by first class mail on 03.09.2016

Lila Dubert